UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DIRECT INVESTMENT PARTNERS AG,

                 Plaintiff,

    -against-

CERBERUS GLOBAL INVESTMENTS, LLC,
CERBERUS CAPITAL MANAGEMENT, L.P.,
CERBERUS PARTNERS, L.P., and CERBERUS
GLOBAL INVESTMENT ADVISORS, LLC,

              Defendants.

07 Civ. 3310 (LLS) (RLE)

FILED VIA ECF

---

**MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS**

---

**LOWENSTEIN SANDLER PC**
Attorneys at Law
65 Livingston Avenue
Roseland, New Jersey 07068
973.597.2500
Attorneys for Defendants Cerberus Global
Investments, LLC, Cerberus Capital
Management, L.P., Cerberus Partners, L.P., and
Cerberus Global Investment Advisors, LLC

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ................................................................................................................. 2

STANDARD OF REVIEW ................................................................................................. 10

ARGUMENT ...................................................................................................................... 12

    I.      BECAUSE THE PARTIES INTENDED NOT TO BE BOUND
          UNTIL A FORMAL, WRITTEN CONTRACT WAS EXECUTED,
          PLAINTIFF'S CONTRACT-BASED CLAIMS ARE BARRED ....................... 12

    II.     NEW YORK'S STATUTE OF FRAUDS PRECLUDES ALL OF
          PLAINTIFF'S CLAIMS OTHER THAN FRAUD .............................................. 18

          A.      Plaintiff's Contract Claims Are Barred By New York's General
                  Obligations Law .......................................................................................... 18

          B.      Plaintiff Has Failed to State a Claim for Promissory or
                  Equitable Estoppel ...................................................................................... 26

          C.      Plaintiff's "Fall-Back" Claims for Unjust Enrichment and
                  Quantum Meruit are also Barred .................................................................. 27

    III.    PLAINTIFF'S FRAUD CLAIM IS INSUFFICIENT AS A MATTER
          OF LAW ............................................................................................................. 29

CONCLUSION .................................................................................................................... 31

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page**

*ABC Trading Co., Ltd. v. Westinghouse Elec. Supply Co.*,
382 F. Supp. 600 (E.D.N.Y. 1974) ...................................................................15

*AG Ltd. v. Liquid Realty Partners, LLC*,
448 F. Supp. 2d 583 (S.D.N.Y. 2006).................................................20, 22, 24

*Allied Sheet Metal Works, Inc. v. Saunders*,
206 A.D.2d 166, 619 N.Y.S.2d 260 (1st Dep't 1994) .......................................22

*Anostario v. Vicinanzo*,
59 N.Y.2d 662, 450 N.E.2d 215, 463 N.Y.S.2d 409 (1983).............................25

*Bell Atlantic Corp. v. Twombly*,
127 S.Ct. 1955 (2007)................................................................................10, 11

*Belotz v. Jefferies & Co.*,
1999 WL 587916, 5 (S.D.N.Y. Aug. 4, 1999), *aff'd*, 213 F.3d 625 (2d Cir. 2000).....27, 28

*Best W. Int'l, Inc. v. CSI Int'l Corp.*,
No. 94 Civ. 0360 (LMM), 1994 WL 465905 (S.D.N.Y. Aug. 23, 1994) .........................29

*Bibeault v. Advanced Health Corp.*,
No. 97 Civ. 9026, 1999 WL 301691 (S.D.N.Y. May 12, 1999)........................27

*Bronner v. Park Place Entm't Corp.*,
137 F. Supp. 2d 306 (S.D.N.Y. 2001)................................................21, 24, 26

*Cal Distrib. Inc. v. Cadbury Schweppes Am. Beverages, Inc.*,
No. 06 Civ. 0496 RMB JCF, 2007 WL 54534 (S.D.N.Y. Jan. 5, 2007) ....................29, 31

*Chromalloy Am. Corp. v. Universal Housing Sys. of Am.*,
495 F. Supp. 544 (S.D.N.Y. 1980), *aff'd mem.*, 697 F.2d 289 (2d Cir. 1982)..................15

*Conley v. Gibson*,
355 U.S. 41 (1957)............................................................................................10

*Crabtree v. Elizabeth Arden Sales Corp.*,
305 N.Y. 48, 110 N.E.2d 551 (1953).................................................................22

*deCiutiis v. Nynex Corp.*,
No. 95 Civ. 9745(PKL), 1996 WL 512150 (S.D.N.Y. Sept. 9, 1996)...............28

*DeRosis v. Kaufman,*
219 A.D.2d 376, 641 N.Y.S.2d 831 (1st Dep't 1996) ......................................................22

*Four Star Corp. v. Nynex Corp.,*
183 F.R.D. 91 (S.D.N.Y. 1997) ...............................................................................18, 26

*Freedman v. Chem. Constr. Corp.,*
43 N.Y.2d 260, 372 N.E.2d 12, 401 N.Y.S.2d 176 (1977)..........................................19, 20

*GSGSB, Inc. v. New York Yankees,*
862 F. Supp. 1160 (S.D.N.Y. 1994)....................................................................... 12, 14-17

*Greystone P'ships Group, Inc. v. Koninklijke Luchtvaart Maatschappij N.V.,*
815 F. Supp. 745 (S.D.N.Y. 1993)..............................................................................13, 19

*Howard-Sloan Legal Search, Inc. v. Todtman, Young, Tunick, Nachamie, Hendler & Spizz, P.C.,*
193 A.D.2d 404, 597 N.Y.S.2d 64 (1st Dep't 1993)........................................................20

*Huntington Dental & Med. Co., Inc. v. Minn. Mining & Mfg. Co.,*
No. 95 Civ. 10959 (JFK), 1998 WL 60954 (S.D.N.Y. Feb. 13, 1998)..............................28

*Intercontinental Planning, Ltd. v. Daystrom, Inc.,*
24 N.Y.2d 372, 248 N.E.2d 576, 300 N.Y.S.2d 817 (1969)........................................12, 19

*Karlin v. Avis,*
457 F.2d 57 (2d Cir. 1972)...........................................................................................23

*Klein v. Smigel,*
44 A.D.2d 248, 354 N.Y.S.2d 117 (1st Dep't 1974)........................................................22

*Kule Res., Ltd. v. Reliance  Group, Inc.,*
49 N.Y.2d 587, 404 N.E.2d 734, 427 N.Y.S.2d 612 (1980)............................................24

*Lauter v. W & J Sloane, Inc.,*
417 F. Supp. 252 (S.D.N.Y. 1976)...............................................................................22

*Longo v. Shore & Reich, Ltd.,*
25 F.3d 94 (2d Cir. 1994) ..........................................................................................12

*Merex A.G. v. Fairchild Weston Sys., Inc.,*
810 F. Supp. 1356 (S.D.N.Y. 1993), *aff'd,* 29 F.3d 821 (2d Cir. 1994) ....................24, 26

*Messner Vetere Berger McNamee Schmetterer Euro RSCG Inc. v. Aegis Group PLC,*
93 N.Y.2d 229, 711 N.E.2d 953, 689 N.Y.S.2d 674 (1999)..............................................25

*Minichiello v. Royal Business Funds Corp.*,
    18 N.Y.2d 521, 223 N.E.2d 793, 277 N.Y.S.2d 268 (1966)..............................................28

*Mobile Data Shred, Inc. v. United Bank of Switzerland*,
    No. 99 Civ. 10315 SAS, 2000 WL 351516 (S.D.N.Y. April 5, 2000) ....................... 25-27

*Philo Smith & Co. v. USLIFE Corp.*,
    420 F. Supp. 1266 (S.D.N.Y. 1976)...............................................................................28

*Philo Smith & Co. v. USLIFE Corp.*,
    554 F.2d 34 (2d Cir. 1977)......................................................................................26, 27

*Prescient Acquisition Group, v. MJ Publ'g Trust*,
    No. 5 Civ. 6298 (PKC), 2006 WL 2136293 (S.D.N.Y. July 31, 2006)............................28

*R.G. Group, Inc. v. The Horn & Hardart Co.*,
    751 F.2d 69 (2d Cir. 1984)................................................................................ 12-14, 16

*Reprosystem, B.V. v. SCM Corp.*,
    727 F.2d 257 (2d Cir. 1984).....................................................................................16, 17

*Rosbach v. Indus. Trading Co., Inc.*,
    81 F. Supp. 2d 522 (S.D.N.Y. 2000).........................................................................21, 28

*Rosenblatt v. Christie, Manson & Woods, Ltd.*,
    No. 04 Civ. 4205(PKC), 2005 WL 2649027 (S.D.N.Y. Oct. 14, 2005)...............18, 29, 30

*Scheck v. Francis*,
    26 N.Y.2d 466, 311 N.Y.S.2d 841, 260 N.E.2d 493 (1970)............................................12

*Schlaifer Nance & Co. v. Estate of Andy Warhol*,
    119 F.3d 91 (2d Cir. 1997).............................................................................................30

*Solin Lee Chu v. Ling Sun Chu*,
    9 A.D.2d 888, 193 N.Y.S.2d 859 (1st Dep't 1959)...........................................................23

*Stephen Pevner, Inc. v. Ensler*,
    309 A.D.2d 722, 766 N.Y.S.2d 183 (1st Dep't 2003).......................................................23

*Sugerman v. MCY Music World, Inc.*,
    158 F. Supp. 2d 316 (S.D.N.Y. 2001)................................................................. 11, 26-28

*The Horn & Hardart Co. v. The Pillsbury Co.*,
    888 F.2d 8 (2d Cir. 1988) .........................................................................................22-24

*Whitman Heffernan Rhein & Co. v. Griffin Co.*,
    163 A.D.2d 86, 557 N.Y.S.2d 342 (1st Dep't 1990) .........................................................21

*Winston v. Mediafare Entm't Corp.*,
    777 F.2d 78 (2d Cir. 1986).......................................................................... 12-14, 16

*Yak v. Bank Brussels Lambert, BBL (USA) Holdings, Inc.*,
    252 F.3d 127 (2d Cir. 2001)..........................................................................................11

*Zeising v. Kelly*,
    152 F. Supp. 2d 335 (S.D.N.Y. 2001)..............................................................11, 21, 29

## Statutes

Fed. R. Civ. P. 9(b) ...............................................................................................1, 2, 31

Fed. R. Civ. P. 12(b)(6)......................................................................................1, 2, 10, 11

N.Y. Gen. Oblig. Law § 5-701(a)(10) (McKinney 2002)..................................... *passim*

## Other Authorities

1 A. Corbin, CORBIN ON CONTRACTS § 30 (1963).......................................................13

1949 Report of N.Y. Law Rev. Comm. [N.Y. Legis. Doc., 1949, No. 65 (G)]............................19

5 C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 1216 (3d ed. 2004) ................11

Defendants Cerberus Global Investments, LLC ("Cerberus Global"), Cerberus Capital Management, L.P. ("Cerberus Capital"), Cerberus Partners, L.P. ("Cerberus Partners"), and Cerberus Global Investment Advisors, LLC ("Cerberus Advisors") (collectively, "Defendants" or "Cerberus") respectfully submit this memorandum of law in support of their motion to dismiss the Complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Plaintiff claims it is entitled to payment from Defendants of a "finder's fee" in the amount of over $300 million for making a single introduction that allegedly led to Defendants' successful acquisition and subsequent initial public offering of a financially-troubled European company. Although one would expect Plaintiff to present a signed, heavily-negotiated contract clearly setting forth its entitlement to such a large fee, one would be wrong. Plaintiff's claim rests on nothing more than an unsubstantiated oral agreement. Since the law of New York does not authorize such a claim -- indeed, New York's clearly-expressed policy is to protect parties like Defendants from such undocumented demands for compensation by alleged intermediaries -- Plaintiff has failed to state any valid cause of action against Defendants.

*First*, the exhibits attached to Plaintiff's Complaint, when considered in light of the allegations made therein, establish as a matter of law that no contract was ever formed between Plaintiff and Defendants. Quite the contrary, during negotiations with Plaintiff, Cerberus expressly reserved the right not to be bound until the parties signed a mutually-agreeable, formal, written contract. Under New York law, where a party insists on having a signed, written agreement in place before being bound, there is no valid contract between the parties until they execute such a document -- regardless of whether the parties reached an oral agreement on terms. As Plaintiff concedes, although the parties here exchanged drafts of a formal contract, they never signed one. Consequently, Plaintiff's contract-based claims fail as a matter of law.

*Second*, even assuming an oral contract was formed, it is unenforceable by virtue of New York's Statute of Frauds. Section 5-701(a)(10) of the General Obligations Law prohibits the enforcement of contracts like the one alleged here unless they are in writing and signed by the party to be charged. Again, since Plaintiff concedes that Cerberus never signed such a contract, all claims based on its alleged agreement with Defendants are barred. Plaintiff's attempt to circumvent the Statute of Frauds by piecing together an agreement from writings that flatly contradict one another, and relying on the "partial performance" doctrine, is without merit.

*Third*, the Statute of Frauds also bars Plaintiff's claims for promissory and equitable estoppel, quantum meruit and unjust enrichment. New York law does not permit plaintiffs to circumvent the General Obligations Law's bar against the enforcement of oral finder's fee agreements through the simple expedient of asserting such quasi- or implied contract claims. Accordingly, the aforementioned claims are deficient on their face.

*Finally*, Plaintiff has failed to state a valid claim for fraud. Plaintiff's fraud-based allegations lack the particularity required by Rule 9(b), are entirely duplicative of its breach of contract claim and fail to sufficiently allege the essential element of reasonable, detrimental reliance. Plaintiff cannot resuscitate its deficient contract claim by dressing it up in the language of fraud. This claim, too, must be dismissed.

For these reasons, as more fully explained below, Defendants' motion should be granted, and the Complaint dismissed in its entirety with prejudice.

## **BACKGROUND**[1]

This is a prototypical "finder's" case, in which Plaintiff has appeared out of the blue to claim a $300 million "finder's fee" under an alleged oral contract as "compensation" for

---

[1]     The facts stated herein are taken from the allegations in and exhibits to Plaintiff's Complaint ("Compl."), which is attached as Exhibit 1 to the Declaration of Thomas E. Redburn, Jr. As is required under Rule 12(b)(6), Defendants assume the truth of these allegations for purposes of this motion only. Indeed, discovery will demonstrate that the vast majority of Plaintiff's allegations are actually false. In particular, the evidence in this case will show beyond doubt that Plaintiff had absolutely nothing to do with Defendants' acquisition of debis AirFinance, B.V.

supposedly facilitating a business transaction he did not even know occurred until after it was consummated.

Plaintiff Direct Investment Partners AG ("Direct" or "Plaintiff") is a Swiss mergers and acquisitions advisory firm operated and controlled by its Chief Executive Officer, Roman Koidl ("Koidl"), an Austrian citizen residing in Switzerland, which purportedly specializes in identifying investment opportunities in Germany, Switzerland and Austria (the "GSA countries"). (Compl. ¶¶ 4-5, 11). Defendants are a number of related investment funds involved in, among other things, corporate restructuring. (*Id.* ¶ 10).

According to the Complaint, Cerberus Global sought Direct's assistance in finding investment opportunities in the GSA countries. Direct contends that in December 2002, Koidl reached an oral agreement with David Teitelbaum ("Teitelbaum"), a Cerberus Managing Director, pursuant to which "Direct agreed to provide for a fee, the contacts, experience, and knowledge base of Direct and Mr. Koidl with regard to investment opportunities in the GSA countries, particularly Germany." (*Id.* ¶ 19). Direct and Koidl supposedly had "specialized experience in identifying non-performing assets, loans and distressed companies" as well as "numerous professional and personal relationships with leaders of industry, banking, and finance in the GSA countries." (*Id.* ¶ 11). Cerberus Global supposedly agreed to pay for this expertise, knowledge base and body of relationships under the alleged oral contract. (*Id.*). In short, Direct was to provide its "know-how" and "know-who" to assist Cerberus in making investments in the GSA countries.

Aside from these general allegations, however, Plaintiff coyly shies away from pleading the specific terms of the alleged contract which Koidl supposedly discussed with Teitelbaum. Instead, Direct proffers a series of unsigned documents as supposed evidence of the parties' contract and its specific terms. Unfortunately for Plaintiff, far from establishing a coherent "agreement," these documents are wildly inconsistent with one another.

*First*, Plaintiff alleges that Teitelbaum set forth the "key commercial terms" in an e-mail sent to Koidl on or about December 26, 2002, which is attached as Exhibit A to the

Complaint (the "December 26, 2002 e-mail").  (*Id*. ¶¶ 21-23 and Ex. A).  This one-page email contains seven numbered paragraphs describing various proposed terms for a "working relationship" between Cerberus and Direct.  However, the document does not purport to be anything close to a recitation of the final terms of the parties' purported agreement.  In fact, it says exactly the opposite.  Numbered paragraphs 5 through 7 -- which address critical terms such as what constitutes an "exclusive" deal entitling Direct to the full fee (as opposed to only 60%), the "mechanism for something to become a Roman Koidl deal," and the definition of "targeted investments" -- refer expressly to a formal, written contract document that will spell out the actual terms.  For example, as to the criteria for an "exclusive" deal, Teitelbaum informed Koidl in the email that he was "not sure how the lawyers will write this up" and that it "may take a bit of work as we otherwise pay people for true exclusives only."  (*Id*., Ex. A).  Moreover, the email's penultimate paragraph expresses a clear intent that the parties would not be bound to any deal until the execution of a formal contract satisfactory to both sides:

> There is a [sic] approx. 10 page contract that will reflect these terms which needs to be modified.  Therefore, this brief email *only captures certain of the more important commercial terms that we discussed but is not a legal obligation for Cerberus or you.*

(*Id*., Ex. A) (emphasis added).  Thus, this email cannot be read as anything other than a springboard for further negotiations over the terms of a formal agreement, with both sides free to withdraw from the transaction prior to signing on the dotted line of a formal contract.  Indeed, Plaintiff himself admits that the December 26, 2002 e-mail "*contemplated* a *future written contract* between the parties, which would be presented by Cerberus's lawyers."  (*Id*. ¶ 23) (emphasis added).

*Second,* Plaintiff alleges that on or about January 25, 2003, Cerberus Global presented Direct with a 19-page draft Consulting Agreement (the "January 2003 Draft"), annexed as Exhibit B to the Complaint, which Cerberus' attorneys prepared.  (*Id*. ¶ 35).  The draft contract attempts to put the terms generally addressed in the December 26, 2002 email into formal, clear and enforceable language, as well as to set forth other material terms of the contract

not addressed at all in Teitelbaum's email.  Further confirming that neither party intended to be bound until a formal contract was executed, the draft contains an integration clause which provides that

> [t]his Agreement constitutes the entire agreement among the parties; it supersedes any prior agreement or understandings among them, oral or written, all of which are hereby canceled.  There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties relating only to the subject matter of this Agreement which are not fully expressed herein.

(*Id.*, Ex. B, ¶ 5.4).  The January 2003 Draft is undated and unsigned by either party.  (*Id.*, Ex. B). Koidl rejected the January 2003 Draft.  (*Id.* ¶ 37).

*Third*, in the wake of its rejection of the Cerberus' proposed contract, Plaintiff alleges that on or about February 10, 2003, Koidl presented Defendants with a revised version of the Consulting Agreement (the "February 2003 Draft"), which is attached as Exhibit C to the Complaint.  (*Id.* ¶ 37).  This version, although dated, is also unsigned by either party, is marked "Draft" and notes that it has been "marked to show amendments from draft dated January 27, 2003."  (*Id.*, Ex. C).  The February 2003 Draft contains an integration clause identical to that contained in the January 2003 Draft.  (*Id.*, Ex. C, ¶ 5.4).

Although Plaintiff attempts in conclusory fashion to minimize the differences between the two drafts, the changes proposed by the February 2003 Draft are actually quite stark. A review of the differences on several material terms illustrates the point:

- *Paragraph 1.1:  Definition of "Exclusive Investment"* -- Under both drafts, to get the full finder's fee, Direct (among many other things) had to provide Cerberus with an "Exclusive Investment."  The January 2003 Draft defines "Exclusive Investment" as one "where no third parties are competing with Cerberus" for the same investment "at the moment of submission of the bid price by Cerberus."  (*Id.*, Ex. B, ¶ 1.1).  By contrast, Direct's February 2003 Draft changes the definition to an investment "where no third parties *are known by the Consultant* [*i.e.*, Direct] to be competing with Cerberus" on price for the same investment.  (*Id.*,

Ex. C, ¶ 1.1). In other words, under Direct's draft, Direct still gets paid in full for a deal on which Cerberus had to compete with a third party on price so long as Direct did not know about the other bidder, whereas no such payment would be forthcoming in the same circumstances under Cerberus' draft. Direct's draft essentially attempts to shift the risk of an unknown third party bidder from Direct to Cerberus.

- *Paragraph 2.1: Proposed Investment* -- Under Cerberus' January 2003 Draft, an investment is treated as a "Proposed Investment" -- *i.e.*, one for which Direct may be eligible for compensation under the contract -- "only if Cerberus becomes aware of such investment exclusively through the Consultant." (*Id.*, Ex. B, ¶ 2.1). In the February 2003 Draft, Direct narrowed this language significantly by imposing on Cerberus a requirement that it "notify the Consultant in writing within one week of receiving the presentation by the Consultant that the relevant investment opportunity was already known to Cerberus." (*Id.*, Ex. C, ¶ 2.1).

- *Paragraph 2.1: Consultant's Ability to Provide Proposed Investments to Third Parties* -- Later in the same paragraph, the January 2003 Draft requires the Consultant to provide investment opportunities exclusively to Cerberus during the term of the agreement, and prohibits the Consultant from submitting any Proposed Investments to third parties "including where such Proposed Investment or Target have been declined by Cerberus, unless authorized in writing by Cerberus." (*Id.*, Ex. B, ¶ 2.1). The differences with the February 2003 Draft could not be more stark. In its version, Direct deleted the written consent requirement and inserted language *expressly authorizing* Direct to submit a Proposed Investment to a third party if Cerberus declines the Proposed Investment. (*Id.*, Ex. C, ¶ 2.1). Similar changes were made in paragraph 2.2(a). (*Id.*, Exs. B, C, ¶ 2.2).

- *Paragraph 3.1: Calculation of the 1.0% Fee* -- Both drafts provide that if Cerberus actually invests in an Exclusive Investment, then Direct would be entitled to a fee equal to 1.0% of the amount actually invested by Cerberus excluding, among other things, "amounts obtained by Leverage." However, the two drafts contain significantly different definitions of "Leverage." Cerberus' draft defines Leverage as "any amounts invested by Cerberus in a

Proposed Investment from the proceeds of loans, borrowings or other indebtedness or credit support obtained from a third party which is not an Affiliate of Cerberus." (*Id.*, Ex. B, ¶ 3.1). Direct added an additional condition to this definition under which amounts borrowed by Cerberus from a third party are not part of Leverage if the lender obtained an equity participation in the Proposed Investment or other share in its profits "in consideration of providing the relevant financing . . . ." (*Id.*, Ex. C, ¶ 3.1). Under circumstances where Cerberus borrows money to invest in a deal but also allows the lender an equity interest, this difference in language between the two drafts would produce drastically different calculations of the amount invested by Cerberus for purposes of determining Direct's fee. The variation could easily reach into the millions of dollars.

- *Paragraph 3.2:  Retainer Fee* -- Cerberus' January 2003 Draft provides that Direct would be entitled to a $12,000 per month retainer fee upon Cerberus' closing of an Exclusive Investment "which has a total value higher than Euro 30,000,000." (*Id.*, Ex. B, ¶ 3.2). This language is virtually identical to paragraph 1 of the December 26, 2002 email. (*Id.*, Ex. A). By contrast, Direct's proposed revision in the February 2003 Draft deletes Cerberus' language and instead requires Cerberus to begin paying the retainer fee on November 1, 2003 "for the duration of Project Phoenix." (*Id.*, Ex. C, ¶ 3.2). Direct's proposed change is nothing short of radical given that Project Phoenix had not closed as of February 2003 and, as Plaintiff later concedes in his Complaint, never closed. (*Id.*, ¶ 100 (admitting that "Project Phoenix in or about March 2004 was awarded to another investor")).

- *Paragraph 3.3:  The Incentive Allocation* -- The two versions of paragraph 3.3 in the competing drafts of the Consulting Agreement are flatly inconsistent. For starters, in Cerberus' version, the Incentive Allocation payable to Direct (equivalent in essence to 20% of amounts realized by Cerberus from all investments under the agreement after achievement by Cerberus of a 20% compounded unlevered internal rate of return) is to be withheld "until such time as the last remaining Investment made pursuant to this Agreement has been liquidated . . . ." (*Id.*, Ex. B, ¶ 3.3(a)). In addition, Cerberus' internal rate of return is to be calculated on the basis

-7-

of all investments it and its affiliates made through Direct, with gains in one investment offset against losses in another.  (*Id.*, Ex. B, ¶ 3.3(b)).  Direct's draft of the agreement, on the other hand, deletes the holdback and calculates Cerberus' return on an investment-by-investment basis -- which is vastly more favorable to Direct.[2]  (*Id.*, Ex. C, ¶¶ 3.3(a), (b)).  Moreover, Direct's draft proposed to insert a definition of "compounded unlevered internal rate of return", but then left the definition blank, leaving one to guess how this provision was supposed to be enforced.  (*Id.*, Ex. C, ¶ 3.3(b) ("The 'compounded unlevered internal rate of return' within the meaning of the preceding sentence shall mean _____.")).

- *Paragraph 3.3(d):  Procedure for Resolving Dispute Over Incentive Fee* -- Under the January 2003 Draft, if the parties get into a dispute over the calculation of the Incentive Fee, then the dispute is submitted to a nationally recognized accounting firm for a determination, which "shall be conclusive and binding" on the parties.  (*Id.*, Ex. B, ¶ 3.3(d)).  In order to protect Cerberus' confidential, proprietary information, Cerberus' draft also expressly prohibits Direct from being allowed access to the "accounting, financial or other material" used in determining the amount, if any, of the Incentive Fee.  (*Id.*).  The February 2003 Draft  substantially weakens these protections by making the accounting firm's determination contestable in the event of "obvious error" -- a term which is undefined -- and by eliminating the restriction on Direct's access to the underlying data.  (*Id.*, Ex. C, ¶ 3.3(d)).

- *Paragraph 3.5:  No Payment Where Cerberus Needs To Hire Another Consultant* -- The January 2003 Draft provides that "[i]t is understood, however, that no Consulting Fee, or Incentive Fee or other amount or fee shall be payable by Cerberus to the Consultant if, in order to achieve the closing of the relevant Proposed Investment (whether it is an Exclusive Investment

---

[2]      To take a simple example, suppose Cerberus made two investments through Direct.  At liquidation, Cerberus realizes a $20 million gain on the first investment and a $20 million loss on the second.  Under Cerberus' proposed paragraph 3.3(b), the gain would be netted against the loss, which would yield a return of $0 to Cerberus and no Incentive Allocation to Direct.  But under Direct's proposed language, the $20 million gain would be considered in isolation for purposes of determining whether Cerberus achieved the requisite rate of return and calculating the Incentive Allocation, which would mean such a fee might be due.

or not), Cerberus needs to hire any other consultant or advisor to carry out the services to be rendered by the Consultant hereunder." (*Id.*, Ex. B, ¶ 3.5). Direct's February 2003 Draft modifies this straightforward exclusion in two ways: (1) by attempting to narrow the types of consultants or advisors whose hiring would trigger the exclusion, and (2) by imposing an obligation on Cerberus to notify Direct of the "perceived default" and allow a ten-day cure period. (*Id.*, Ex. C, ¶ 3.5).

No one can seriously contend that the differences identified above between the two versions of the Consulting Agreement are immaterial. Yet, while at the same time conceding that Defendants never signed the February 2003 Draft (*id.* ¶ 177), Plaintiff asserts without support that this unsigned draft -- to the exclusion of the other two contradictory documents attached to the Complaint -- constitutes an accurate reflection of the parties' alleged oral agreement and a binding contract. (*Id.* ¶¶ 127-132). The documents suggest the opposite -- that the parties never actually reached an agreement on the specific terms of their relationship, which is why no version of the Consulting Agreement was ever signed.

In any event, with full knowledge that it lacked a signed contract, Plaintiff allegedly began efforts to procure an introduction between the Defendants and the Institutional Restructuring Unit ("IRU") of Dresdner Bank AG. (*Id.* ¶¶ 58-89). Although the transaction to which this introduction related (*i.e.*, Project Phoenix) never closed, Plaintiff nevertheless contends that its introduction ultimately led to Defendants' separate acquisition of debis AirFinance, B.V. ("dAF"), and that it is entitled to be paid a 1.0% Fee as well as a 20% Incentive Fee for this transaction. Plaintiff concedes it was never involved in the negotiation or structuring of the dAF transaction. (*Id.* ¶ 116). Indeed, Plaintiff apparently learned of the deal from the public announcements of dAF's (now known as AerCap, B.V.) initial public offering in November 2006. (*See Id.* ¶¶ 122). Upon learning that the deal apparently turned out well for Cerberus, Plaintiff swooped in to demand a piece of the expected profit, filing his Complaint in this Court in April 2007. Plaintiff claims that he is entitled to total compensation in an amount

exceeding $300 million for a deal with which he concedes he had no direct involvement.  (*Id*. ¶¶ 117, 124).

        The Complaint asserts causes of action against Defendants for (a) breach of contract, (b) breach of the implied covenant of good faith and fair dealing, (c) fraud, (d) declaratory judgment, (e) promissory and equitable estoppel, (f) unjust enrichment and (g) quantum meruit.  (*Id*. ¶¶ 127-220).  As explained below, all of these claims are deficient as a matter of law, and should be dismissed.

## <u>STANDARD OF REVIEW</u>

        The Supreme Court recently clarified the standard for determining whether a complaint survives a motion to dismiss under Rule 12(b)(6).  In *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007), the Court effectively abrogated the language from *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), which stated that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Twombly*, 127 S.Ct. at 1968 (quoting *Conley*).  The Court explained that under a literal reading of this language "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery."  *Id*. at 1968 (alteration in original).  Because such a result sets the 12(b)(6) bar far too low, the Court held that *Conley*'s "phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard:  *once a claim has been stated adequately*, it may be supported by showing any set of facts consistent with the allegations in the complaint."  *Id*. at 1969 (emphasis added).

        In order to adequately state a claim, however, the pleader must assert *facts* which support each of the legal theories advanced in the complaint.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]"  *Id*. at 1964-65

(citations omitted) (some alterations in original) (discussing Rule 8(a)(2)'s requirement for a "short and plain statement of the claim showing that the pleader is entitled to relief"). The "'pleading must contain something more … than … a statement of facts that merely creates a suspicion [of] a legally cognizable right of action[.]'" *Id.* at 1965 (quoting 5 C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 1216, pp. 235-36 (3d ed. 2004)) (alteration and ellipses in original). Rather, the pleading must contain factual allegations which, assuming the truth of those allegations, are "enough to raise a right to relief *above the speculative level*[.]" *Id.* (emphasis added).

In considering a motion to dismiss, the Court may consider documents integral to the complaint without converting the motion to one for summary judgment. Specifically, the Court "may consider 'any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference.'" *Yak v. Bank Brussels Lambert, BBL (USA) Holdings, Inc.*, 252 F.3d 127, 130 (2d Cir. 2001) (quotations omitted); *see also Zeising v. Kelly*, 152 F. Supp. 2d 335, 342 (S.D.N.Y. 2001). Thus, in addition to the allegations contained in the text of Plaintiff's Complaint, the three documents attached as Exhibits A-C thereto are fair game for the Court's consideration.

For purposes of this motion, Defendants accept Plaintiff's contention that the substantive law of New York applies. (See Compl. ¶ 50 ("The parties contemplated and agreed that the terms of any agreement between them would be governed by New York law . . . .")). Although, as explained below, the alleged contract on which Plaintiff bases this contention does not exist, Plaintiff is nevertheless bound by its choice to invoke the protections of New York law. In any event, New York has an overriding governmental interest in protecting its residents and participants in its financial markets (such as Defendants) from unfounded claims for finder's fees, which justifies the application of New York law to the issues raised by this motion. *See Sugerman v. MCY Music World, Inc.*, 158 F. Supp. 2d 316, 322 (S.D.N.Y. 2001) (defining New York's interests as the deterrence of "unfounded and multiple claims for commissions asserted by finders" and the preservation of New York's "traditional role as an international clearing

-11-

house and market place") (quotations omitted); *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 382, 248 N.E.2d 576, 582, 300 N.Y.S.2d 817, 825 (1969).

Under well-established principles of New York law, Plaintiff's Complaint should be dismissed with prejudice for failure to state a claim on which relief can be granted.

## **ARGUMENT**

I. **BECAUSE THE PARTIES INTENDED NOT TO BE BOUND UNTIL A FORMAL, WRITTEN CONTRACT WAS EXECUTED, PLAINTIFF'S CONTRACT-BASED CLAIMS ARE BARRED**

The Complaint's factual allegations, coupled with the exhibits attached thereto, demonstrate unequivocally that as a matter of law no contract was ever formed between Defendants and Direct. The reason is simple: the parties intended that no legally-binding obligations would arise between them until they negotiated *and executed* a formal, written contract. Since Plaintiff concedes that no such written document was ever executed by either party, the contract alleged by Plaintiff never came into existence.

Under New York law, if parties do not intend to be bound by an agreement until it is put in writing and signed, then there is no contract unless and until that event occurs. *Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 97 (2d Cir. 1994); *R.G. Group, Inc. v. The Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir. 1984); *Scheck v. Francis*, 26 N.Y.2d 466, 469-70, 311 N.Y.S.2d 841, 843, 260 N.E.2d 493, 494 (1970). "This rule holds even if the parties have orally agreed upon all the terms of the proposed contract." *R.G. Group, Inc.*, 751 F.2d at 74 (citing *Schwartz v. Greenberg*, 304 N.Y. 250, 107 N.E.2d 65 (1952)); *see also Longo*, 25 F.3d at 97 (same); *GSGSB, Inc. v. New York Yankees*, 862 F. Supp. 1160, 1172 (S.D.N.Y. 1994) (same). Moreover, for this rule to apply, it is not necessary that both parties share an intent not to be bound until a written contract is executed. Instead, "if *either party* communicates an intent not to be bound until he achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract." *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1986); *see also R.G. Group, Inc.*, 751 F.2d at 75 (holding that "when a

party gives forthright, reasonable signals that it means to be bound only by a written agreement, courts should not frustrate that intent"); *Greystone P'ships Group, Inc. v. Koninklijke Luchtvaart Maatschappij N.V.*, 815 F. Supp. 745, 754 (S.D.N.Y. 1993).

The purpose of this rule is to allow parties negotiating a commercial agreement the freedom to "negotiate candidly, secure in the knowledge that [they] will not be bound until execution of what both parties consider to be [the] final document." *Winston*, 777 F.2d at 80; *see also R.G. Group, Inc.*, 751 F.2d at 74 ("The point of these rules is to give parties the power to contract as they please, so that they may, if they like, bind themselves orally or by informal letters, or that they may maintain 'complete immunity from all obligation' until a written agreement is executed.") (quoting 1 A. Corbin, CORBIN ON CONTRACTS § 30, at 98 (1963)).  As the Second Circuit has explained, the ability to avoid being bound by an oral "agreement" is essential to protect parties in complex transactions where, as is true here, material differences between the parties may not become apparent until the drafting process gets underway.

> Freedom to avoid oral agreements is especially important when business entrepreneurs and corporations engage in substantial and complex dealings.  In these circumstances there are often forceful reasons for refusing to make a binding contract unless it is put in writing.  The actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution.  Details that are unnoticed or passed by in oral discussion will be pinned down when the understanding is reduced to writing.  These considerations are not minor; indeed, above a certain level of investment and complexity, requiring written contracts may be the norm in the business world, rather than the exception.

*R.G. Group, Inc.*, 751 F.2d at 75 (citation omitted).

In determining whether the parties intended to be bound in the absence of a written document executed by both sides, courts consider four factors:  (1) whether one or both parties have expressly reserved the right not to be bound in the absence of a writing; (2) whether the parties have reached agreement on all of the terms of the alleged contract such that "there was literally nothing left to negotiate or settle[;]" (3) whether the alleged agreement is the type of

-13-

contract that is usually committed to writing; and (4) whether there has been partial performance of the contract. *Id*. at 75-76; *Winston*, 777 F.2d at 80-81; *GSGSB, Inc.*, 862 F. Supp. at 1172. Although no single factor is dispositive, "considerable weight" is placed on "a party's explicit statement that it reserves the right to be bound only when a written agreement is signed." *R.G. Group, Inc.*, 751 F.2d at 75; *GSGSB, Inc.*, 862 F. Supp. at 1172. "Courts are reluctant to discount such a clear signal, and it does not matter whether the signal is given during the course of bargaining, or at the time of the alleged agreement." *R.G. Group, Inc.*, 751 F.2d at 75.

Application of these factors here leads inexorably to the conclusion that Cerberus and Direct never intended to be bound until a formal Consulting Agreement was drafted and signed by both parties. Thus, Plaintiff's allegations of an oral "agreement" between the parties are legally irrelevant. As a matter of law, no contract was ever formed between the parties.

*First*, Cerberus expressly reserved the right not to be bound until the parties signed a formal, written instrument. Teitelbaum's December 26th email to Koidl informed Koidl that Cerberus would be forwarding an "approx. 10 page contract", that the email "only captures certain of the more important commercial terms that we discussed" and that the email "is not a legal obligation for Cerberus or you." (Compl., Ex. A). In addition, as to two issues (the "mechanism for something to become a Roman Koidl deal" and the definition of "targeted investments"), the email does not even attempt to set forth the parties' understanding, but indicates instead that they would have to "see what the lawyers come up" with. (*Id*.). And, anticipating the negotiation that was to come with respect to the critical issue of exclusivity, Teitelbaum told Koidl that he was "not sure how the lawyers will write this up" and that the language "may take a bit of work." (*Id*.). Given the language used in Teitelbaum's email, Cerberus' expression of intent not to be bound until a formal contract was executed could not be clearer. Indeed, Plaintiff admits that he understood the email in precisely this manner. (*Id*. ¶ 23 (conceding that the December 26, 2002 e-mail "contemplated a future written contract between the parties, which would be presented by Cerberus's lawyers")). Given this "clear signal" by Cerberus at the commencement of negotiations with Direct, no agreement could arise unless and

-14-

until both parties executed a written agreement.  *See, e.g., Chromalloy Am. Corp. v. Universal Housing Sys. of Am.*, 495 F. Supp. 544, 550 (S.D.N.Y. 1980) (no intent to be bound absent a written contract where the "correspondence between the parties not only refers to a written agreement, but expressly disclaims any intention to be bound until the execution of such a document"), *aff'd mem.*, 697 F.2d 289 (2d Cir. 1982); *ABC Trading Co., Ltd. v. Westinghouse Elec. Supply Co.*, 382 F. Supp. 600, 602 (E.D.N.Y. 1974) (no intent to be bound absent a written agreement where defendant's attorney sent a letter stating that "[i]f your client finds this proposal agreeable in principle, we can proceed to reduce it to a written agreement incorporating, if you wish, a simple escrow arrangement") (footnote omitted).

Consistent with the December 26th email, the draft Consulting Agreements themselves indicate that both parties shared an intent not to be bound absent a writing.  Both drafts contain an integration clause which provided that the written contract constituted the parties' entire agreement and superseded any prior oral or written agreements or understandings between them.  (Compl., Ex. B, ¶ 5.4, Ex. C, ¶ 5.4).  The existence of such a clause strongly supports the inference that the parties "placed great importance on the formalities of execution" and, thus, intended a formal, written instrument.  *See GSGSB, Inc.*, 862 F. Supp. at 1173.

*Second*, the parties' exchange of draft agreements left a large number of material issues to resolve, indicating they were a long way from signing a formal contract.  After laying the two drafts of the Consulting Agreement side by side, it quickly becomes apparent that at least eight material issues remained open as of February 10, 2003 -- including disagreements on such fundamental points as the criteria for determining which investments entitle Direct to compensation from Cerberus (paragraphs 1.1 and 2.1), the scope of Direct's obligation to share an opportunity only with Cerberus (paragraph 2.1), the respective methods for calculating the 1.0% fee and the Incentive Allocation (paragraphs 3.1 and 3.3), the conditions under which Cerberus must pay a monthly retainer fee (paragraph 3.2), dispute resolution procedures (paragraph 3.3(d)) and the consequences of Cerberus' being required to hire another consultant to close a particular deal (paragraph 3.5).  To state the obvious, these are not small issues.  To the

extent that they were not covered in the December 26th email, it is precisely because the parties' disagreements revealed themselves during the process of putting pen to paper. In short, the stark differences between Cerberus' draft of the Consulting Agreement and Direct's counteroffer belie any notion that "there was literally nothing left to negotiate or settle" as of February 10, 2003. *R.G. Group, Inc.*, 751 F.2d at 76. This factor also strongly supports the inference that the parties did not intend to be bound until a formal contract was executed. *See Winston*, 777 F.2d at 82-83 (holding that the parties' exchange of re-drafted versions of the agreement warrants the inference that the changes made were "important enough to the parties to have delayed final execution and consummation of the agreement" and noting that "[p]arties that wish to be bound only upon execution of a formal document agree to negotiate in that manner because they wish to create a writing that is satisfactory to both sides in every respect"); *GSGSB, Inc.*, 862 F. Supp. at 1174 (noting the strong presumption against finding a binding obligation in an agreement which still contained open terms).

*Third*, the complexity of the alleged agreement is such that a writing requirement would be expected. The draft agreements would have committed Cerberus to paying finder's fees to Direct that could potentially reach tens (if not hundreds) of millions of dollars. Indeed, in this lawsuit, Direct seeks recovery of a fee in the amount of over $300 million. Thus, the extent of Cerberus' potential monetary obligation by itself demonstrates that the alleged agreement was of the type normally put in writing. *See R.G. Group, Inc.*, 751 F.2d at 77 (holding that it was "most telling" that the parties contemplated an initial investment of approximately $2 million and that plaintiffs alleged damages of at least $80 million; "[w]ith that amount of money at stake, a requirement that the agreement be in writing and signed simply cannot be a surprise to anyone"); *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262-63 (2d Cir. 1984) (contract for $4 million sale of six companies was of the type that would normally be in writing); *Winston*, 777 F.2d at 83 (settlement agreement for $62,500 was of the type that normally would be in writing). Moreover, even a cursory review of the December 26th email reveals that the most basic terms of the contract needed to be fleshed out with a degree of precision that could only be

-16-

achieved through a formal, written contract. Indeed, as to three of these terms, the email expressly reveals Cerberus' intention to wait and see how the "lawyers" wrote up these provisions before conducting further negotiation. The drafts subsequently exchanged between the parties demonstrate the complexities involved in precisely defining what the parties had actually agreed to. In short, it is unreasonable as a matter of law to infer that Cerberus would have agreed to bind itself to the obligations alleged by Direct on the basis of nothing but an oral contract. *Reprosystem, B.V.*, 727 F.2d at 262-63 (holding that "the magnitude and complexity of the deal as reflected in the numerous written contract drafts not only reinforce the parties' stated intent not to be bound until written contracts were signed, but also reflect a practical business need to record all the parties' commitments in definitive documents").

*Fourth*, Plaintiff's allegations of partial performance of the alleged agreement do not weigh in favor of finding an enforceable oral contract. These allegations relate almost entirely to acts undertaken by Plaintiff -- such as Koidl's bringing potential investment opportunities to Cerberus for consideration. (*E.g.*, Compl. ¶¶ 52, 59). Yet, Koidl's engaging in such activity is equally consistent with an inference that Plaintiff made a calculated business decision to begin working on Cerberus' behalf in preparation for the contract Plaintiff hoped it would eventually enter into with Cerberus. It does not negate the parties' intent to be bound only upon execution of a formal contract. *See GSGSB, Inc.*, 862 F. Supp. at 1174 (holding that plaintiff's rendering of services to defendant did not weigh clearly in favor of either party for purposes of determining whether they intended to be bound prior to the execution of a written contract; it was unclear whether plaintiff "commenced performance based on its belief that an oral contract existed or merely as a calculated risk designed to obtain a contract with the [defendant]").

Considering Plaintiff's allegations in light of the undisputed documentary evidence attached to the Complaint, the conclusion is inescapable that the parties (and, at the very least, Cerberus) intended not to be legally bound absent the execution of a formal, written contract instrument. Plaintiff concedes Cerberus never signed such a document. Consequently,

under New York law, no contract between the parties was ever formed, and Plaintiff's breach of contract count fails to state a claim on which relief can be granted. This claim should be dismissed along with Plaintiff's claims for breach of the implied covenant of good faith and fair dealing and for a declaratory judgment, both of which are entirely dependent on the existence of a valid contract. *See Rosenblatt v. Christie, Manson & Woods, Ltd.*, No. 04 Civ. 4205(PKC), 2005 WL 2649027, at *9 (S.D.N.Y. Oct. 14, 2005) ("Such claims [for breach of the duty of good faith and fair dealing] are derivative and duplicative of breach of contract claims, and cannot create contractual rights not contemplated in the contract at issue."), *aff'd*, 195 Fed. Appx. 11 (2d Cir. 2006); *Four Star Corp. v. Nynex Corp.*, 183 F.R.D. 91, 103 (S.D.N.Y. 1997) ("[A] duty to negotiate in good faith cannot arise absent an enforceable agreement.").

## II.     NEW YORK'S STATUTE OF FRAUDS PRECLUDES ALL OF PLAINTIFF'S CLAIMS OTHER THAN FRAUD

### A.     Plaintiff's Contract Claims Are Barred By New York's General Obligations Law

Even if Plaintiff could somehow circumvent these bedrock contract formation principles (which it cannot), the Statute of Frauds contained in section 5-701(a)(10) of the New York General Obligations Law is absolutely fatal to Plaintiff's claims. Because they constitute contracts to pay for services rendered in negotiating the sale of a business opportunity, section 5-701(a)(10) requires finder's contracts, like the one alleged by Plaintiff here, to be in writing and signed by the party to be charged in order to be legally enforceable. Specifically, the statute provides that:

> [e]very agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking . . . [i]s a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest. 'Negotiating' includes procuring an introduction to a party to the transaction or

> assisting in the negotiation or consummation of the transaction.
> This provision shall apply to a contract implied in fact or in law to
> pay reasonable compensation . . . .

N.Y. Gen. Oblig. Law § 5-701(a)(10) (McKinney 2002).

In *Freedman v. Chem. Constr. Corp.*, 43 N.Y.2d 260, 372 N.E.2d 12, 4012 N.Y.S.2d 176 (1977), the New York Court of Appeals broadly construed this provision as encompassing any contract between a principal and an intermediary under which the intermediary provides "'know-how' or 'know-who', in bringing about between principals an enterprise of some complexity or an acquisition of a significant interest in an enterprise[.]" *Id*. at 267, 372 N.E.2d at 16, 401 N.Y.S.2d at 181. Thus, where a party seeks compensation under an alleged contract for using his "connections, ability and knowledge to arrange meetings between appropriate persons," section 5-701(a)(10) precludes enforcement of the purported contract unless it is in writing and subscribed by the party against whom enforcement is sought. *Greystone P'ships Group., Inc.*, 815 F. Supp. at 755 (citing *Freedman*, 43 N.Y.2d at 267, 372 N.E.2d at 16, 401 N.Y.S.2d at 181). The purpose of this requirement is to protect principals who successfully consummate a purchase or sale of a business or an interest in a business from unfounded claims by intermediaries that the principal had orally promised to pay them a finder's fee or other compensation for helping to bring about the transaction. *Intercontinental Planning*, 24 N.Y.2d at 383. It reflects the New York Legislature's considered judgment that juries are too easily led astray when required to decide such claims on the basis of conflicting testimony about whether an oral promise was made, and that a requirement for a written contract will prevent such erroneous verdicts. *Id*. at 382-83 (citing 1949 Report of N.Y. Law Rev. Comm. [N.Y. Legis. Doc., 1949, No. 65 (G)], p. 615); *Freedman*, 43 N.Y.2d at 267, 372 N.E.2d at 16, 401 N.Y.S.2d at 18 ("Because in some circumstances the important services of an intermediary may be accomplished in the course of a few and even momentary conversations, false or exaggerated claims can be asserted easily and disproved only with difficulty. It is this type of situation to which the statute is addressed.").

-19-

It is beyond cavil that section 5-701(a)(10) covers the contract Direct claims to have had with Cerberus. Consequently, the alleged contract must be in writing and signed by Cerberus to be enforceable. According to Direct's own description of the alleged contract, "Direct agreed to provide for a fee, the contacts, experience, and knowledge base of Direct and Mr. Koidl with regard to investment opportunities in the GSA countries, particularly Germany." (*Id*. ¶ 19). Cerberus allegedly obtained the benefit of Direct's "specialized experience in identifying non-performing assets, loans and distressed companies" as well as "numerous professional and personal relationships with leaders of industry, banking, and finance in the GSA territories." (*Id*. ¶ 11). Direct claims to have performed under this contract by bringing proposed investments and acquisitions to Cerberus' attention and by making introductions on Cerberus' behalf to persons in positions of influence at firms presenting potential investment opportunities for Cerberus. (*E.g., id.* ¶¶ 58-89). In light of these allegations, one would be hard pressed to come up with a clearer example of a contract involving the sale of "know-how" and "know-who" for use in bringing about successful purchases of businesses or substantial interests in businesses between principals. *Freedman*, 43 N.Y.2d at 267, 372 N.E.2d at 16, 401 N.Y.S.2d at 181. Plaintiff's alleged contract would have required Cerberus to compensate Direct for making introductions to participants in potential acquisition transactions and for assisting in consummating such transactions, activities which section 5-701(a)(10) expressly defines as "negotiating" the sale of a business opportunity. N.Y. Gen. Oblig. Law § 5-701(a)(10) ("'Negotiating' includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction."). Thus, the purported oral contract on which Plaintiff bases its claims is subject to the Statute of Frauds, and, consequently, is unenforceable. *E.g., AG Ltd. v. Liquid Realty Partners, LLC*, 448 F. Supp. 2d 583, 585-88 (S.D.N.Y. 2006) (holding that contract for payment of compensation to intermediary for assistance relating to an acquisition of restaurant chain was void under Statute of Frauds); *Howard-Sloan Legal Search, Inc. v. Todtman, Young, Tunick, Nachamie, Hendler & Spizz, P.C.*, 193 A.D.2d 404, 404-05, 597

N.Y.S.2d 64, 65 (1st Dep't 1993) (holding that contract to compensate plaintiff for services rendered in effectuating the merger of two law firms was void under Statute of Frauds).

In light of the clear purpose underlying New York's Statute of Frauds to protect participants in the financial markets from unsubstantiated demands for compensation by interlopers, courts have not hesitated to dismiss claims based on oral finder's fee contracts at the pleadings stage. *Zeising*, 152 F. Supp. 2d at 343 ("Consideration of the statute of frauds as an affirmative defense is appropriate on a motion to dismiss, as such a motion is intended to weed out meritless claims, avoiding needless efforts on the parts of the parties and the Court and avoiding needless discovery."); *Bronner v. Park Place Entm't Corp.*, 137 F. Supp. 2d 306, 309-11 (S.D.N.Y. 2001) (granting 12(b)(6) motion to dismiss claims based on contract for payment of a commission for introducing parties to a casino development transaction which failed to comply with Statute of Frauds); *Rosbach v. Indus. Trading Co., Inc.*, 81 F. Supp. 2d 522, 524 (S.D.N.Y. 2000) (granting 12(b)(6) motion on grounds that oral finder's fee contract was void under the Statute of Frauds). This case is no different.

It is undisputed that Cerberus did not sign either draft of the Consulting Agreement attached to the Complaint, and that these unsigned documents by themselves are insufficient as a matter of law to comply with the Statute of Frauds. *See Whitman Heffernan Rhein & Co., Inc. v. Griffin Co.*, 163 A.D.2d 86, 87, 557 N.Y.S.2d 342, 343 (1st Dep't 1990) (holding that an unsigned draft agreement, even if in final form and setting forth the terms of the performance fee, is insufficient to satisfy the Statute of Frauds). Instead, Plaintiff attempts to satisfy section 5-701(a)(10)'s writing requirement by constructing an amalgam of various documents, including the December 26th email, the two draft Consulting Agreements, a December 30th email from Teitelbaum (which is not attached to the Complaint), and an April 15, 2003 letter from Cerberus to a third party which purportedly "acknowledged Mr. Koidl's role in introducing Cerberus to [the third party]" (and which was also curiously omitted from the exhibits attached to the Complaint). (Compl. ¶¶ 75-78). According to Plaintiff, when considered

together, these documents purportedly constitute sufficient written evidence of the alleged contract to satisfy the Statute of Frauds. (Compl. ¶¶ 128-132). Plaintiff is wrong.

To comply with the Statute of Frauds, a writing must "designate the parties, identify and describe the subject matter and state *all* the essential or material terms of the contract." *Allied Sheet Metal Works, Inc. v. Saunders*, 206 A.D.2d 166, 168, 619 N.Y.S.2d 260, 262 (1ˢᵗ Dep't 1994) (emphasis added) (quotations omitted); *DeRosis v. Kaufman*, 219 A.D.2d 376, 379, 641 N.Y.S.2d 831, 832-33 (1ˢᵗ Dep't 1996) (same); *Klein v. Smigel*, 44 A.D.2d 248, 251, 354 N.Y.S.2d 117, 120 (1ˢᵗ Dep't 1974) (letter offered to substantiate contract failed to comply with Statute of Frauds because it "d[id] not contain all the material terms of the purported agreement"), *aff'd*, 36 N.Y.2d 809, 331 N.E.2d 679, 370 N.Y.S.2d 897 (1975); *see also Lauter v. W & J Sloane, Inc.*, 417 F. Supp. 252, 257-59 (S.D.N.Y. 1976) (holding that New York courts have strictly adhered to the rule that to satisfy the Statute of Frauds the purported memorandum must contain all the substantial and material terms of the contract and "be a complete reflection of the agreement that was made").

Although in theory multiple writings can be pieced together to satisfy the Statute of Frauds, the writings offered must be "'connected with one another either expressly or by the internal evidence of subject-matter and occasion,'" and at least one of them must be signed by the defendant. *AG Ltd.*, 448 F. Supp. 2d at 586 (quoting *Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 110 N.E.2d 551, 553 (1953) (Fuld, J.)). Moreover, the signed writing must "itself establish 'a contractual relationship between the parties.'" *The Horn & Hardart Co. v. The Pillsbury Co.*, 888 F.2d 8, 11 (2d Cir. 1989) (quoting *Crabtree*, 305 N.Y. at 56, 110 N.E.2d at 554). However, just like a single memorandum, the multiple writings offered in response to a Statute of Frauds defense must as a whole set forth all of the material terms of the agreement, either expressly or by implication, and provide evidence of defendant's assent to paying the allegedly agreed-upon fee. *AG Ltd.*, 448 F. Supp. 2d at 586. Because "[s]peculation and hypothesis are anathema to the policy behind the Statute of Frauds," the terms of the agreement must be crystal clear from the documents offered. *The Horn & Hardart Co.*, 888 F.2d at 11. "If

the proferred writings permit doubt as to the existence or nature of the contractual relationship, the inquiry is terminated and the agreement deemed unenforceable." *Id*.

Furthermore, it is black letter law in New York that unsigned writings prepared by plaintiff will not bind a defendant. *Karlin v. Avis*, 457 F.2d 57, 62 (2d Cir. 1972); *see also Solin Lee Chu v. Ling Sun Chu*, 9 A.D.2d 888, 889, 193 N.Y.S.2d 859, 860 (1st Dep't 1959) ("To permit the unsigned document prepared by the plaintiff to serve as a portion of the requisite memorandum would open the door to the evils the Statute of Frauds was designed to avoid."). Where the multiple writings offered by plaintiff rely on unsigned agreements prepared by the plaintiff himself to set forth the material terms of the alleged contract, they are insufficient to satisfy the statute. *See Stephen Pevner, Inc. v. Ensler*, 309 A.D.2d 722, 722, 766 N.Y.S.2d 183, 184 (1st Dep't 2003) (holding that collective writings are insufficient to satisfy the Statute of Frauds where "they rely almost entirely upon the unexecuted agreements prepared by plaintiff himself").

The amalgam of writings offered by Direct fails to meet these exacting standards. As a preliminary matter, *Plaintiff* prepared the unsigned document on which it primarily relies as evidence for the actual terms of the contract -- namely, the February 2003 Draft. Under the clear holdings in *Solin Lee Chu* and *Stephen Pevner, Inc.*, this draft cannot be used, either by itself or in combination with other documents, to satisfy the Statute of Frauds. But even if this document is considered, the result is the same because the collection of documents offered by Plaintiff does not contain all of the essential terms of the contract. As explained above, the December 26th email, the January 2003 Draft and the February 2003 Draft flatly contradict one another as to numerous material terms. Although Plaintiff baldly asserts that the February 2003 Draft is the one that contains the "real" terms of the contract, that most definitely is not apparent from the face of the unsigned documents. Indeed, the inescapable inference is that the February 2003 Draft reflects nothing more than Direct's negotiating position in response to Cerberus' January 2003 Draft, which Cerberus rejected. In other words, Direct's preferred writings generate precisely the kind of "doubt" requiring "speculation" and "hypothesis" on the part of the Court

-23-

which the Second Circuit discussed in *The Horn & Hardart Co*., and which the Court of Appeals held compels a determination that the purported agreement is unenforceable.  888 F.2d at 11.

Even assuming that the documents support the existence of some business relationship between Direct and Cerberus, that is not enough to overcome the Statute of Frauds bar.  *AG Ltd.*, 448 F. Supp. 2d at 587.  The writings have to clearly set forth *all* of the material terms of the contract.  *Id*. at 586.  Here, one simply cannot tell from reading the documents proffered by Plaintiff what the terms of the alleged agreement between Direct and Cerberus actually are.  As a result, the alleged writings fail to comply with the Statute of Frauds as a matter of law.  To allow Plaintiff to survive a motion to dismiss on the basis of nothing more than an unsubstantiated allegation that one unsigned draft agreement among several constitutes the parties' contract is to invite the very evils which the New York Legislature intended to prevent when it enacted section 5-701(a)(10).[3]

Finally, Plaintiff's allegations regarding Defendants' alleged partial performance (Compl. ¶¶ 147-152) and acceptance by silence (Compl. ¶ 40) do nothing to cure the fatal deficiencies of Plaintiff's contract claim.  Because the Statute of Frauds governs this claim, Cerberus' silence is of no legal consequence.  *See Bronner*, 137 F. Supp. 2d at 312 ("[A] party's silence cannot be translated into an acceptance of an offer to contract. . . . The statute would be meaningless if hopeful finders like [plaintiff] could avoid that proscription by merely sending a letter purporting to confirm an oral agreement.").

The doctrine of part performance is also of no help to Plaintiff.  As a preliminary matter, the New York Court of Appeals has already held that the doctrine of partial performance

---

[3]    Plaintiff's allegations about oral representations between the parties about what the various documents mean and were meant to accomplish, even if true (which they are not), are legally irrelevant, and cannot factor into the determination of whether a valid contract exists.  *See Merex A.G. v. Fairchild Weston Sys., Inc.*, 810 F. Supp. 1356, 1367 (S.D.N.Y. 1993) ("Parol evidence, even in affidavit form, is immaterial to the threshold issue of whether the documents are sufficient on their face to satisfy the Statute of Frauds.  Consideration of parol evidence in assessing the adequacy of a writing for Statute of Frauds purposes would otherwise undermine the very reason for a Statute of Frauds in the first instance."), *aff'd*, 29 F.3d 821 (2d Cir. 1994).

does not apply to finder's claims covered by section 5-701(a)(10). *Kule Res., Ltd. v. Reliance Group, Inc.*, 49 N.Y.2d 587, 592-93, 404 N.E.2d 734, 735, 427 N.Y.S.2d 612, 614 (1980); *see also* N.Y. Gen. Oblig. Law § 5-701(a)(10) (provision barring enforcement of oral contracts for negotiating the sale of a business opportunity "shall apply to a contract implied in fact or in law to pay reasonable compensation . . . .").

        However, even if this exception to the Statute of Frauds could lawfully be applied here, Plaintiff's argument still fails.  The relevant acts of part performance are "those of the party insisting on the contract, not those of the party insisting on the Statute of Frauds." *Messner Vetere Berger McNamee Schmetterer Euro RSCG Inc. v. Aegis Group PLC*, 93 N.Y.2d 229, 237, 711 N.E.2d 953, 957, 689 N.Y.S.2d 674, 679 (1999); *see also id.* at 236 ("Under our jurisprudence, it is the conduct of the entity seeking to enforce the oral agreement, and its detrimental reliance on the agreement, that makes proper the invocation of equitable principles.").  Thus, Direct's allegations concerning purported partial performance *by Cerberus* are of no relevance to the analysis.  (Compl. ¶¶ 148-153).  What matters is what *Direct* allegedly did to perform under the contract.  And, on that score, Direct's allegations of its own alleged partial performance are woefully inadequate.  To take an oral agreement out of the Statute of Frauds, the alleged acts of partial performance must be "unequivocally referable" to the agreement. *Mobile Data Shred, Inc. v. United Bank of Switzerland*, No. 99 Civ. 10315 SAS, 2000 WL 351516, at *3 (S.D.N.Y. April 5, 2000) (granting motion to dismiss on Statute of Frauds grounds); *Messner Vetere*, 93 N.Y.2d at 235; *Anostario v. Vicinanzo*, 59 N.Y.2d 662, 664, 450 N.E.2d 215, 216, 463 N.Y.S.2d 409, 410 (1983).  In other words, the plaintiff's actions must be "'unintelligible or at least extraordinary,' explainable only with reference to the oral agreement." *Anostario*, 59 N.Y.2d at 664.  Allegations of conduct that is "equally consistent with an explanation other than the oral agreement" -- such as actions taken in preparation for consummation of an agreement in the future -- are insufficient to overcome the Statute of Frauds. *Mobile Data*, 2000 WL 351516, at *3.  Here, Direct's alleged actions -- bringing investment opportunities to Cerberus' attention and making introductions on Cerberus' behalf -- can just as

easily be construed as preparatory actions taken in anticipation of reaching a binding contract with Cerberus, which never came to fruition.  (Compl. ¶¶ 133-136).  As this Court has previously explained in a case with very similar facts,

> [p]ersons having no formal agreement attempt to broker arrangements all the time in the hope that some reward will be forthcoming.  While a purported oral agreement between plaintiff and defendant can be said to lend some significance to plaintiff's [actions], it is equally explainable as preparatory to a future, or continuing, business relationship.  There is nothing unintelligible about someone in [plaintiff's] position doing what he did -- even in the absence of any agreement.  The doctrine of partial performance therefore does not take this case outside of the Statute of Frauds.

*Bronner*, 137 F. Supp. 2d at 312.  The same is true here.

Plaintiff's claims for breach of contract, breach of the implied covenant of good faith and fair dealing and for a declaratory judgment are barred by the Statute of Frauds and must be dismissed.

    B.    <u>Plaintiff Has Failed to State a Claim for Promissory or Equitable Estoppel</u>

Plaintiff's estoppel-based claims also fail as a matter of law.  In order to make out a claim for promissory or equitable estoppel sufficient to overcome the Statute of Frauds, Plaintiff must allege circumstances such that it would be "unconscionable" to deny the promise upon which Plaintiff has claimed to rely.  *See Philo Smith & Co. v. USLIFE Corp.*, 554 F.2d 34, 36 (2d Cir. 1977); *Sugerman*, 158 F. Supp. 2d at 325; *Mobile Data*, 2000 WL 351516, at *4; *see also Four Star Corp.*, 183 F.R.D. at 103 ("Under New York law . . . th[e] doctrine [of promissory estoppel] is confined to cases where application of the Statute of Frauds would produce an unconscionable result."); *Merex*, 810 F. Supp. at 1373 ("Before imposing liability by finding an equitable estoppel, courts look for a high degree of unconscionable behavior on the part of the defendant which makes invocation of the Statute of Frauds itself a fraud.").  If the rule were otherwise, the "strongly held public policy reflected in New York's Statute of Frauds

would be severely undermined if a party could be estopped from asserting it every time a court found that some unfairness would otherwise result." *Philo Smith*, 554 F.2d at 36.

To qualify as "unconscionable", the Plaintiff's alleged injury must be something more than simply damages "that flow naturally from the defendant's non-performance or from the plaintiff's continuing performance of the unenforceable agreement." *Mobile Data*, 2000 WL 351516, at *4. In particular, "[o]ther than in the most exceptional cases, courts have consistently held that lost fees . . . constitute insufficient injury to invoke the doctrine [of promissory estoppel as a bar to the assertion of a Statute of Frauds defense]." *Belotz v. Jefferies & Co.*, No. 98 Civ. 2587 (LAP), 1999 WL 587916, *5 (S.D.N.Y. Aug. 4, 1999) (alteration in original) (quotations omitted), *aff'd*, 213 F.3d 625 (2d Cir. 2000); *see also Philo Smith*, 554 F.2d at 36 ("[Loss of a fee] is not the kind of injury contemplated by New York law, for it is solely a result of the non-performance of a void agreement."); *Sugerman*, 158 F. Supp. 2d at 326 (holding that promissory estoppel claim was barred by Statute of Frauds; "[f]inder's fee damages 'represent expectation damages or the benefit of the oral contract, and do not qualify as unconscionable under the statute of frauds'") (quoting *Bibeault v. Advanced Health Corp.*, No. 97 Civ. 9026, 1999 WL 301691, at *7 (S.D.N.Y. May 12, 1999)). But here the *only* injury alleged by Plaintiff related to its estoppel claims is Defendants' alleged failure to pay fees in the amount of $3.7 million which Plaintiff claims to be due under the unenforceable and non-existent contract. (Compl. ¶¶ 199-208). As such, Plaintiff's claims for promissory and equitable estoppel fail to state a claim on which relief can be granted.

C.    Plaintiff's "Fall-Back" Claims for Unjust Enrichment and Quantum Meruit are also Barred

The Statute of Frauds also bars Plaintiff's claims for unjust enrichment and quantum meruit. The New York Legislature could not have been clearer when it amended section 5-701(a)(10) in 1964 to explicitly bar such claims. As stated in the Revision Notes,

> [t]his amendment was recommended by the Law Revision Commission . . . . Its purpose is to make clear that the contracts required to be evidenced by writing include a contract or

agreement for the compensation of a business broker for acting as a 'finder,' 'originator' or 'introducer,' or for assisting in the negotiation or consummation of the transaction, and that *the requirement cannot be avoided by an action for compensation in quantum meruit*." (Emphasis added).

The courts have repeatedly honored the Legislature's intent to bar quasi-contract claims, including unjust enrichment, where the Statute of Frauds renders the underlying finder's fee contract unenforceable. *See, e.g., Sugerman*, 158 F. Supp. 2d at 326 ("'The Legislature amended subdivision 10 to clearly apply the section to finders and to preclude any recovery in quantum meruit . . . . The nature of the transaction is such that, in the absence of the requirement of a writing, unfounded and multiple claims for commissions are frequently asserted . . . . [T]o allow recovery for the reasonable value of these services is to substantially defeat the writing requirement.'") (quoting *Minichiello v. Royal Business Funds Corp.*, 18 N.Y.2d 521, 525, 223 N.E.2d 793, 795, 277 N.Y.S.2d 268, 270 (1966)); *Huntington Dental & Med. Co., Inc. v. Minn. Mining & Mfg. Co.*, No. 95 Civ. 10959 (JFK), 1998 WL 60954, at *7 (S.D.N.Y. Feb. 13, 1998) ("[T]he law prevents a plaintiff from circumventing the reach of the statute of frauds by asserting a quasi-contract claim, such as quantum meruit or unjust enrichment."); *see also Prescient Acquisition Group v. MJ Publ'g Trust*, No. 5 Civ. 6298 (PKC), 2006 WL 2136293, at *5 (S.D.N.Y. July 31, 2006) ("In New York, a plaintiff may not assert an action under a theory of unjust enrichment in order to circumvent the writing requirement of the Statute of Frauds."); *Rosbach*, 81 F. Supp. 2d at 525 ("New York courts have specifically applied the requirement that finder's agreements be in writing to claims for commissions sought under both contract and *quantum meruit* theories."); *Belotz*, 1999 WL 587916, at *5 ("It is well-accepted that when N.Y. Gen. Oblig. Law § 5-701(a)(10) applies, a plaintiff may not circumvent the statute of frauds by claiming unjust enrichment.") (quotation omitted); *deCiutiis v. Nynex Corp.*, No. 95 Civ. 9745(PKL), 1996 WL 512150, *3 (S.D.N.Y. Sept. 9, 1996) ("Plaintiff cannot circumvent the statute of frauds by merely recharacterizing his contractual claim as one for recovery in quantum meruit."); *Philo Smith & Co.*, 420 F. Supp. 1266, 1271 (S.D.N.Y. 1976) ("To allow the statute to be avoided easily would be to open the door 'wide to possible frauds[,] the very thing which the

statute was designed to prevent.'").  That is clearly the case here.  As a result, Plaintiff's claims

for unjust enrichment and quantum meruit are also barred and must be dismissed.

### III.    PLAINTIFF'S FRAUD CLAIM IS INSUFFICIENT AS A MATTER OF LAW

Plaintiff's fraud claim is facially deficient for three reasons.  *First*, and most

importantly, the fraud allegations are wholly duplicative of Plaintiff's breach of contract claim.

"New York law makes clear that a plaintiff may not circumvent the Statute of Frauds by 'simply

dressing up a breach of contract claim by further alleging that the promisor had no intention, at

the time of the contract's making, to perform its obligations thereunder.'"  *Zeising*, 152 F. Supp.

2d at 346 (quoting *Best W. Int'l, Inc. v. CSI Int'l Corp.*, No. 94 Civ. 0360 (LMM), 1994 WL

465905, at *4 (S.D.N.Y. Aug. 23, 1994)) (ellipse in original).  "To state a fraud claim co-existent

with an alleged breach of contract, [Plaintiffs] must: (i) demonstrate a legal duty separate from

the duty to perform under the contract; (ii) demonstrate a fraudulent misrepresentation collateral

or extraneous to the contract; or (iii) seek special damages that are caused by the

misrepresentation and unrecoverable as contract damages."  *Cal Distrib. Inc. v. Cadbury

Schweppes Am. Beverages, Inc.*, No. 06 Civ. 0496 RMB JCF, 2007 WL 54534, at *8 (S.D.N.Y.

Jan. 5, 2007) (alteration in original) (quotations omitted).  *See also Rosenblatt v. Christie,

Manson & Woods Ltd.*, No. Civ. 4205(PKC), 2005 WL 2649027, at *10 (S.D.N.Y. Oct. 14,

2005) ("Under New York law, [i]t is well settled that a cause of action for fraud will not arise

when the only fraud charged relates to a breach of contract.") (alteration in original) (quotations

omitted), *aff'd*, 195 Fed. Appx. 11 (2d Cir. 2006).

Here, the sum and substance of Plaintiff's fraud claim is that Cerberus Global

misrepresented its connections to IRU and the source and nature of the dAF transaction in order

to exclude Mr. Koidl and Direct from the transaction and avoid having to pay Plaintiff its

finder's fee.  (Compl. ¶¶ 176-193).  According to Plaintiff, Cerberus falsely claimed that it was

already known to Dresdner Bank and that Direct had nothing to do with the aborted investment

in IRU, misrepresented "the extent to which Direct introduced IRU and its investment

-29-

opportunities to Cerberus sufficiently to warrant earning the fees" under the alleged contract, and lied about Dresdner's wanting to be "*incognito*" when dealing with Cerberus. (*Id.* ¶¶ 184, 186). Far from being extraneous to the contract, however, each and every one of these alleged misrepresentations are clearly related and intrinsic to the alleged contract. (*Id.* ¶ 184 (alleging that Defendants made misrepresentations intended to prevent Plaintiff from "earning the fees under the 'key commercial terms' proposed by Cerberus and agreed to by Direct.")). At bottom, Plaintiff alleges nothing more than that Cerberus supposedly made up false excuses for not paying Direct the compensation allegedly due under the parties' unenforceable contract. This allegation sounds in breach of contract, not fraud. Indeed, although Plaintiff tacks on a claim for punitive damages, Plaintiff's damages claims are identical to those it seeks for its contract claim. Where the identical contractual benefit of the bargain recovery is sought, the claim of fraud is duplicative and deficient as a matter of law. *See Rosenblatt*, 2005 WL 2649027, at *11.

> *Second*, Plaintiff has failed to allege the essential element of reasonable, detrimental reliance. Direct clearly did not rely at all on Cerberus' purported misrepresentations about its relationship with Dresdner Bank and Direct's involvement in the IRU discussions. Direct's own allegations establish unequivocally that, at the time those representations were made, it believed them to be false. If a party does not believe the truth of a representation, he cannot rely on it as a matter of law. *See, e.g., Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91, 99 (2d Cir. 1997) (where plaintiff was aware of information which contradicted a representation, reliance on the representation was unreasonable). As for the allegation that Cerberus misrepresented Dresdner's desires, Direct's alleged "reliance" on this misrepresentation did not alter its position in any way, let alone to its detriment. Direct contends that, under the alleged contract, it was entitled to be paid based on the introduction it made to Dresdner on Cerberus' behalf *before* Cerberus supposedly told Koidl that Dresdner wanted to deal with Cerberus "*incognito*." Thus, even assuming that Koidl made no further attempt to communicate with Dresdner because of what Cerberus had told him, Koidl's forbearance in that regard did not alter what Direct believed to be its rights *vis a vis* Cerberus. Moreover, if (as is

the case) there was no contract between Direct and Cerberus, Direct would still not have been entitled to collect a fee from Cerberus even if Koidl had ignored Cerberus' statement and continued to inject himself into the discussions.  Accordingly, assuming the truth of Plaintiff's own allegations, Direct could not have relied on Cerberus' purported misrepresentation *to its detriment*.

*Finally*, Plaintiff has failed to plead the fraud claim with sufficient particularity to satisfy Fed. R. Civ. P. 9(b).  "A complaint alleging fraud must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Cal Distrib.*, 2007 WL 54534, at *8 (quotations omitted).  Plaintiff's allegations in this regard are woefully inadequate, as none of the necessary details are present.  As such, and even ignoring the legal deficiencies described above, Plaintiff's fraud claim must be dismissed.

## CONCLUSION

Wherefore, for the foregoing reasons, Defendants respectfully request that the Complaint be dismissed with prejudice.

Dated:  July 27, 2007                                    **LOWENSTEIN SANDLER PC**

By:   *s/ Lawrence M. Rolnick*
        Lawrence M. Rolnick (LR-0546)
        Thomas E. Redburn, Jr. (TR-3902)
        James I. Lee (JL-0459)
        1251 Avenue of the Americas
        18th Floor
        New York, New York  10020
        Tel: 212.262.6700
        Fax: 212.262.7402
        -and-
        65 Livingston Avenue
        Roseland, New Jersey  07068
        Tel: 973.597.2500
        Fax: 973.597.2400