UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

JUDGE STANTON

07 CV 3310

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DIRECT INVESTMENT PARTNERS AG,

                              Plaintiff,

            - against -

CERBERUS GLOBAL INVESTMENTS, LLC,
CERBERUS CAPITAL MANAGEMENT, L.P.,
CERBERUS PARTNERS, L.P., and CERBERUS
GLOBAL INVESTMENT ADVISORS, LLC,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**COMPLAINT**

07 Civ. ____ **DOC #** ____

**JURY TRIAL DEMANDED**

        Plaintiff, Direct Investment Partners AG ("Direct"), brings this action against

Cerberus Global Investments, LLC, Cerberus Capital Management, L.P., Cerberus Partners, L.P.,

and Cerberus Global Investment Advisors, LLC (collectively, "Cerberus"), alleging the

following:

### PRELIMINARY STATEMENT

        This action seeks to recover substantial fees and payments owed to Direct as the

result of Direct's work, efforts, and consulting and advisory services to present to Cerberus a

lucrative investment opportunity.  Pursuant to a contract between the parties, Direct introduced,

originated, and presented the Institutional Restructuring Unit ("IRU") of Dresdner Bank AG and

the investment opportunities presented thereby to Cerberus.  Direct then opened, participated in,

and facilitated negotiations between IRU and Cerberus, thereby introducing to Cerberus assets

valued at €31 billion, including debis AirFinance B.V., Amsterdam, the Netherlands ("dAF"),

which was subsequently acquired by Cerberus in a transaction valued at $1.37 billion.  Cerberus

has failed to pay Direct the fees contracted to between the parties as a result of Direct's efforts in

exclusively bringing together Cerberus and IRU, and in facilitating the dAF transaction.

Given the value of the dAF deal, as confirmed by the November 20, 2006 prospectus for the initial public offering of AerCap Holdings B.V., the amount immediately at issue in this lawsuit is in the millions, and the amount at issue in total is in the hundreds of millions of dollars.

## JURISDICTION

1.      Jurisdiction of this Court is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332.  The amount in controversy is in excess of $75,000, exclusive of interest and costs.

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.  There is no other venue among the federal courts that has a relationship with the facts and circumstances of this matter.

3.      The parties consented to the exclusive jurisdiction of New York state or federal courts to resolve any action or proceeding arising out of their business relationship and contract.  No other court or jurisdiction has a greater interest in the facts and circumstances of this matter.

## THE PARTIES

4.      Direct is a Swiss company located at Weinmarkt 6, CH-6004 Luzern, Switzerland.  Direct is a mergers and acquisition advisory firm that provides consulting services

and advice to hedge funds, banks, and financial management advisors. Direct frequently acts as an advisor to banks and firms, sourcing deals.

5.      Direct is operated and controlled by its Chief Executive Officer, Roman Koidl, a citizen of Austria and resident of Switzerland. Mr. Koidl and Direct have substantial ties, relationships, and connections to the business and financial community in Europe, particularly Germany.

6.      Cerberus Global Investments, LLC is a Delaware limited liability company located in, and having its principal place of business at 450 Park Avenue, New York, New York 10022. Vice President Dan Quayle is the Chairman of Cerberus Global Investments, LLC, and Frank Bruno is its President and Managing Director.

7.      Cerberus Capital Management, L.P. is a Delaware limited partnership located in, and having its principal place of business at 299 Park Avenue, New York, New York 10171. Former Secretary of the U.S. Treasury, John Snow is the Chairman of Cerberus Capital Management, L.P.

8.      Cerberus Partners, L.P. is a Delaware limited partnership located in, and having its principal place of business at 299 Park Avenue, New York, New York 10171. Stephen A. Feinberg manages Cerberus Partners, L.P. and serves as the managing member of Cerberus Associates, L.L.C., the general partner of Cerberus Partners, L.P.

9.     Cerberus Global Investment Advisors, LLC is a Delaware limited liability company located in, and having its principal place of business at 450 Park Avenue, New York, New York 10022. Dr. Pieter Korteweg is a senior advisor to Cerberus Global Investment Advisors, LLC.

10.     The Cerberus companies, founded in 1992, comprise one of the world's largest group of funds specializing in corporate restructuring.  Cerberus regularly participates in or negotiates for deals valued in the billions of dollars.  According to publicly available information, Cerberus currently has more than $18 billion in assets under management.

### FACTUAL BACKGROUND

**A.     Cerberus Asks Direct to Introduce Cerberus to the German Market**

11.     Direct is a firm operated by Mr. Koidl which specializes in identifying investment opportunities and targets in GSA countries (Germany, Switzerland, and Austria). Direct and Mr. Koidl have specialized experience in identifying non-performing assets, loans, and distressed companies.  Mr. Koidl has numerous professional and personal relationships with leaders of industry, banking, and finance in the GSA territories.  It was these relationships, and Mr. Koidl's knowledge and expertise of local business practices and culture, that Cerberus intended to take advantage of when Cerberus contracted with Direct to investigate and locate European investment opportunities for Cerberus.

12.     In 2002, Cerberus had no formal and fixed operations or presence in Germany, but desired entry into the lucrative German investment market for restructuring distressed companies and loans.

13.     Mr. Koidl of Direct learned of Cerberus's desire to enter Germany during his December 13, 2002 visit to Cerberus's 450 Park Avenue, New York office and during his meeting with Frank Bruno, President of Cerberus Global Investments, LLC, and head of Cerberus's international operations and investments.

14.     The meeting between Messrs. Bruno and Koidl had been arranged by Cerberus's European advisor, Dr. Pieter Korteweg, after a meeting between Dr. Korteweg and Mr. Koidl in Amsterdam. In a December 10, 2002 e-mail from Dr. Korteweg, Mr. Koidl was informed that Mr. Bruno in the New York meeting would *"spell out specifics and economics of working with you, including the terms of a contract."*

15.     At the December 13th New York meeting, Mr. Bruno expressed Cerberus's desire to work with Direct in identifying investment opportunities. Mr. Bruno represented to Mr. Koidl that Cerberus typically offered a compensation package to consultants and advisors like Direct that included: (i) reimbursement for expenses; (ii) 1% of the equity Cerberus invested in an investment opportunity presented to Cerberus; (iii) an incentive fee of 15% - 20% after an internal rate of return 15% - 20% for the Cerberus entity making the investment; and (iv) a representation fee. Mr. Koidl agreed to work with Cerberus, and Mr. Bruno instructed Mr. Koidl to report to David Teitelbaum, a Cerberus Managing Director.

16.    On or about December 18, 2002, Mr. Koidl met with Mr. Teitelbaum at the Steigenberger Hotel in Frankfurt. At this meeting, Mr. Koidl identified certain potential Cerberus investment opportunities in Germany. Mr. Teitelbaum acknowledged these investment targets by marking the list with notations indicating Cerberus's preference for the opportunities.

17.    At or about the time of the Frankfurt meeting, Mr. Teitelbaum agreed to define the terms expressed by Mr. Bruno in New York that would reflect a fee-based relationship for Direct's services and activities in identifying investment opportunities for Cerberus.

18.    Less than one week later, Mr. Teitelbaum contacted Mr. Koidl on his mobile phone to confirm the arrangement pursuant to which Direct would introduce Cerberus to potential GSA investment opportunities for a fee in the event Cerberus actually made an investment.

19.    During this discussion, Mr. Teitelbaum confirmed Cerberus's desire to enter the GSA countries for investment opportunities. Cerberus requested, and Direct agreed to provide for a fee, the contacts, experience, and knowledge base of Direct and Mr. Koidl with regard to investment opportunities in the GSA countries, particularly Germany.

20.    Cerberus, initially through Mr. Teitelbaum, but later confirmed by senior management, established a "working relationship" with Direct under which Cerberus agreed to provide a fee for consulting and other services rendered by Direct and Mr. Koidl.

21.    On December 26, 2002, Mr. Teitelbaum reduced the basic aspects of the arrangement, which had been discussed between Messrs Teitelbaum, Bruno, and Koidl, to a writing, describing the "key commercial terms" between Cerberus and Direct.

22.    These "key commercial terms" were defined in the December 26th e-mail transmission, and were accepted by Direct.  A copy of the December 26th e-mail is annexed as Ex. A.

23.    The December 26th e-mail (and a December 30, 2002 e-mail from Mr. Teitelbaum) contemplated a future written contract between the parties, which would be presented by Cerberus's lawyers.  The "key commercial terms" of the December 26th e-mail were later reduced to an agreement prepared by Cerberus's lawyers, as contemplated and promised by Mr. Teitelbaum.

24.    The "key commercial terms" did not change from the time of Mr. Bruno's initial introduction of the terms to the time of Mr. Teitelbaum's December 26th e-mail or the exchange of the written agreements between the parties.

25.    The "key commercial terms" included: (i) $12,000 per month paid to Direct at or about the time of an investment or acquisition by Cerberus exceeding €30 million; (ii) 1% of net invested amount by Cerberus for investments sourced exclusively by Direct; if the deal is not exclusive, the 1% consulting fee is discounted by 40%; (iii) 20% of all profits from an investment made by a Cerberus entity above a 20% unleveraged internal rate of return ("IRR")

on the invested amount; and (iv) reimbursement of expenses not to exceed $12,000 per month.

"Exclusive" was defined by Cerberus as a deal in which *"there are no other third parties*

*submitting bid prices . . . no others competing on price throughout the process . . . "*

26.    These "key commercial terms" were memorialized by Mr. Teitelbaum in the December 26th e-mail to Mr. Koidl, copying Mr. Bruno of Cerberus.

27.    Mr. Bruno did not, and has never objected to the December 26th e-mail from Mr. Teitelbaum to Direct.

28.    Mr. Bruno never informed Direct that Cerberus disavowed the "key commercial terms" in the December 26th e-mail or the Consulting Agreement presented by Cerberus to Mr. Koidl.

29.    After receiving the December 26th e-mail, Messrs. Koidl and Teitelbaum had a telephone conference to discuss reducing the terms to another writing prepared by Cerberus's attorneys, during which conversation Mr. Teitelbaum remarked, *"Don't worry Roman, we always pay our consultants."*

30.    Mr. Teitelbaum on December 30, 2002 agreed to expand the definition of "exclusive" in the December 26th e-mail to include deals brought to Cerberus by Direct or deals in which Direct acted as the party making the target introduction to Cerberus. If Direct acted alone in making an introduction to Cerberus, the relationship would be considered "exclusive."

31.    In his December 30th e-mail to Mr. Koidl, Mr. Teitelbaum remarked, *"my prior email did reflect how we intend to work with you and that email was also consistent with our conversation."* (emphasis supplied).   Mr. Teitelbaum also confirmed the system in which Cerberus and Direct would communicate, including addressing and discussing deals by telephone, e-mail, or in person.

32.    After the parties agreed to the "key commercial terms," and with Cerberus's knowledge and encouragement, on or about January 1, 2003 Direct began to investigate investment opportunities for Cerberus.   At the time, Cerberus did not have a German office and had limited experience for the type of investments Cerberus wanted to pursue in Germany.

33.    On or about January 23, 2003, Mr. Koidl met with Dr. Hans-Joachim Körber, CEO of Metro Holding AG in Düsseldorf about an €8 billion disinvestment vehicle known as Diavaco.  This opportunity was presented to Cerberus.

34.    From January 2003, Direct continued to use its best efforts to investigate and research investment opportunities for Cerberus, presenting the opportunities to Cerberus. Direct concentrated on presenting investment opportunities in distressed assets and asset portfolios located in Europe.

35.    On or about January 25, 2003, Cerberus, by Cerberus Global Investments, LLC, presented to Direct a "Consulting Agreement," a copy of which is annexed as Ex. B and which terms are adopted by reference.  The Consulting Agreement, prepared by Cerberus's

attorneys, further memorialized the "key commercial terms" between Cerberus and Direct, and provided additional terms between the parties relative to their overall relationship. The Consulting Agreement elaborated on but did not change the "key commercial terms."

36.    The January 25, 2003 Consulting Agreement was represented by Cerberus to be a "standard" agreement, and, indeed, it was so "standard" that it mistakenly contained the name of another entity with which Cerberus either entered into a similar arrangement or was negotiating.

37.    On or about February 10, 2003, Mr. Koidl presented to Cerberus some revised language, but did not change the "key commercial terms" that were the basis of the parties' relationship and agreement: (i) $12,000 per month paid to Direct at or about the time of an investment or acquisition by Cerberus exceeding €30 million; (ii) 1% of net invested amount by Cerberus for investments sourced exclusively by Direct; if the deal is not exclusive, the 1% consulting fee is discounted by 40%; (iii) 20% of all profits from an investment made by a Cerberus entity above a 20% IRR on the invested amount plus certain expenses; and (iv) reimbursement of expenses not to exceed $12,000 per month. A copy of the February 10, 2003 Consulting Agreement, which terms are adopted by reference, is annexed as Ex. C.

38.    The changes proposed by Direct in its revised Consulting Agreement did not alter the 'Cerberus standard' financial terms agreed to by the parties with respect to any investment opportunity presented by Direct, that is the 1% of the net invested amount consulting

fee, 20% of profits above a 20% IRR on the invested amount, and reimbursement of deal expenses incurred by Direct.

39.    At all times relevant, Direct and Mr. Koidl were dealing with Cerberus Global Investments, LLC, Cerberus Capital Management, L.P., Cerberus Partners, L.P., and Cerberus Global Investment Advisors, LLC, all of which represented, and Direct understood were considered as Cerberus and all of which are "Affiliates" and part of the Cerberus Group under the parties' agreement. Cerberus did not communicate to Direct that it objected to any terms of the Consulting Agreement annexed as Ex. C.

40.    Cerberus did not reject or object to the terms of the Consulting Agreement changes by Direct. At all times relevant, Cerberus operated under the terms consistent between the Consulting Agreement annexed as Exs. B and C, which confirmed the "key commercial terms" identified in the December 26th e-mail, Ex. A, and confirmed by Mr. Teitelbaum in his December 30th e-mail.

41.    Cerberus and Direct tendered and rendered performance under the Consulting Agreement annexed as Ex. C.

42.    Cerberus proposed the "key commercial terms" in the December 26, 2002 e-mail by Mr. Teitelbaum which were accepted by Direct, and proposed the terms of the January 25, 2003 Consulting Agreement, which were accepted by Direct except with regard to the limited

changes proposed to certain other terms, as memorialized in the February 10, 2003 Consulting Agreement presented by Direct and accepted by Cerberus.

43.     The drafting process between the parties did not reveal any disagreement as to the "key commercial terms."

44.     Cerberus, by its consent, actions, deeds, and oral and written words, agreed and contracted that the "key commercial terms" proposed by Cerberus in the December 26th e-mail governed the parties' relationship, which terms were accepted by Direct. Cerberus confirmed it accepted the Consulting Agreement pursuant to the e-mail exchange confirmation process as proposed in Mr. Teitelbaum's December 30th e-mail and that was discussed and agreed upon by the parties. In numerous e-mails and discussions, Cerberus confirmed and acknowledged the Consulting Agreement as its signature to the contract, as per the parties' agreement.

45.     The terms of the January 25, 2003 and February 10, 2003 Consulting Agreements further detailed the "key commercial terms" but did not change such terms, and ratified the parties' business relationship with regard to matters that did not include the "key commercial terms."

46.     Mr. Teitelbaum represented that the terms of the February 10, 2003 Consulting Agreement were accepted, and also promised he would secure the signature of Cerberus to the February 10, 2003 Consulting Agreement. During all times relevant to this

Complaint, the parties operated under the "key commercial terms" of the January 25, 2003 and

February 10, 2003 Consulting Agreement. As per the agreement proposed by Mr. Teitelbaum

and accepted by Direct, email exchanges served as the confirmation process between Cerberus

and Direct, and the e-mail exchange between the parties confirmed the contract.


      47.    The terms of the February 10, 2003 Consulting Agreement, including the

"key commercial terms," form and therefore constitute the contract between Cerberus and Direct

that is the subject of this lawsuit.


      48.    The contract provides, in relevant part, various forms of compensation for

Direct's role in identifying investment opportunities for Cerberus. The "key commercial terms,"

as reflected in the Consulting Agreement exchanges that specify the compensation to which

Direct is entitled:


      Article 3.1:    1% of the amount invested as equity by Cerberus or its

Affiliates or the Cerberus investor to whom the investment is referred.


      Article 3.2:   $12,000 per month Retainer Fee if the invested amount

exceeds €30 million from the month Cerberus or its Affiliates closes the investment to the date

the contract is terminated.


      Article 3.3:   20% of all Profits from the investment after the receipt by

Cerberus or its Affiliates of a 20% Preferred Return. No matter the means of calculating

Cerberus's preferred return in either the Consulting Agreement versions of Ex. B or Ex. C, the amount due to Direct upon exiting the subject investment (dAF) is determined on the same principle.

Article 3.4:    Reimbursement to Direct of Deal Expenses up to a maximum of $12,000 per month.

Article 3.5:    If Cerberus closes a Proposed Investment that is not an Exclusive Investment, the 1% Consulting Fee of Article 3.1 is discounted by 40%.

49.    These fundamental terms do not deviate from the "key commercial terms" of the December 26th e-mail from Cerberus to Direct, confirming the terms discussed in New York between Messrs. Bruno and Koidl, which were accepted by Direct.

50.    The parties contemplated and agreed that the terms of any agreement between them would be governed by New York law, and the Consulting Agreement memorialized such agreement at Article 5.3.

51.    The Consulting Agreement and the parties contemplated that any dispute arising between the parties under their contract would be litigated in New York.

52.    Relying on the parties' contract and Mr. Teitelbaum's promises that Direct would be compensated for its work in presenting deals in which Cerberus made an investment,

Direct explored investment opportunities for Cerberus, proceeding to make introductions on behalf of Cerberus to various banks, financial institutions, and others.

53.    On or about March 6, 2003, Cerberus wrote to Direct to advise that Mr. Koidl should deal directly with Mr. Teitelbaum.  In the correspondence, Cerberus acknowledged that it had "contracted" with Direct.

54.    Mr. Koidl honored the reporting instructions given to Direct by Cerberus.

55.    Mr. Bruno of Cerberus wrote Direct on March 12, 2003, confirming Cerberus's interest in working with Direct on five exclusive transactions with certain enumerated investment targets.  This e-mail from Mr. Bruno,  titled "transactions," comported with the confirmation process in Mr. Teitelbaum's December 30, 2002 e-mail and in the Consulting Agreement and which was addressed with Mr. Teitelbaum to acknowledge 'Koidl deals,' investment opportunities that were sourced by Direct.

56.    Mr. Teitelbaum, a Cerberus Managing Director, had actual and apparent authority to enter into a contract with Direct.

57.    Mr. Bruno of Cerberus never challenged Mr. Teitelbaum's authority to contract with Direct.

**B.**    **Direct Introduces IRU to Cerberus**

58.    IRU was a special purpose vehicle established by Dresdner Bank in early 2003 to sell distressed, non-performing, sub-performing and other non-strategic investments valued at approximately €35 billion.

59.    Soon after IRU was established by Dresdner Bank, Mr. Koidl explored investment opportunities at IRU for Cerberus, ultimately presenting its portfolio of investment assets to Cerberus.

60.    Cerberus relied on Direct to introduce Cerberus to the investment opportunities provided by IRU.

61.    While Cerberus had certainly heard of Dresdner Bank, Mr. Teitelbaum explained that Cerberus had no contacts at IRU and was very interested in pursuing investment opportunities provided by IRU, directing Mr. Koidl to get Cerberus introduced to IRU.

62.    Prior to the introduction by Mr. Koidl, Cerberus did not have a contact at IRU, nor had Cerberus ever had any direct communications with IRU.

63.    On or about April 9, 2003, Mr. Koidl initiated a telephone conference with senior Dresdner Bank official Dr. Volker Deville, Member of the Management Board, Chief

Operating Officer, and Chief Financial Officer of IRU, to facilitate a meeting with Cerberus, the purpose of which meeting was to introduce Cerberus to IRU and its assets.

64.    Cerberus did not participate in the April 9, 2003 telephone conference, and Dr. Deville expressed to Mr. Koidl that he had never heard of Cerberus prior to Direct's introduction.

65.    Immediately after the April 9, 2003 telephone conference, Mr. Koidl called Mr. Teitelbaum to share the news about IRU. Mr. Teitelbaum expressed considerable excitement and interest in meeting with IRU officials and exploring investment opportunities at IRU, directing Mr. Koidl to explore this investment opportunity.

66.    On or about April 14, 2003, Mr. Koidl met with Dr. Deville to personally introduce Cerberus to IRU. At the meeting, Dr. Deville represented that he had not previously met with Cerberus and did not have any business dealings or contacts with Cerberus, and did not even know who Cerberus was. This was the second time IRU was introduced to Cerberus, and the first personal introduction of Cerberus to IRU, all of which was accomplished solely by Cerberus's advisor, Mr. Koidl.

67.    During the April 14, 2003 meeting, Mr. Koidl discussed the possibility of Cerberus investing in or making an acquisition of IRU's entire portfolio of assets or certain IRU investments.

68.    IRU's assets were the type of equity and debt investments Cerberus informed Direct it was interested in considering.

69.    IRU included dAF and a portfolio of German non- and sub-performing loans that later became the subject of a potential transaction with Cerberus, known as "Project Phoenix."

70.    At the April 14th meeting, Dr. Deville and Mr. Koidl specifically discussed dAF.

71.    After the April 14th meeting, Mr. Koidl called Mr. Teitelbaum and informed him about IRU and its investments, including dAF.

72.    During the conference, Mr. Teitelbaum expressed to Mr. Koidl how excited he was about the prospect of a Cerberus investment in IRU's portfolio of assets, remarking that this would be a *"landmark transaction."* Mr. Bruno used the same expression in a November 10, 2003 letter to IRU concerning Cerberus's investment in IRU asset Project Phoenix.

73.    Mr. Teitelbaum immediately conferenced Mr. Bruno into the call with Mr. Koidl, and both Messrs. Bruno and Teitelbaum expressed interest in IRU and its portfolio of investment opportunities, and asked Mr. Koidl to pursue these opportunities on behalf of Cerberus.

74.     Cerberus was so excited about the investment opportunities at IRU that it wanted to immediately discuss possible transactions with IRU.  At Dr. Deville's direction during the April 14th meeting, Mr. Koidl recommended to Messrs. Bruno and Teitelbaum that Cerberus prepare a letter of introduction (on Cerberus letterhead) to IRU.

75.     The next day, Cerberus directed a letter of introduction to IRU.  Drafts of the letter were furnished to Mr. Koidl for comment and correction.  Mr. Koidl assisted in drafting the letter, exchanging comments with Mr. Teitelbaum.

76.     One important change in the first draft of the April 15, 2003 letter from Cerberus was Mr. Koidl's insistence that the letter confirm that Direct introduced Cerberus to IRU.  Messrs. Koidl, Bruno, and Teitelbaum specifically discussed the letter would serve as written confirmation and acknowledgement of the contract between the parties and that IRU and its portfolio of investments was introduced to Cerberus by Direct.  This change was important to Mr. Koidl, and Cerberus consented to these changes to the letter to reflect this confirmation.  Mr. Bruno signed the letter.

77.     The April 15, 2003 letter acknowledged Mr. Koidl's role in introducing Cerberus to IRU, referring to Mr. Koidl as Cerberus's advisor.  Cerberus admitted in the letter that it was looking to expand in Germany, which is why it engaged Direct.

78.     Messrs. Teitelbaum and Koidl agreed that the April 15th letter was the writing that confirmed Direct introduced Cerberus to the IRU portfolio of investments and

recognized and confirmed and ratified the parties' contract. Along with e-mail exchanges, this
Case 1:07-cv-03310-LLS     Document 19-2     Filed 07/27/2007     Page 20 of 96
was an additional "signature" to the Consulting Agreement.

79.     After the April 15th letter, Mr. Teitelbaum remained extremely interested in IRU, pressing Mr. Koidl to further engage IRU and arrange meetings.

80.     On or about April 27, 2003, Direct arranged a meeting between IRU and Cerberus. Attending the meeting with Mr. Koidl were: Dr. Deville; Andreas Ritter, IRU's Chief Portfolio Manager; Karl-Rudolf Grosche of Dresdner Bank; Messrs. Bruno and Teitelbaum of Cerberus; and David Knower, head of Cerberus's German operations. Among other topics and investment opportunities, dAF and the project finance business of IRU were discussed at the meeting. This was the first time Cerberus representatives (other than Mr. Koidl) and IRU addressed dAF in the same meeting.

81.     At the April 27th meeting, IRU officials specifically discussed dAF and other IRU investments, and Mr. Bruno commented that the investments of IRU matched the business model being pursued by Cerberus in Germany. At the time of the meeting, and during 2003, Cerberus's discussions with IRU were focused on Cerberus acquiring all interests in IRU portfolio assets, including dAF.

82.     On April 29, 2003, Direct furnished to Cerberus a list of some of the investment opportunities being worked on by Mr. Koidl, including the investment opportunities provided at IRU. Cerberus accepted the list.

83.    Direct is not aware whether Cerberus executed the Consulting Agreement in New York, but was not in receipt of an executed copy. By failing to remit the signature page, Cerberus started a process by which it intended to defraud Direct.

84.    Direct continued to work on and present to Cerberus possible investments, and Mr. Koidl continued to correspond with Mr. Teitelbaum and other senior Cerberus officials about investment opportunities, including Schmidt Bank and Metro Holdings AG. In fact, in one letter to Metro Holdings, Cerberus referred to Mr. Koidl as its "advisor." Cerberus was receptive to each of these investment opportunities.

85.    On June 18, 2003, in order to assist in bringing Cerberus and IRU closer to a deal, Mr. Koidl hosted a private dinner in his Berlin apartment. The event was attended by Germany's Vice Minister of Economics and Labor, Rezzo Schlauch; the former CEO of the German State Bank, Kreditanstalt für Wiederaufbau, Dr. Gert Vogt; Messrs. Teitelbaum and Knower; Dr. Deville; Dr. Walter Kuna, CEO of Lazard & Company (Frankfurt); and other dignitaries.

86.    After the initial April 2003 meetings with Cerberus, IRU adjourned future meetings until it could structure the portfolios for investment by third-parties. On June 24, 2003, IRU's Chief Executive Officer, Jan Kvarnstrom, publicly announced that IRU intended to disinvest Dresdner Bank of non- and sub-performing assets and loans and non-strategic investments. This was the first public announcement of IRU's intention with regard to these assets.

87.    After IRU's public announcement, Cerberus became concerned that other

banks or investors might compete with Cerberus for IRU's business.  At the time, Cerberus

enjoyed a special relationship with IRU officials as a result of Mr. Koidl's involvement and

Cerberus's exclusive access to IRU, but still was concerned that other investors might compete

for the assets IRU announced it intended to bring to market.

88.    Mr. Teitelbaum repeatedly asked Mr. Koidl to contact Dr. Deville to learn

whether IRU was considering Cerberus for an investment in all or part of IRU's portfolio.  At

Cerberus's request, Mr. Koidl continued to contact IRU officials and worked to maintain the

relationship that he formed between IRU and Cerberus.

89.    Mr. Teitelbaum instructed Mr. Koidl to preserve the relationship formed

between Cerberus and IRU, and Direct took steps to maintain the relationship and ensure that

Cerberus was considered a favored investment partner of IRU.

## C.    Cerberus's Tactics to Avoid Direct's Fees

90.    During 2003-2004, Cerberus continued to negotiate with IRU about

certain of its assets, including Project Phoenix.

91.    In early August 2003, Cerberus was impatient with the speed of

negotiations with IRU and concluded that Dr. Deville may not have been the right person to deal

with at IRU.  Mr. Koidl warned about ignoring the IRU management structure, but was pressed

by Mr. Knower to make a more senior introduction. Mr. Koidl contacted Dr. Vera Bloemer, former Director of Mergers & Acquisitions at Deutsche Bank AG, to inquire whether Herbert Walter, CEO of Dresdner Allianz AG and a member of the Executive Board of Dresdner's major shareholder, Allianz AG, would accept a meeting. Mr. Walter declined to meet because IRU was supposed to act independently from Dresdner Bank and Dresdner Allianz, and Mr. Walter left operational transaction issues to the assigned IRU management.

92.     When Mr. Knower learned that Mr. Walter declined the meeting, he unilaterally contacted Jan Kvarnstrom of Dresdner Bank on August 7, 2003 to arrange a private IRU - Cerberus meeting. This move began a scheme to marginalize, and ultimately defraud Mr. Koidl and Direct, and to develop cover and an excuse not to pay Direct under the parties' contract.

93.     On August 19, 2003, Mr. Kvarnstrom directed his secretary to have Mr. Koidl attend the meeting arranged by Cerberus because IRU was aware that Mr. Koidl regularly attended meetings between Cerberus and IRU, and Dresdner Bank considered Mr. Koidl important to the process of negotiating with Cerberus. As part of the meeting invitation, Mr. Kvarnstrom's office forwarded a copy of Mr. Knower's letter to Mr. Koidl.

94.     Mr. Kvarnstrom of IRU met with Messrs. Teitelbaum and Koidl on August 25, 2003, accepting from Mr. Teitelbaum a white paper called "Proposed Investment Structure Dresdner Bank."

95.    Prior to the meeting, Mr. Koidl was asked to execute a confidentiality agreement prepared by Cerberus Global Investment Advisors, LLC. The confidentiality agreement was signed by Messrs. Bruno and Koidl.

96.    After Cerberus's presentation to IRU, Mr. Kvarnstrom advised Mr. Teitelbaum that the operation processes were being driven by Dr. Deville, and that further communications should be directed to Dr. Deville. At Mr. Teitelbaum's direction and with Cerberus's knowledge and consent, Mr. Koidl facilitated these further contacts between Dr. Deville and Cerberus.

97.    On September 26, 2003, a meeting was scheduled to introduce Messrs. Koidl, Teitelbaum, and Knower to the IRU "transaction team," consisting of Tim Hanford, Dr. Widman, and Thomas Wiegand of Dresdner Bank. Mr. Koidl learned that Dr. Horst Clemens, Managing Director of IRU, had been assigned to lead the transaction process. Mr. Wiegand, who was involved in the dAF transaction for IRU, now works for Cerberus.

98.    At the September 26, 2003 meeting, Dr. Clemens explained that IRU was prepared to begin selling certain investments and that Cerberus was a credible buyer or possible future joint venture partner.

99.    The September 26th meeting focused on financial structuring and technical transaction issues, and on October 2, 2003, Direct was instructed by Cerberus to forward to IRU a Cerberus-prepared Power Point presentation explaining potential deal terms.

100.    Cerberus made it to the final round of bidding, but Project Phoenix in or about March 2004 was awarded to another investor. Cerberus did not prevail at auction for Project Phoenix because of the sensitivity of the large number of borrowers in Dresdner Bank's home market vis-à-vis large U.S. investors like Cerberus, a fact made known to Cerberus by Direct.

101.    Indeed, because of these types of sensitivities and the cultural knowledge that is important to successfully negotiate deals with companies like Dresdner, Direct's efforts on behalf of Cerberus were extremely valuable to Cerberus.

102.    Sometime in 2004, Cerberus began focusing on dAF, which Cerberus first learned about in the April 27, 2003 meeting arranged by Direct.

103.    Cerberus did not enter into its contract and agreement intending to defraud Direct, but after learning of the value of IRU, and having gained the trust of IRU through its involvement in negotiating Project Phoenix, Cerberus decided that it did not need Mr. Koidl to negotiate dAF, and did not want to pay Direct if it closed a deal for dAF.

104.    It was the intent and desire of Cerberus to take actions and steps to make it appear that Direct had no role or no more than a limited or marginal role in introducing Cerberus to dAF, taking advantage of Cerberus's great size and wealth to later claim that Cerberus did not need a smaller entity such as Direct to introduce Cerberus to Dresdner and/or IRU.

105.    Unlike Project Phoenix, dAF was a non-auction format negotiation, and Cerberus negotiated exclusively with IRU for dAF.

106.    As part of its plan and scheme to avoid paying Direct under the parties' contract, Cerberus neglected to include Direct in important discussions and negotiations between IRU and Cerberus. Direct was not even made aware of all the dAF discussions, despite previous statements by Mr. Teitelbaum that Mr. Koidl was an integral player in assisting Cerberus with IRU; indeed, at one point in 2003, Mr. Koidl was informed by Cerberus that he was the only person who should be in contact with Dresdner with regard to IRU discussions.

107.    Mr. Koidl informed Mr. Knower of his concern that Direct was being ignored by Cerberus, and Mr. Knower responded that Cerberus was, as a result of the Project Phoenix dealings, already known to IRU, and that Direct's further involvement in IRU matters was no longer necessary.

108.    By the end of 2003, Cerberus was mostly dealing with IRU on its own, but Cerberus occasionally involved Mr. Koidl. For instance, on November 3, 2003, Cerberus hosted a dinner in Frankfurt am Main for Dr. Deville, Dr. Clemens and other IRU officials. Mr. Koidl attended with Messrs. Bruno, Knower, Teitelbaum, and Vice President Quayle.

109.    In addition, Mr. Teitelbaum continued to ask Mr. Koidl to review certain presentation materials that would be furnished to IRU, particularly for a meeting in Japan.

Despite asking to attend, Mr. Koidl was excluded from the Japan meeting, but Mr. Teitelbaum continued to ask Mr. Koidl to assist Cerberus in preparing for the Japan meeting.

110.    On January 30, 2004, Mr. Koidl met with Mr. Bruno in Frankfurt am Main, and reminded Mr. Bruno of the "key commercial terms." Mr. Bruno acknowledged the parties' agreement and Direct and Mr. Koidl's involvement in: (i) arranging the introduction to IRU; (ii) the investment opportunities presented as a result of this introduction; and (iii) the efforts of Direct in making the exclusive IRU introduction and facilitating meetings and negotiations, among other services furnished by Direct to Cerberus. Mr. Bruno commented, *'Roman, we do not have amnesia. We know about your involvement, and you will get paid if we get something closed at IRU.'*

111.    These statements by Mr. Bruno, acknowledging the contract with Direct, are consistent with the December 26, 2002 e-mail from Mr. Teitelbaum to Mr. Koidl, copying Mr. Bruno, where Cerberus represented that *"we otherwise pay people for true exclusives only"* and that if Cerberus is *"selected to negotiate one-on-one with the seller on price that would entitle [Direct] to the full fee."* As it turned out, IRU's portfolio of investment opportunities was presented to Cerberus by Direct, and the dAF deal was an exclusive one-on-one negotiation with IRU.

112.    After this meeting with Mr. Bruno, Cerberus no longer involved Direct in any discussions or negotiations with IRU, and closed the dAF acquisition without Mr. Koidl's participation.

113.    Cerberus had motive and incentive to take steps to avoid paying Direct, particularly after Cerberus learned of the value of available deals at IRU, such as dAF and Project Phoenix.

114.    For instance, after considering the value of Project Phoenix, Mr. Bruno of Cerberus commented to Mr. Koidl that the range of fees to be earned by Direct was large, and asked Direct to agree to accept a "cap." Mr. Koidl declined to modify the parties' contract.

115.    Mr. Bruno's request that Direct agree to "cap" its fees reflects Cerberus's understanding and confirmation of the parties' contract and its terms, particularly the payment that could be due Direct if Cerberus made an investment in an opportunity presented through Direct's efforts.

**D.    Cerberus Finalizes the dAF Deal**

116.    During 2004, Cerberus negotiated and structured the dAF deal without the involvement of, or any reporting to Direct or Mr. Koidl.

117.    In or about April 2005, Cerberus Capital Management, L.P., a private equity fund controlled and managed by Cerberus (via FERN S.à.r.l., a specially created vehicle for the purchase) completed a $1.37 billion acquisition of dAF. The purchase was financed as follows: $370 million was funded by equity contributed by Cerberus; and $1 billion was funded through a term loan to dAF by a banking syndicate under the lead of Lehman Brothers. This

loan refinanced debt previously held by dAF's shareholders, which at the time of the acquisition was valued at $1.8 billion. In this transaction, Cerberus acquired the share capital and certain debt held by dAF's shareholders.

118.    Cerberus acquired all of dAF's shares through FERN S.à.r.l., a limited liability company organized under the laws of Luxembourg, which was 99.6% controlled by Cerberus. Prior to the acquisition, dAF's equity and debt was impaired, which is why Dresdner's debt and equity investment in dAF was part of IRU. The investment terms were extremely favorable to Cerberus.

119.    The purchase price paid by Cerberus did not cover the debt in the amount of $1.8 billion owed by dAF to Dresdner Bank and the other investors in dAF, let alone their equity investments. As a result, Dresdner Bank and the other banks and investors had to write off a very significant portion of their investments in dAF.

120.    The buy-out by Cerberus enabled Dresdner Bank and its co-investors in dAF to cut their losses. The recapitalization of dAF once again made it a viable entity which has since outperformed its competitors in the market. At the time of the acquisition, Dresdner Bank and its co-creditors carried the primary remaining risk of a dAF collapse because, as the purchase price paid by Cerberus reflects, the equity investors had already lost their entire investment.

121.    On or about June 30, 2005, dAF was renamed AerCap B.V. ("AerCap").

122.    On November 27, 2006, AerCap completed the initial public offering ("IPO") of its shares. At that time, AerCap's equity was valued by investors at $1,955,850,011. Including the $1 billion in debt on AerCap's books, at the time of the IPO, the value of the Company had more than doubled since Cerberus's acquisition in April 2005, and the value of Cerberus's unleveraged equity investment almost quadrupled.

123.    In the IPO, Cerberus sold shares worth $443,900,000 to the public, and as of April 13, 2007 its remaining investment was worth $ 1,762,215,014. As of April 13, 2007, the value of Cerberus's unleveraged equity investment in AerCap (including the value of the shares it sold in the IPO) had increased five times to $2,206,115,014.

124.    Under the contract between Cerberus and Direct, Cerberus owes to Direct the following fees as a result of the dAF transaction:

A.    1% Consulting Fee on the unleveraged Invested Amount of $370 million: $3.7 million.

B.    20% Incentive Fee, to be determined and calculated after Cerberus has earned its preferred return of 20% IRR. As of the filing date of this Complaint, Direct is not aware that Cerberus has earned an amount equal to a 20% IRR on the Invested Amount. However, to illustrate the value of Direct's possible Incentive Fee, the following calculation indicates the Incentive Fee that Cerberus would have owed to Direct had Cerberus sold its entire investment in the IPO at the IPO price of $23 per share:

| | |
|---|---|
| Total Value of Cerberus's Investment at IPO | $1,799,450,011 |
| (Costs @ 5% of investment) | ($18,500,000) |
| (Invested Amount) | ($370,000,000) |
| (1% Consulting Fee) | ($3,700,000) |
| Net Profit after Cost | $1,407,250,011 |
| 20% IRR          Yr. 1 | $74,000,000 |
|                       Yr. 2 (.41 year) | $30,340,000 |
| Total IRR | $104,340,000 |
| Profit after 20% IRR | $1,302,910,011 |
| 20% Incentive Fee | $260,582,002 |

If Cerberus had liquidated its investment as of April 13, 2007, conservatively assuming its deal related costs at 5%, the value of Direct's Incentive Fee would have been:

| | |
|---|---|
| IPO Proceeds to Cerberus | $443,900,000 |
| Value of Cerberus's Remaining Investment as of April 13, 2007 | $1,762,215,014 |
| Total Gross Value of Cerberus's Investment as of April 13, 2007 | $2,206,115,014 |
| (Costs estimated @ 5%) | ($18,500,000) |
| (Invested Amount) | ($370,000,000) |
| (1% Fee to Direct) | ($3,700,000) |
| Net Profit after Cost | $1,813,915,014 |
| 20% IRR (closing to determination date) | $130,460,000 |
| 20% Incentive Fee | |
| Profit after 20% IRR | $1,683,675,014 |
| 20% Incentive Fee | $336,735,003 |

125.    The advisory and consulting services furnished by Direct to Cerberus led to Cerberus being presented to the dAF deal.

126.    Direct has demanded payment under the contract for its consulting and advisory services to Cerberus.  Cerberus Global Investments, LLC, Cerberus Capital Management, L.P., Cerberus Partners, L.P., and Cerberus Global Investment Advisors, LLC all of which are "Affiliates" and Cerberus Group companies under the Consulting Agreement and the parties' contract, have failed to make any payment to Direct.

## FIRST CAUSE OF ACTION
## <u>BREACH OF CONTRACT</u>

127.    Plaintiff repeats, realleges, and adopts the allegations in paragraphs 1 through 126 and incorporates them herein by reference.

128.    Direct negotiated the terms of a contract with Cerberus on or about December 13, 2002, which "key commercial terms" were memorialized in a December 26, 2002 writing prepared by Mr. Teitelbaum of Cerberus, who had authority to enter into an agreement on behalf of Cerberus.

129.    The December 26th and 30th e-mails and the exchanges of Consulting Agreements, along with other e-mail communications in 2003-2004 between the parties is evidence sufficient to indicate that in the communications a contract was made between the parties.

130.    The written exchanges between the parties were pursuant to an agreement between the parties to confirm that they intended to be bound, and Cerberus did not object to Direct asserting that the consulting and other activities Direct performed on behalf of Cerberus were pursuant to the parties' agreement although senior management knew of the terms and their significance as evidenced by the fact that Mr. Bruno was copied on the December 26, 2002 e-mail from Mr. Teitelbaum to Mr. Koidl and an e-mail from Mr. Koidl to Mr. Teitelbaum, dated December 29, 2002, that discussed the key commercial terms of the relationship between Cerberus and Direct.

131.    The tangible writings (e-mails) between Direct and Cerberus constitute a writing and a symbol adopted by the parties such that they intended to be bound by the writings evidencing the "key commercial terms."

132.    The parties later further detailed their agreement, culminating in the February 10, 2003 Consulting Agreement, which was confirmed, ratified, and acknowledged by Cerberus and partially performed by Cerberus.

133.    Under the parties' contract, Direct performed consulting and advisory services.

134.    Direct complied with the contract by exclusively identifying, discovering, and sourcing target investment opportunities for Cerberus, including presenting dAF.

135.    Direct exclusively introduced Cerberus to the investment opportunities presented by IRU's portfolio of debt and equity investments, including dAF.

136.    Direct presented the dAF investment opportunity to Cerberus or one of the Cerberus affiliates, entities, or group of companies and thereby performed all of its obligations under the contract.

137.    The dAF transaction was not an auction, and there were no bidders competing against Cerberus to acquire dAF.

138.    By meetings, telephone, e-mail and other writings, Direct presented IRU and its portfolio of investment opportunities, including dAF, exclusively to Cerberus, and Cerberus confirmed by e-mail, deeds, conduct, telephone, writings, and meetings that Cerberus was interested in IRU and dAF as a proposed target investment.

139.    Cerberus has never notified Direct nor represented that the presentation of IRU and/or dAF by Direct to Cerberus was already known to Cerberus.

140.    In fact, in accordance with the contract, Cerberus should have previously informed Direct when it already knew of investment opportunities presented by Direct. Cerberus complied with this requirement when, for instance, Mr. Teitelbaum advised Mr. Koidl that Cerberus already was aware of Schmidt Bank when the opportunity was presented to Cerberus.

141.    During the effective period of the contract, Direct and Mr. Koidl did not submit to third parties investments presented to Cerberus.

142.    Direct performed all of its duties under the contract and earned a nonrefundable fee under the parties' contract.

143.    Under the contract, Direct is entitled to receive, and Cerberus is contractually obligated to pay Direct compensation for its services, including the fees triggered by the "key commercial terms" between the parties.

144.    Cerberus has and had a duty under the contract between the parties to pay the fees earned by Direct.

145.    Cerberus breached the contract between the parties by failing to pay, despite Direct's demand, any fees earned under the parties' contract after the dAF deal closed.

146.    There were no material terms left open between the parties with regard to the writings memorializing the contract between Direct and Cerberus.

147.    By its conduct, comments, words, deeds, actions and activities, Cerberus partially performed under the parties' contract.

148.    Cerberus performed and objectively manifested its intent to be bound under the agreement by, among other things and performance: (a) accepting the exclusive introduction by Direct of investment opportunities in distressed assets, debts, and portfolios in Europe; (b) seizing upon its right to invest in the investment opportunities introduced by Direct, including dAF; (c) using Direct to become aware of investment opportunities in Europe of the type and kind Cerberus contracted with Direct to present; (d) exclusively locking-up Direct during the period of the agreement to learn of such investment opportunities to the exclusion of other actual or potential customers or clients of Direct and Mr. Koidl; (e) approving target investments after learning of the investment opportunities through Direct; (f) enjoying the exclusive right to negotiate with targeted investments introduced by Direct, to the exclusion of other actual and potential Direct clients; (g) benefiting from Direct not disclosing to, nor

assisting other actual or potential clients with the investment targets presented to Cerberus; (h)

benefiting from Direct's assistance, to the exclusion of others, in negotiations with IRU and

others and introducing Cerberus to IRU and the investment opportunities presented thereby; and

(i) learning from Direct important cultural aspects of dealing with IRU that assisted Cerberus in

reaching a deal and transaction with IRU.

149.    Cerberus also partially performed under the contract by reimbursing

Direct for its expenses incurred in presenting IRU and dAF to Cerberus and making other

payments to Direct under the contract.

150.    Cerberus ratified the parties' agreement by performance and by

conducting itself in conformance with the parties' agreement.

151.    Direct accepted the performance of the parties' contract by Cerberus.

152.    The performance by Cerberus and its interaction and dealings with Direct

and IRU was unequivocally referable to the parties' contract.

153.    Direct relied upon the performance by Cerberus under the parties'

agreement by providing the consulting services contemplated by the contract, including

identifying and presenting to Cerberus a variety of exclusive investment opportunities, including

those presented by IRU and dAF.  Direct also followed Cerberus's instructions with regard to

travel, sending Mr. Koidl on a number of trips throughout Europe in favor of facilitating an investment by Cerberus in IRU or its portfolio of assets.

154.    The writings, performance, and conduct between the parties relating to the contract indicate that Cerberus and Direct intended to be bound by the "key commercial terms."

155.    A contract between the parties exists in fact, or, if not in fact, is implied in law and/or implied in fact.

156.    Cerberus intended to be bound by the parties' agreement, specifically the "key commercial terms," as indicated by Cerberus's performance, actions, words, and deeds and by Cerberus accepting Direct's performance under the contract.

157.    As a result of Cerberus's breach of the contract, Cerberus has caused Direct to be damaged, and Direct has been damaged in the amount of $3.7 million, fixed as 1% of the $370 million invested by Cerberus in dAF. Direct is entitled to interest on the amount due, fixed from the date the dAF transaction closed.

158.    In addition, Cerberus will owe to Direct a sum likely in excess of $300 million after Cerberus has earned its 20% IRR on its investment in dAF/AerCap.

159.    Direct is not aware whether Cerberus closed or made investments in any other deal or investment opportunity presented by Direct to Cerberus, including at IRU, but will amend the Complaint to the extent it is learned Cerberus failed to pay Direct for any other deal introduced by Direct under the parties' contract.

## SECOND CAUSE OF ACTION
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

160.    Plaintiff repeats, realleges, and adopts the allegations in paragraphs 1 through 159 and incorporates them herein by reference.

161.    Implied by law in the contract between Direct and Cerberus is a covenant of good faith and fair dealing.

162.    Cerberus deprived Direct of the benefit of the bargain between the parties by failing to pay to Direct the fees Direct earned under the parties' agreement.

163.    Even if Cerberus did not breach the contract in a technical sense, Cerberus's conduct deprived Direct of its benefit of the bargain, namely the fees identified in the December 26, 2002 e-mail from David Teitelbaum and the exchange of written Consulting Agreements.

164.    The conduct of Cerberus in breaching the implied covenant of good faith and fair dealing is different than the conduct resulting in Cerberus's breach of the contract in

that, absent a breach by Cerberus of the contract, Direct has not been paid the fees earned under

the parties' agreement and Cerberus has acted in bad faith by (i) structuring the dAF transaction

in a way to deprive Direct of its contractual fees or rights; (ii) taking steps to limit the

applicability of the financial terms to the dAF transaction; and/or (iii) interpreting the contract

such that Direct is not entitled to any fees or compensation.

165.    In bad faith and to avoid a contract breach claim, Cerberus booked,

accounted for, considered, entered, and/or characterized the dAF transaction in such a way as to

avoid having to pay Direct any fees under the contract.

166.    In bad faith and in an attempt to avoid a contract breach claim, Cerberus

negotiated, to the exclusion of Direct, the dAF investment, and positioned the negotiations and

transaction in such a way as to avoid having to pay Direct any fees.

167.    In bad faith, Cerberus failed to report to Direct when it closed the

acquisition of dAF.

168.    At or about the time Cerberus lost the Project Phoenix bid, in bad faith,

Cerberus conducted its dealings and closed a deal with IRU in such a way as to avoid having to

pay Direct any fees.

169.    At or about the time Cerberus lost the Project Phoenix bid, Cerberus, in

bad faith, structured the acquisition in a way to avoid paying to Direct any fees.

Page 39 of 54

170.    Cerberus breached the implied covenant of good faith and fair dealing by conducting itself in a way to avoid having to pay to Direct a Consulting Fee, Retainer Fee, Incentive Fee, or any other type of fees, despite the efforts of Direct in presenting IRU to Cerberus.

171.    Cerberus acted in bad faith in using Direct and Mr. Koidl to gain exclusive access to and knowledge about the GSA territories, Dresdner Bank, IRU, and/or dAF, and then taking steps to ensure that the parties' contract did not apply to the dAF transaction.

172.    Cerberus breached the implied covenant of good faith and fair dealing by unfairly using Direct and Mr. Koidl for their knowledge, expertise, contacts, and resources in arranging for Cerberus to be introduced to IRU and its principals and to be introduced to dAF, and then negotiating without Direct to close dAF and not compensate Direct for its efforts, services, and work, claiming that Direct did not introduce IRU or dAF in a way that triggered the payment of any fees to Direct.

173.    Under the parties' contract, Direct performed advisory services and earned the fees identified in the parties' agreement and the "key commercial terms." Cerberus breached the implied covenant of good faith and fair dealing by unfairly and/or in bad faith using the services, contacts, and resources of and furnished by Direct for its own benefit, and then construing the contract in a way in which Cerberus maintains that dAF was not presented by Direct to Cerberus.

174.    Under the contract's implied covenant of good faith and fair dealing, Direct is entitled to receive, and Cerberus has caused Direct to be damaged in the amount of $3.7 million, fixed as 1% of the $370 million invested by Cerberus in dAF. Direct is entitled to interest on the amount due, fixed from the date the dAF transaction closed.

175.    Cerberus will owe to Direct a sum likely in excess of $300 million as soon as the profit on the amount invested by the Cerberus entity that made the investment in AerCap exceeds the 20% IRR threshold.

### THIRD CAUSE OF ACTION
### FRAUD

176.    Plaintiff repeats, realleges, and adopts the allegations in paragraphs 1 through 175 and incorporates them herein by reference.

177.    At some point after the parties entered into their contract, Cerberus determined that it did not want to pay to Direct any fees under the "key commercial terms," including the Consulting Fee, Retainer Fee, and Incentive Fee, nor any other type of fees, and began to take steps to avoid paying such fees, including diminishing and marginalizing Direct's and Mr. Koidl's role and participation in meetings with IRU and others when pursuing investment opportunities, and negotiating for the dAF deal. Cerberus did not physically sign the signature page of the February 10, 2003 Consulting Agreement because it wanted to use Direct, then not pay Direct, ultimately defrauding Direct.

178.    After Cerberus contracted with Direct, it learned about IRU and the various investment opportunities arising out of this introduction and quickly determined that Direct would be entitled to substantial fees if Cerberus closed a deal with respect to one of these investment opportunities. Cerberus in late 2003 and 2004 took steps to make it appear as if dAF was not sourced by Direct such that Direct could not later claim a fee under the parties' contract. These were fraudulent acts.

179.    Such conduct by Cerberus violated the direction of Senior Cerberus Advisor Dr. Korteweg, who suggested in a March 6, 2003 e-mail to Mr. Koidl that Mr. Teitelbaum was to *"keep you in the loop of things happening in Cerberus-germany [sic],"* and that Messrs. Teitelbaum and Koidl should speak weekly.

180.    In 2004, Cerberus wrongfully theorized that if Direct was not involved in negotiating the dAF deal, it could avoid paying to Direct any type of fee, commission, or compensation.

181.    Cerberus completely ignored Direct after Cerberus lost the Project Phoenix bid, seizing upon the growing familiarity Cerberus had gained with IRU as a result of Direct's efforts, all in order to marginalize Direct in such a way to make it appear that Direct could not later claim it should be compensated if Cerberus invested in an opportunity presented by Direct, such as dAF.

182.    Indeed, Cerberus used Mr. Koidl to get close to IRU and its investment opportunities, and then jettisoned Direct when Cerberus became familiar enough with IRU to negotiate the dAF deal on its own, and to later justify not compensating Direct for its services.

183.    Cerberus had the motive (avoiding fees under the contract); intent (excluding Mr. Koidl and Direct; claiming that Cerberus already knew Dresdner and did not need Direct to introduce IRU; asking Mr. Koidl to cap Direct's fees; and other indicia of Cerberus' intent to defraud Direct); and means (refusing to physically sign the contract; controlling the environment in which the negotiations for dAF took place, the deal terms, and the stock purchase agreement; growing a German office and presence to act as cover for Direct later arguing that Mr. Koidl introduced Cerberus to the investment opportunities resulting from Direct's introduction to IRU) to defraud Direct.

184.    Cerberus made material misrepresentations to Direct, including that Cerberus is too large and important not to already be known to Dresdner Bank, and, therefore to IRU; Direct had nothing to do with IRU and dAF; and other misrepresentations about the extent to which Direct introduced IRU and its investment opportunities to Cerberus sufficiently to warrant earning the fees under the "key commercial terms" proposed by Cerberus and agreed to by Direct.

185.    In 2003, Direct reasonably relied on the representations made to it by Cerberus about Direct's role with regard to the IRU portfolio of investments, continuing to

expend efforts on behalf of Cerberus to locate investment opportunities in accordance with the parties' contract.

186.   Cerberus, by Mr. Knower, misrepresented to Direct in December 2003 that Dresdner wanted to be *"incognito"* when dealing with Cerberus on an IRU transaction, meaning that Direct should be excluded from such participation, despite the fact that IRU was at all times willing to involve Mr. Koidl in its discussions with Cerberus.

187.   Cerberus had a legal duty to Direct separate from its duty to perform under the parties' contract, and violated this duty by taking steps to avoid having to pay Direct under the contract, including refusing to sign the written Consulting Agreement and other deeds and actions.

188.   Cerberus's conduct with regard to the dAF acquisition and its dealings with Direct were intended to deceive and defraud Direct or to force Direct to sue to recover its contractual fees, all in the hope that Direct would settle for less than the amount owed to Direct by Cerberus.

189.   Cerberus's actions were aimed at placing Direct at a financial disadvantage by forcing it to sue to collect the fees due under the parties' contract, believing that Direct, without the considerable means or funds of Cerberus, ultimately would accept a reduced amount under the parties' contract, extracting from Direct through litigation what Cerberus

demanded through compromise when Cerberus asked Mr. Koidl to modify the parties' contract by accepting a "cap."

190.    Cerberus, with the intent to deceive Direct and with the intent to avoid paying Direct under the parties' contract, fraudulently structured the dAF transaction or conducted the negotiations to acquire dAF in a way to avoid having to pay Direct any fees under the parties' contract.

191.    As a result of Cerberus's fraud, Direct has been damaged in the amount of $3.7 million, fixed as 1% of the $370 million invested by Cerberus in dAF.  Direct is entitled to interest on the amount due, fixed from the date the dAF transaction closed.

192.    Cerberus will owe to Direct a sum likely in excess of $300 million as soon as the profit on the amount invested by the Cerberus entity that made the investment in AerCap exceeds the 20% IRR threshold.

193.    Direct is entitled to punitive damages as a result of Cerberus's fraud and also to deter Cerberus from engaging in future fraudulent conduct in an amount not less than three times the compensatory damages suffered by Direct.

### FOURTH CAUSE OF ACTION
### <u>DECLARATORY JUDGMENT</u>

194.    Plaintiff repeats, realleges, and adopts the allegations in paragraphs 1 through 193 and incorporates them herein by reference.

195.    Pursuant to Fed R. Civ. P. 57 and 28 U.S.C. § 2201, Direct is entitled to and demands a judgment declaring that the 20% incentive allocation, fee, payment, commission, or "Incentive Fee" owed to Direct under the parties' contract shall be paid by Cerberus after Cerberus shall have sold, transferred, disposed, liquidated, conveyed or otherwise realized its investment in AerCap in whole or in part pursuant to the terms of the parties' agreement.

196.    Pursuant to the authority of this Court under the Declaratory Judgment Act, Direct is entitled to and demands a judgment declaring that it shall receive a 20% incentive allocation, fee, payment, commission, or "Incentive Fee" with respect to the dAF investment made by Cerberus after the receipt by Cerberus of its preferred return, as defined by the parties' contract.

197.    Pursuant to the authority of this Court under the Declaratory Judgment Act, Direct is entitled to and demands a judgment declaring that it shall receive from Cerberus, pursuant to the February 10, 2003 contract, 20% of all profits above a 20% unleveraged IRR, after such profits are realized by Cerberus when AerCap is liquidated.

198.    Direct demands a judgment declaring that it is entitled to the Incentive

Fees and other fees earned by Direct when the profit on the amount invested by the Cerberus

entity that made the investment in AerCap exceeds the 20% IRR threshold.

## FIFTH CAUSE OF ACTION
## PROMISSORY & EQUITABLE ESTOPPEL

199.    Plaintiff repeats, realleges, and adopts the allegations in paragraphs 1

through 198 and incorporates them herein by reference.

200.    In the alternative, if the Court determines there is no contract between

Direct and Cerberus, Direct is entitled to relief under the theory of promissory and/or equitable

estoppel because Cerberus made a clear and unambiguous promise to Direct, specifically Mr.

Koidl, that Cerberus would pay to Direct the fees set forth in the December 26, 2002 e-mail from

Mr. Teitelbaum to Mr. Koidl and reaffirmed in the January 25, 2003 Consulting Agreement sent

to Direct if Cerberus ended up making an investment in any investment or opportunity presented

by Direct to Cerberus.

201.    Direct reasonably and forseeably relied on that promise by Cerberus and

has been injured and harmed by relying on Cerberus's promise to pay a fee to Direct if it

invested in any investment presented to Cerberus by Direct.

202.    Cerberus promised to pay to Direct the fees set forth in the December 26,

2002 e-mail and reaffirmed in the January 25, 2003 Consulting Agreement if Direct presented to

Cerberus an investment opportunity that Cerberus ultimately made an investment in, no matter how the deal was negotiated or characterized. As set forth in the January 25, 2003 Consulting Agreement drafted by Cerberus, all that was required was for Direct to present to Cerberus the investment opportunity, and then for Cerberus to make an investment.

203.    Direct reasonably and forseeably relied on Cerberus's promise by spending considerable effort and resources attempting to identify and source deals for Cerberus, presenting to Cerberus many different investment opportunities, including IRU, and consequently dAF, and affording Cerberus exclusivity with respect to such investment opportunities.

204.    Relying on the promise by Cerberus to pay Direct for sourcing a deal, Mr. Koidl traveled throughout Europe on behalf of Cerberus, meeting with members of the European financial community, including banks. Mr. Koidl made a considerable effort to identify and locate investment opportunities and presented many of these opportunities to Cerberus, and gave up other opportunities to earn consulting and incentive fees with respect to these investment opportunities.

205.    In the alternative, if the Court determines there is no contract between Direct and Cerberus, because Cerberus failed to remit the amount equal to 1% of the equity invested by Cerberus in dAF, Cerberus should be estopped from keeping $3.7 million, which is calculated as 1% of the equity invested by Cerberus in the dAF investment.

206. By its conduct and actions, Cerberus induced Direct to provide services and source deals for Cerberus by promising to pay to Direct a fee if Cerberus closed a deal based upon a presentation from Direct.

207. Direct was induced by Cerberus to perform services because of promises Cerberus made to Direct that it would compensate Direct for sourcing deals and presenting investments to Cerberus. Direct presented IRU to Cerberus and presented dAF to Cerberus.

208. In the alternative to a finding of breach of contract, Cerberus should be estopped from retaining, and Direct has been damaged in an amount not less than $3.7 million. Direct is entitled to interest on the amount due, fixed from the date the dAF transaction closed.

## SIXTH CAUSE OF ACTION
## UNJUST ENRICHMENT

209. Plaintiff repeats, realleges, and adopts the allegations in paragraphs 1 through 208 and incorporates them herein by reference.

210. In the alternative, if the Court determines there is no contract between Direct and Cerberus, Direct is entitled to relief under the theory of unjust enrichment, that is, by failing to make the payments promised and owed to Direct, Cerberus has been unjustly enriched at the expense of Direct.

211.    In the alternative, if the Court determines there is no contract between Direct and Cerberus, by failing to tender to Cerberus the amount equal to 1% of the equity invested by Cerberus in dAF, Cerberus has conferred upon itself a benefit, assuming unauthorized dominion and control over the payment owed to Direct as per the parties' agreement, whether in the written Consulting Agreement or pursuant to the parties agreement, or promises made by Cerberus, at the expense of Direct.

212.    Cerberus has exercised unauthorized control over the money (fees) owed to Direct for Direct's role in presenting and introducing Cerberus to IRU and, consequently, dAF.

213.    At the expense of Direct, Cerberus benefitted from not paying any fee to Direct as a result of closing the dAF deal.  Equity and good conscience require Cerberus to remit to Direct the amount of $3.7 million, which is calculated as 1% of the equity invested by Cerberus in the dAF investment.

214.    In the alternative to a finding of breach of contract, Cerberus has been unjustly enriched, and Direct has been damaged in an amount not less than $3.7 million.

## SEVENTH CAUSE OF ACTION
## QUANTUM MERUIT

215.    Plaintiff repeats, realleges, and adopts the allegations in paragraphs 1 through 214 and incorporates them herein by reference.

216.    In the alternative, if the Court determines there is no contract between Direct and Cerberus, Direct is entitled to relief under quantum meruit because Direct in good faith performed valuable services to Cerberus, including introducing Cerberus to IRU and, subsequently, dAF, and Direct had a reasonable expectation of compensation for such services.

217.    Cerberus accepted the services rendered by Direct.

218.    Direct reasonably and forseeably expected to be compensated for its services to Cerberus.

219.    The reasonable value of the services rendered by Direct is equal to (i) 1% of the equity invested by Cerberus in dAF, or $3.7 million, the amount Cerberus should be required to pay to Direct in quantum meruit; and (ii) the amount of the 20% incentive allocation, fee, payment, commission, or "Incentive Fee" after the realization by Cerberus of a 20% unleveraged IRR of 20% of all profits above such 20% IRR.

220.    In the alternative to a finding of breach of contract, Direct is entitled to a judgment, and Cerberus should be directed to pay to Direct in quantum meruit an amount not less than $3.7 million and an amount under the 20% incentive allocation, fee, payment, commission, or "Incentive Fee," fixed at the time of the realization by Cerberus of a 20% unleveraged IRR of 20% of all profits above such 20% IRR.

**WHEREFORE,** Direct demands that a judgment be entered against each of the Cerberus defendants:

(A)    for the first cause of action designated "Breach of Contract" in an amount not less than $3.7 million, plus the attorneys' fees, interest (calculated at 9% from the date of the dAF transaction), costs, and expenses of this action;

(B)    for the second cause of action designated "Breach of the Implied Covenant of Good Faith and Fair Dealing" in an amount not less than $3.7 million, plus the attorneys' fees, interest (calculated at 9% from the date of the dAF transaction), costs, and expenses of this action;

(C)    for the third cause of action designated "Fraud" in an amount not less than $3.7 million, plus the attorneys' fees, interest (calculated at 9% from the date of the dAF transaction), costs, and expenses of this action;

(1)    for punitive damages in an amount not less than $11,100,000 or an amount sufficient to deter Cerberus from such future wrongdoing, as determined in the discretion of the trier of fact on the evidence produced at trial, given the relative circumstances and financial positions of the parties and the degree of malice shown by the conduct of Cerberus;

(D)    for the fourth cause of action designated "Declaratory Judgment" for a judgment from the Court declaring that (i) the amount owed to Direct under the parties'

contract shall be paid by Cerberus after Cerberus sells, transfers, liquidates, disposes, or conveys AerCap such that any profits from such transaction are realized by Cerberus pursuant to the terms of the parties' contract; (ii) Direct shall receive a 20% incentive allocation, fee, payment, commission, or "Incentive Allocation" with respect to the dAF investment made by Cerberus after the realization by Cerberus of its preferred return, as defined by the parties' contract; and (iii) Direct shall receive from Cerberus 20% of all profits above a 20% unleveraged IRR, after such profits are realized by Cerberus;

(E)    for the fifth cause of action designated "Promissory & Equitable Estoppel" in an amount not less than $3.7 million, plus the attorneys' fees, interest (calculated at 9% from the date of the dAF transaction), costs, and expenses of this action;

(F)    for the sixth cause of action designated "Unjust Enrichment" in an amount not less than $3.7 million, plus the attorneys' fees, interest (calculated at 9% from the date of the dAF transaction), costs, and expenses of this action; and

(G)    for the seventh cause of action designated "Quantum Meruit" in an amount not less than $3.7 million, plus the attorneys' fees, interest (calculated at 9% from the date of the dAF transaction), costs, and expenses of this action; Cerberus should be directed to pay to Direct an incentive allocation, fee, payment, commission, or "Incentive Allocation" with respect to the dAF investment made by Cerberus, after the realization by Cerberus of a 20% unleveraged IRR of 20% of all profits above such 20% IRR.

Dated: New York, New York
      April 25, 2007

                              WUERSCH & GERING LLP


                              By: Samuel D. Levy (SDL9271)
                              Counsel for Plaintiff DIRECT
                              INVESTMENT PARTNERS AG
                              100 Wall Street, 21st Floor
                              New York, New York 10005
                              212-509-5050

# EXHIBIT A

## Roman M. Koidl

| | |
|---|---|
| **Von:** | David Teitelbaum [dteitel@attglobal.net] |
| **Gesendet:** | Donnerstag, 26. Dezember 2002 09:40 |
| **An:** | Roman M. Koidl |
| **Cc:** | Frank Bruno |
| **Betreff:** | Agreement... |

Roman -

Per our conversation, following, please find certain of the key commercial terms of our working relationship:

1) A retainer of US$12,000 month starting in the month when we close our first deal together, where the cumulative invested amount must exceed 30,000,000 euros. So, if we were to close a first deal in month 4 you would receive a retainer of $12,000 a month, related to months 4 through 18 inclusive.
2) You received 1% of the Cerberus net invested amount of exclusive deals you source exclusively
3) 20% of all profits above a US$20% unlevered IRR of exclusive deals you source exclusively
4) Expense reimbursement for direct out of pocket expenses related to Cerberus targeted investments (such expenses include travel, phone, fax but not office rental type expense) up to a maximum of US$12,000 per month. Cerberus will need complete receipts and it should be expected that it will take literally months for your to receive reimbursement.
5) If a deal is not an exclusive, all fee amounts are to be discounted by 40%., except for the retainer amount in (1) above. An exclusive is a deal where at the point that we submit any bid price (indication through final) there are no other third parties submitting bid prices. So, if it were a two step process where (Phase 1) we compete on qualitative criteria (commitment to the market, restructuring expertise, etc) and then (Phase 2) we are selected to negotiate one-on-one with the seller on price that would entitle you to the full fee. So, only if there are no others competing on price throughout the process would be pay you the full fee amount. I am not sure how the lawyers will write this up and this may take a bit of work as we otherwise pay people for true exclusives only.
6) We have some mechanism for something to become a Roman Koidl deal -- like a reply email from either me or Frank Bruno. Let's see what the lawyers come up on this but your request is reasonable.
7) You work with cerberus exclusively on "targeted investments" which will be defined in the contract.

All payments above will have timing grace periods -- for the retainer ninety (90) days for example. But if we get to that stage (and I hope we do) then once you are in our system in NY you payment would probably be made on a more timely basis. But I want to manage your expectations in the regards now.

*not discussed:*
Contract of 18 months, with Cerberus having a right to extend for one year at the end of the period. I forgot to mention this to you on the phone but it is something that we have as a standard term and is part of this overall package. Let's discuss.

There is a approx. 10 page contract that will reflect these terms which needs to be modified. Therefore, this brief email only captures certain of the more important commercial terms that we discussed but is not a legal obligation for Cerberus or you.

I look forward to working with you starting in the New Year.

Warm regards,

David


*David Teitelbaum*
*Managing Director*

# EXHIBIT B

# CONSULTING AGREEMENT

**among**

**Cerberus Global Investments, LLC**

**and**

**Roman Koidl**

**Dated as of**

**January_____, 2003**

## CONSULTING AGREEMENT

CONSULTING AGREEMENT, dated as of January ___, 2003 among Cerberus Global Investments, LLC ("Cerberus"), a Delaware limited liability company, and Roman Koidl, a citizen of Germany.

## W I T N E S S E T H :

In consideration of the mutual covenants and agreements herein made and intending to be legally bound, the parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

1.1        Defined Terms.  The defined terms used in this Agreement shall, unless the context otherwise requires, have the meanings specified in this Article I.

"Affiliate" shall mean, with respect to any Person, (a) a director, officer, member or general partner of such Person or any Person identified in clause (c) below, (b) a spouse, parent, sibling or descendant of such Person (or a spouse, parent, sibling or descendant of any director, member or partner or executive officer of such Person) and (c) any other Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person.  The term "control" includes, without limitation, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership or voting securities, by contract or otherwise.

"Agreement" shall mean this Consulting Agreement, as originally executed and as the same may be amended, modified, supplemented or restated from time to time.

"Approved Target" shall have the meaning set forth in Section 2.2(b) hereof.

"Business Day" shall mean a day other than a day in which a commercial bank located in New York City is required or authorized to close.

"Cause" shall have the meaning set forth in paragraph 2.3(b) hereof.

"Cerberus Group" has the meaning set forth in Section 2.1 hereof.

"Consulting Fee" shall have the meaning set forth in Section 3.1 hereof.

"Covered Person" shall mean Cerberus, the Consultant, any member of the Cerberus Group, their respective Affiliates and any member, partner, director, officer, agent or employee of the foregoing.

"Deal Expenses" shall mean, with respect to any Investment or any Proposed Investment, out-of-pocket fees, bank commitment fees, finders fees and similar fees and expenses paid or incurred, directly or indirectly, to third parties including, but not limited to, Affiliates of Cerberus or the Consultant, as well as out of pocket fees and expenses of outside advisors including, but not limited to, consultants, counsel and accountants; it being understood that Deal Expenses shall not include the expenses relating to the rent of office spaces, purchase of office equipment or other office-related expenses.

"Effective Date" shall mean the date of this Agreement.

"Effective Period" shall mean the period beginning on the Effective Date and ending on the Termination Date.

"Exclusive Investment" shall mean a Proposed Investment where no third parties are competing with Cerberus for the same Proposed Investment at the moment of submission of the bid price by Cerberus. In particular a Proposed Investment shall be an Exclusive Investment if, at the end of a preliminary competitive process based only on qualitative criteria other than the bid price, Cerberus is selected to negotiate with the

relevant counterparty in connection with such Proposed Investment on an exclusive and individual basis and no bid price is submitted by any third party.

"Exclusivity Period" shall have the meaning set forth in paragraph 2.2(a) hereof.

"Final Calculation Date" shall have the meaning set forth in paragraph 3.3(a) hereof.

"Incentive Fee Reserve" shall have the meaning set forth in paragraph 3.3(a) hereof.

"Investment" shall have the meaning set forth in Section 2.1 hereof.

"Leverage" shall have the meaning set forth in Section 3.1 hereof.

"Person" shall be construed broadly and shall include any individual, partnership, corporation, limited liability company, unincorporated organization or association, trust (including the trustees thereof, in their capacity as such) or other entity.

"Preferred Return" shall have the meaning set forth in paragraph 3.3(b) hereof.

"Projected Leverage" shall have the meaning set forth in Section 3.1 hereof.

"Proposed Investment" shall have the meaning set forth in Section 2.1 hereof.

"Proposed Plan" shall have the meaning set forth in Section 2.2(c) hereof.

"Retainer Fee" shall have the meaning set forth in Section 3.2 hereof.

"Selected fee Percentage" shall have the meaning set forth in Section 3.1 hereof.

"Target" shall have the meaning set forth in Section 2.2(a) hereof.

"Termination Date" shall mean, unless terminated earlier for "Cause" in accordance with the terms hereof, the 18th month anniversary of the Effective Date or, if the term of this Agreement is extended pursuant to Section 2.3 hereof, the last day (or date of early termination) of the term as extended.

## ARTICLE II

## CONSULTING SERVICES

2.1        Purpose.  During the Effective Period, the Consultant shall use its best efforts to identify, and present exclusively to Cerberus opportunities to make investments in distressed businesses or entities, or distressed assets, distressed debts, distressed equity securities or portfolios thereof located in Europe or related to European entities ("Proposed Investments"). Cerberus, on behalf of itself and its Affiliates (together "the "Cerberus Group""), shall have the exclusive right to invest under the terms set forth herein with respect to each Proposed Investment. The Parties acknowledge that an investment presented to Cerberus by the Consultant shall be treated as a Proposed Investment only if Cerberus becomes aware of such investment exclusively through the Consultant. Such Proposed Investments may be in any form, including without limitation to, cash, shares of common stock, shares of convertible preferred stock, convertible debt obligations, shares of preferred stock or debt obligations together with equity securities or warrants, rights or options to purchase equity securities, or other like arrangements, partnership interests, public and private debt obligations, loan participations, trade claims and contracts and other claims, or any combination thereof, as determined by Cerberus (any such investment hereunder an "Investment"). The Consultant agrees that, until the Termination Date, it shall submit Proposed Investments exclusively to Cerberus and that it shall not submit or propose any Proposed Investments to any third parties, nor assist any third party in connection with a Proposed Investment or other transaction involving the Target, including where such Proposed Investment or Target have been declined by Cerberus, unless authorized in writing by Cerberus.

2.2          Consulting Services; Exclusivity. (a)  Prior to contacting any business or entity that is the subject of a Proposed Investment (a "Target"), the Consultant shall first provide the name of the Target to Cerberus. The Consultant shall not contact the Target unless and until Cerberus has approved the Target pursuant to Section 2.2(b) below, in its sole and absolute discretion.  If Cerberus approves a Target pursuant to section 2.2(b) below, Cerberus shall have the exclusive right, during the period until the date that is twelve months after the Termination Date without regard to any early termination by Cerberus for Cause (the "Exclusivity Period"), to negotiate with the Approved Target (as defined in paragraph 2.2(b)) and/or its advisors with respect to a Proposed Investment in the Approved Target, and that the Consultant shall not, during such Exclusivity Period, identify discuss any Approved Target with, any other Person, or in any way discuss or participate in negotiations with any other Person with respect to a Proposed Investment, nor assist any other Person with respect to any transaction involving a Proposed Investment or an Approved Target.

(b)  The Consultant shall provide Cerberus, via email in accordance with Section 5.1(c) below, with the name of the Target and the necessary information on the Proposed Investment. The Proposed Investment shall become an Approved Target for the purposes of this Section 2.2 only if and when Cerberus notifies the Consultant that it is interested in the Proposed Investment by email within 15 Business Days from the receipt of the communication thereof from the Consultant.

(c)  Once Cerberus has approved a Target, the Consultant shall assist Cerberus, with, if Cerberus so decides, the involvement of the Approved Target, in either (i) developing a restructuring, recapitalization or similar reorganization plan (the "Proposed Plan") for the Approved Target or (ii) acquiring the Approved Target's debt or equity securities. If Cerberus (and, if Cerberus so decides, the Approved Target) approves such Proposed Plan, the Consultant shall assist Cerberus in developing an implementation strategy for, and in implementing, such Proposed Plan.

(d)  In addition to the services mentioned under Sections 2.2(a) and (c) above, the Consultant shall assist Cerberus, as requested in: (i) an initial due diligence, with respect to the Approved Target and the Proposed Investment, if and to

the extent requested in advance and in writing by Cerberus; (ii) the provision of any other professional services as may be agreed upon in advance and in writing between the Parties. The professional services described in this Section 2.2(d) will be billed to Cerberus on the basis of the professional rate fees calculated as shown in Annex A. The professional services set forth in Sections 2.2(a) and (c) above will be remunerated only by the payment of the Consulting Fee, the Retainer Fee and the Incentive Fee, as defined below, if applicable pursuant to this Agreement.

2.3        Term. (a)  This Agreement shall continue in full force and effect until the Termination Date; provided that Cerberus is entitled to extend the duration of this Agreement for another 12 month period, by notifying in writing the Consultant thereof anytime before the Termination Date; provided, however, that Sections 2.2 and 2.3 hereof, and Articles IV and V hereof shall continue until the termination or complete liquidation of all Investments; and provided, further, that this Agreement may be terminated for "Cause" by either of the parties hereto upon receipt by the Party to be terminated of written notice of the basis for such termination for "Cause".

(b)  A termination of this Agreement pursuant to Section 2.3(a) shall not relieve the defaulting party from claims of damage for a breach of this Agreement. For purposes of this Agreement, "Cause" shall mean (i) with respect to a termination by Cerberus, (u) a material breach of this Agreement by the Consultant and the Consultant fails to cure such breach within 30 days of the receipt of written notice thereof from a member of the Cerberus Group, (v) a violation of law involving a felony, fraud or a material securities violation, by the Consultant or any of its Affiliates, (w) breach of fiduciary duty, gross negligence or willful misconduct on the part of the Consultant with respect to carrying out any of its duties under this Agreement, (x) the bankruptcy or insolvency of the Consultant (y) representing both Target and Cerberus without mutual written consent from both parties or (z) any breach of Section 5.2 hereof and (ii) with respect to a termination by the Consultant, (m) the bankruptcy or insolvency of Cerberus, or (n) a material breach of this Agreement by Cerberus and Cerberus fails to cure such breach within 30 days written notice thereof from the Consultant.

# ARTICLE III

## CONSULTING FEE; INCENTIVE ALLOCATION

3.1        <u>Fee</u>.   Cerberus shall pay the Consultant a non-refundable fee ("Consulting Fee") for services relating to the identification of, and consultation regarding, Proposed Investments which are Exclusive Investments, during the Effective Period of this Agreement, in an amount equal to one percent (1.0%) percent of the amount actually invested by Cerberus (or the investor who it is referring to the Proposed Investment) in a Proposed Investment, payable within sixty (60) days of the closing of such Proposed Investment (the percentage selected within this range is the "Selected Fee Percentage").  In calculating the amount actually invested by Cerberus, amounts obtained through Leverage (as defined below), or which Cerberus reasonably anticipates obtaining through Leverage within nine (9) months following the closing of such Investment (such future leverage defined as "Projected Leverage") shall not be included; <u>provided</u>, <u>however</u>, that if Cerberus has not actually obtained such Projected Leverage within such nine (9) month period then Cerberus shall pay to the Consultant, on the date nine (9) months after the closing of the relevant Investment, the Consulting Fee in an amount equal to the Selected Fee Percentage times the difference between (A) Anticipated Leverage less, (B)  Leverage actually obtained and invested within such nine (9) month period.  As used herein, "Leverage" shall mean any amounts invested by Cerberus in a Proposed Investment from the proceeds of loans, borrowings or other indebtedness or credit support obtained from a third party which is not an Affiliate of Cerberus.

3.2        <u>Retainer Fee</u>. Cerberus shall pay to the Consultant a retainer fee (the "Retainer Fee"), should Cerberus close an Exclusive Investment which has a total value higher than Euro 30,000,000. The Retainer Fee shall be equal to US$ 12,000 per month, starting from the month in which Cerberus closes the Exclusive Investment until the Termination Date. The Retainer Fee shall be payable by Cerberus to the Consultant within 90 days of the last day of each month with respect to which the Retainer Fee is due.

3.3        Incentive Allocation; Claw-back.  (a) The Consultant shall be entitled to receive a twenty (20.0%) percent incentive allocation (the "Incentive Fee") with respect to all Investments made by Cerberus after the receipt by the members of the Cerberus Group of its Preferred Return (as defined below).   The incentive allocation to the Consultant shall be held in reserve by Cerberus (the "Incentive Fee Reserve") until such time as the last remaining Investment made pursuant to this Agreement has been liquidated (the "Final Calculation Date"); provided that prior to the Final Calculation Date, the Consultant shall be entitled to receive an annual tax distribution, as determined by Cerberus in its sole and absolute discretion with respect to the income allocated to the Consultant from all Investments made pursuant to this Agreement.

(b) To the extent that, as of the Final Calculation Date, the members of the Cerberus Group have not received from all of the Investments made pursuant to this Agreement (i.e., losses in any Investment(s) are offset against gains in any other investment(s)) a net an aggregate amount equal to the sum of (i) all amounts actually invested by Cerberus or a member of the Cerberus Group in such Investments, plus (ii) all Deal Expenses, plus (iii) the aggregate amount of the Consulting Fees paid to the Consultant pursuant to Section 3.1 hereof, plus (iv) a US$ 20% compounded unlevered internal rate of return on the amounts described in clauses (i) through (iii) above (the "Preferred Return"), the amounts held in the Incentive Fee Reserve shall be distributed to the members of the Cerberus Group until they have received the Preferred Return.

(c) To the extent that, as of the Final Calculation Date, the members of the Cerberus Group have not received the amount necessary to be distributed to them to achieve the Preferred Return after receiving any amount held in the Incentive Fee Reserve under clause (a) above, the amount necessary to cause the members of the Cerberus Group to receive the Preferred Return shall be paid directly by the Consultant or any of its Affiliates, provided that the amounts paid by the Consultant or its Affiliates to the members of the Cerberus Group pursuant to this paragraph 3.2(c) shall not exceed the aggregate amount of the distributions made to the Consultant under this Section 3.2.   To the extent that the amount held in the

Investment Fee Reserve is greater than the Preferred Return, the Consultant shall be entitled to receive such excess amount.

(d) On the last Business Day of each August and March during the Effective Period and on the Final Calculation Date, Cerberus shall provide or cause a member of the Cerberus Group to provide a calculation of the Incentive Fee, if any, owing as of such date. If the Consultant does not object to such calculation within 10 Business Days, such calculation shall be conclusive and binding on the parties. If the Consultant notifies Cerberus in writing within such ten Business Day period that it disputes such calculation, Cerberus shall provide a copy of such calculation to PricewaterhouseCoopers (or any other nationally recognized accounting firm that provides auditing services to Cerberus) for verification and adjustment if necessary. The determination of such accounting firm as to whether any Incentive Fee is payable and the amount of any Incentive Fee payable shall be conclusive and binding upon Cerberus and the Consultant, and within 10 Business Days of receipt of such determination Cerberus shall cause the Incentive Fee, if any, in the amount so determined (subject to the withholding of the Incentive Fee Reserve) to be paid to the Consultant in accordance with wire instructions provided by the Consultant in writing. Consultant acknowledges and agrees that the financial information with respect to each Investment is confidential and proprietary, and that the Consultant shall in no event be permitted to, or have any right to, examine or otherwise review any of the accounting, financial or other material used by Cerberus or the relevant accountants in reaching their respective determinations as to the amount, if any, of any Incentive Fees that may be payable.

3.4      Reimbursement of Deal Expenses. Cerberus will reimburse the Consultant of all its reasonable and documented Deal Expenses other than finder's fees paid by the Consultant to any third parties on a monthly basis, up to a maximum amount of US$ 12,000 per month. Such amount shall be payable by Cerberus to the Consultant within 90 days of receipt by Cerberus of the relevant invoice issued by the Consultant.

3.5        <u>Non – Exclusive Investments</u>. In case Cerberus closes a Proposed Investment other than an Exclusive Investment, the Consulting Fee and the Incentive Fee shall be discounted by 40% of the amount that would otherwise be payable to the Consultant according to Sections 3.1 and 3.3 above. It is understood, however, that no Consulting Fee, or Incentive Fee or other amount or fee shall be payable by Cerberus to the Consultant if, in order to achieve the closing of the relevant Proposed Investment (whether it is an Exclusive Investment or not), Cerberus needs to hire any other consultant or advisor to carry out the services to be rendered by the Consultant hereunder.

## ARTICLE IV

## EXCULPATION

4.1        <u>Exculpation</u>.    Provided they shall act in good faith and have not engaged in willful misconduct, gross negligence or any material breach of this Agreement, a Covered Person shall not be liable (i) for any mistake in judgment, (ii) for any action or inaction taken or omitted for a purpose which such Person believed in good faith to be consistent with the best interests of the Cerberus Group, or (iii) for any loss due to the mistake, action, inaction, negligence, dishonesty, fraud or bad faith of any broker or other agent, provided that such broker or other agent is not and was not an Affiliate of the Covered Person and was selected, engaged or retained without gross negligence.

## ARTICLE V

## MISCELLANEOUS

5.1        <u>Notice</u>.  (a)  Any notice to a party to this Agreement shall be in writing and sent to the address of such party set forth in below or such other mailing address of which a party shall advise the others in writing:

If to Cerberus:

> 450 Park Avenue, 28th Floor
> New York, New York 10022
> Attention: Mark A. Neporent
> Facsimile: 212-891-1540

> For the sole purpose of Section 2.2 (b) hereof:
> David Teitelbaum    email:
> Frank Bruno        email:

If to the Consultant:

> Roman Koidl
> Tel:

(b) Any notice shall be deemed to have been duly given if personally delivered or sent by United States mail or by facsimile transmission and will be deemed received, unless earlier received, (i) if sent by mail, three days after mailing, (ii) if sent by United States Express Mail or overnight courier, on the business day after delivery to such service, (iii) if sent by facsimile transmission, on the date sent provided confirmation of transmission is obtained and (iv) if delivered by hand, on the date of receipt.

(c)        For the sole purpose of Section 2.2(b) hereof, transmission via email shall satisfy the requirements provided by this Section 5.1 and shall be deemed received upon receipt of the relevant receipt confirmation message.

5.2        Use of Fees / Representation / Certification. The Consultant hereby represents, warrants and agrees that it will not directly or indirectly in connection with this Agreement, pay, promise, or offer to pay money or anything of value to any foreign

official, foreign political party or official thereof, any candidate for political office or any other person for the purpose of: (a) assisting Cerberus or any member of the Cerberus Group in obtaining business, retaining business or directing business to Cerberus or a member of the Cerberus Group; (b) influencing any act or decision of such foreign official, political party or candidate; or (c) inducing such foreign official, political party or candidate to use his or its influence to affect or influence any act or decision of such person or entity; provided, however, that the Consultant may make any such payments required to facilitate, expedite or secure the performance of a routine or customary governmental action such as obtaining a license, permit or other official document necessary to qualify a person to do business, processing work orders, visas or similar government documents, providing phone, mail or power services or actions of a similar nature. the Consultant will, on request from time to time certify that no such payments have been, or will be, made.

5.3 Governing Law.   All questions concerning the construction, interpretation and validity of this Agreement shall be governed by and construed and enforced in accordance with the domestic laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether in the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.  In furtherance of the foregoing, the internal law of the State of New York will control the interpretation and construction of this Agreement, even if under such jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily or necessarily apply.

5.4        Entire Agreement. This Agreement constitutes the entire agreement among the parties; it supersedes any prior agreement or understandings among them, oral or written, all of which are hereby canceled.   There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties relating only to the subject matter of this Agreement which are not fully expressed herein.

5.5        Headings. The headings in this Agreement are inserted for convenience of reference only and shall not affect the interpretation of this Agreement.

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in either the masculine or the neuter gender shall include the masculine, the feminine and the neuter.

5.6    Binding Provision; Assignment.    The covenants and agreements contained herein shall be binding upon and inure to the benefit of the heirs, executors, administrators, personal or legal representatives, successors and permitted assigns of the respective parties hereto.  This Agreement may not be assigned without the written consent of the other parties.  Any assignment in violation of this paragraph shall be null and void.  Assignment of this Agreement in accordance with this paragraph 5.5 shall not relieve the assignor from liability for its obligations hereunder.

5.7    No Waiver.  The failure of any party to seek redress for violation or to insist on strict performance, of any covenant or condition of this Agreement shall not prevent a subsequent act which would have constituted a violation from having the effect of an original violation.

5.8    Counterparts.    This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

5.9    Severability.  It is the desire and intent of the parties hereto that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies    applied in each jurisdiction in which enforcement is sought. Accordingly, if any particular provision of this Agreement shall be adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.  Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

5.10        Confidentiality.  Information furnished under this Agreement by any party to another party, including their respective agents and employees, is confidential and will not be disclosed to third parties without the prior permission of the other party, unless disclosure is requested by a regulatory authority or otherwise is required by law or applicable regulations.   This provision shall not apply to information that (i) is generally available to the public other than as a result of a disclosure by such party or its agents or employees, (ii) is in the possession of such party prior to its delivery, or (iii) is obtained, after the date hereof, by such party on a non-confidential basis from any person that is not known by such party to be in violation of any confidentiality agreement regarding such information.

5.11        No Agency.   The parties hereto are independent contractors and nothing contained in this Agreement shall be deemed to create the relationship of partners, joint ventures or of principal and agent, franchiser and franchisee, or of any association or relationship between the parties except as expressly provided in this Agreement.   Each party acknowledges that it does not have the right to make any representations to any third party or to act on behalf of, or bind, the other party except to the extent expressly contemplated by this Agreement.

5.12        Jurisdiction, Etc.  (a)  Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or federal court of the United States of America sitting in the State of New York and the county of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any related agreement or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees to institute any and all claims in respect of this Agreement or any related agreement to a New York State court or, to the extent permitted by law, in such federal court.   Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b) Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any related agreement in any New York State or federal court. Each of the parties hereto irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

5.13    Waiver of Jury Trial. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENT.

IN WITNESS WHEREOF, the undersigned have hereunto set their hands as of January ___, 2003.

HAMTON ENTERPRISE INC.


By: _____

      Name:   Mr. Roman Koidl

      Title:


CERBERUS GLOBAL INVESTMENTS, LLC


By: _____

      Name:   Mark Neporent

      Title:  Chief Operating Officer

## Annex A

## Professional Rates

Further professional services rendered by the Consultant to Cerberus as described in point 2.2 (d) will be billed to Cerberus as follows:

Roman Koidl          [250] € hour rate

# EXHIBIT C

Draft February 10, 2003

marked to show amendments from draft dated January 27, 2003

# CONSULTING AGREEMENT

**among**

**Cerberus Global Investments, LLC**

**and**

**Direct Investment Partners Ltd.**

**Dated as of**

**January, 1, 2003**

## CONSULTING AGREEMENT

CONSULTING AGREEMENT, dated as of January 1, 2003 among Cerberus Global Investments, LLC ("Cerberus"), a Delaware limited liability company, and Direct Investment Partners Ltd., Dorfstrasse 1, 6442 Gersau, Switzerland ("Consultant").

## WITNESSETH:

In consideration of the mutual covenants and agreements herein made and intending to be legally bound, the parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

1.1      Defined Terms. The defined terms used in this Agreement shall, unless the context otherwise requires, have the meanings specified in this Article I.

"Affiliate" shall mean, with respect to any Person, (a) a director, officer, member or general partner of such Person or any Person identified in clause (c) below, (b) a spouse, parent, sibling or descendant of such Person (or a spouse, parent, sibling or descendant of any director, member or partner or executive officer of such Person) and (c) any other Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. The term "control" includes, without limitation, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership or voting securities, by contract or otherwise.

"Agreement" shall mean this Consulting Agreement, as originally executed and as the same may be amended, modified, supplemented or restated from time to time.

"Approved Target" shall have the meaning set forth in Section 2.2(b) hereof.

"Business Day" shall mean a day other than a day in which a commercial bank located in New York City is required or authorized to close.

"Cause" shall have the meaning set forth in paragraph 2.3(b) hereof.

"Cerberus Group" has the meaning set forth in Section 2.1 hereof.

"Consulting Fee" shall have the meaning set forth in Section 3.1 hereof.

"Covered Person" shall mean Cerberus, the Consultant, any member of the Cerberus Group, their respective Affiliates and any member, partner, director, officer, agent or employee of the foregoing.

"Deal Expenses" shall mean, with respect to any Investment or any Proposed Investment, out-of-pocket fees, bank commitment fees, finders fees and similar fees and expenses paid or incurred, directly or indirectly, to third parties including, but not limited to, Affiliates of Cerberus or the Consultant, as well as out of pocket fees and expenses of outside advisors including, but not limited to, consultants, counsel and accountants; it being understood that Deal Expenses shall not include the expenses relating to the rent of office spaces, purchase of office equipment or other office-related expenses.

"Effective Date" shall mean the date of this Agreement.

"Effective Period" shall mean the period beginning on the Effective Date and ending on the Termination Date.

"Exclusive Investment" shall mean a Proposed Investment where no third parties are known by the Consultant to be competing with Cerberus for the same Proposed Investment at the moment of submission of the bid price by Cerberus. In particular a Proposed Investment shall be an Exclusive Investment if, at the end of a preliminary competitive process based only on qualitative criteria other than the bid price, Cerberus is selected to negotiate with the relevant counterparty in connection

with such Proposed Investment on an exclusive and individual basis and no bid price is known by the Consultant to be submitted by any third party.

"Exclusivity Period" shall have the meaning set forth in paragraph 2.2(a) hereof.

"Final Calculation Date" shall have the meaning set forth in paragraph 3.3(a) hereof.

"Incentive Fee Reserve" shall have the meaning set forth in paragraph 3.3(a) hereof.

"Investment" shall have the meaning set forth in Section 2.1 hereof.

"Leverage" shall have the meaning set forth in Section 3.1 hereof.

"Person" shall be construed broadly and shall include any individual, partnership, corporation, limited liability company, unincorporated organization or association, trust (including the trustees thereof, in their capacity as such) or other entity.

"Preferred Return" shall have the meaning set forth in paragraph 3.3(b) hereof.

"Projected Leverage" shall have the meaning set forth in Section 3.1 hereof.

"Proposed Investment" shall have the meaning set forth in Section 2.1 hereof.

"Proposed Plan" shall have the meaning set forth in Section 2.2(c) hereof.

"Retainer Fee" shall have the meaning set forth in Section 3.2 hereof.

"Selected fee Percentage" shall have the meaning set forth in Section 3.1 hereof.

"Target" shall have the meaning set forth in Section 2.2(a) hereof.

"Termination Date" shall mean, unless terminated earlier for "Cause" in accordance with the terms hereof, the 18th month anniversary of the Effective Date or, if the term of this Agreement is extended pursuant to Section 2.3 hereof, the last day (or date of early termination) of the term as extended.

## ARTICLE II

## CONSULTING SERVICES

2.1    <u>Purpose</u>. During the Effective Period, the Consultant shall use its best efforts to identify, and present exclusively to Cerberus opportunities to make investments in distressed businesses or entities, or distressed assets, distressed debts, distressed equity securities or portfolios thereof located in Europe or related to European entities ("Proposed Investments"). Cerberus, on behalf of itself and its Affiliates (together "the "Cerberus Group""), shall have the exclusive right to invest under the terms set forth herein with respect to each Proposed Investment. The Parties acknowledge that an investment presented to Cerberus by the Consultant shall be treated as a Proposed Investment only if Cerberus became aware of such investment, until it was presented to Cerberus by the Consultant, exclusively through the Consultant, which shall be deemed the case if Cerberus does not notify the Consultant in writing within one week of receiving the presentation by the Consultant that the relevant investment opportunity was already known to Cerberus. Such Proposed Investments may be in any form, including without limitation to, cash, shares of common stock, shares of convertible preferred stock, convertible debt obligations, shares of preferred stock or debt obligations together with equity securities or warrants, rights or options to purchase equity securities, or other like arrangements, partnership interests, public and private debt obligations, loan participations, trade claims and contracts and other claims, or any combination thereof, as determined by Cerberus (any such investment hereunder an "Investment"). The Consultant agrees that, until the Termination Date, it shall submit Proposed Investments exclusively to Cerberus and that it shall not submit or propose any Proposed Investments to any third parties, nor

assist any third party in connection with a Proposed Investment or other transaction involving the Target, unless such Proposed Investment or other transaction involving the Target has been declined by Cerberus.

2.2          Consulting Services; Exclusivity. (a)  Prior to contacting any business or entity that is the subject of a Proposed Investment (a "Target"), the Consultant shall first provide the name of the Target to Cerberus.  The Consultant shall not contact the Target unless and until Cerberus has approved the Target pursuant to Section 2.2(b) below, in its sole and absolute discretion.  If Cerberus approves a Target pursuant to section 2.2(b) below, Cerberus shall have the exclusive right, during the period until the date that is twelve months after the Termination Date without regard to any early termination by Cerberus for Cause (the "Exclusivity Period"), to negotiate with the Approved Target (as defined in paragraph 2.2(b)) and/or its advisors with respect to a Proposed Investment in the Approved Target, and that the Consultant shall not, during such Exclusivity Period, identify or discuss any Approved Target with any other Person, or in any way discuss or participate in negotiations with any other Person with respect to a Proposed Investment, nor assist any other Person with respect to any transaction involving a Proposed Investment or an Approved Target unless Cerberus has declined to invest in such Proposed Investment or definitely terminated negotiations.

(b)  The Consultant shall provide Cerberus, via email in accordance with Section 5.1(c) below, with the name of the Target and the necessary information on the Proposed Investment. The Proposed Investment shall become an Approved Target for the purposes of this Section 2.2 only if and when Cerberus notifies the Consultant that it is interested in the Proposed Investment by email within 15 Business Days from the receipt of the communication thereof from the Consultant.

(c)  Once Cerberus has approved a Target, the Consultant shall assist Cerberus, with, if Cerberus so decides, the involvement of the Approved Target, in either (i) developing a restructuring, recapitalization or similar reorganization plan (the "Proposed Plan") for the Approved Target or (ii) acquiring the Approved Target's debt or equity securities. If Cerberus (and, if Cerberus so decides, the Approved Target)

approves such Proposed Plan, the Consultant shall assist Cerberus in developing an implementation strategy for, and in implementing, such Proposed Plan.

(d)  In addition to the services mentioned under Sections 2.2(a) and (c) above, the Consultant shall assist Cerberus, as requested in: (i) an initial due diligence, with respect to the Approved Target and the Proposed Investment, if and to the extent requested in advance and in writing by Cerberus; (ii) the provision of any other professional services as may be agreed upon in advance and in writing between the Parties. The professional services described in this Section 2.2(d) will be billed to Cerberus on the basis of the professional rate fees calculated as shown in Annex A. The professional services set forth in Sections 2.2(a) and (c) above will be remunerated only by the payment of the Consulting Fee, the Retainer Fee and the Incentive Fee, as defined below, if applicable pursuant to this Agreement.

2.3          Term. (a)  This Agreement shall continue in full force and effect until the Termination Date; provided that Cerberus is entitled to extend the duration of this Agreement for another 12 month period, by notifying in writing the Consultant thereof anytime before the Termination Date; provided, however, that Sections 2.2 and 2.3 hereof, and Articles IV and V hereof shall continue until the termination or complete liquidation of all Investments; and provided, further, that this Agreement may be terminated for "Cause" by either of the parties hereto upon receipt by the Party to be terminated of written notice of the basis for such termination for "Cause".

(b)  A termination of this Agreement pursuant to Section 2.3(a) shall not relieve the defaulting party from claims of damage for a breach of this Agreement. For purposes of this Agreement, "Cause" shall mean (i) with respect to a termination by Cerberus, (u) a material breach of this Agreement by the Consultant and the Consultant fails to cure such breach within 30 days of the receipt of written notice thereof from a member of the Cerberus Group, (v) a violation of law involving a felony, fraud or a material securities violation, by the Consultant or any of its Affiliates, (w) breach of fiduciary duty, gross negligence or willful misconduct on the part of the Consultant with respect to carrying out any of its duties under this Agreement, (x) the bankruptcy or

insolvency of the Consultant  (y) representing both Target and Cerberus without mutual written consent from both parties or (z) any breach of Section 5.2 hereof and (ii) with respect to a termination by the Consultant, (m) the bankruptcy or insolvency of Cerberus, or (n) a material breach of this Agreement by Cerberus and Cerberus fails to cure such breach within 30 days written notice thereof from the Consultant.

ARTICLE III

CONSULTING FEE; INCENTIVE ALLOCATION

3.1          Fee.  Cerberus shall pay the Consultant a non-refundable fee ("Consulting Fee") for services relating to the identification of, and consultation regarding, Proposed Investments which are Exclusive Investments, during the Effective Period of this Agreement, in an amount equal to one percent (1.0%) percent (the "Consulting Fee Percentage") of the amount actually invested by Cerberus (or the investor who it is referring to the Proposed Investment) in a Proposed Investment (the "Invested Amount"), payable within sixty (60) days of the closing of such Proposed Investment.  In calculating the Invested Amount, amounts obtained through Leverage (as defined below), or which Cerberus reasonably anticipates obtaining through Leverage within nine (9) months following the closing of such Investment (such future leverage defined as "Projected Leverage") shall not be included; provided, however, that if Cerberus has not actually obtained such Projected Leverage within such nine (9) month period then Cerberus shall pay to the Consultant, on the date nine (9) months after the closing of the relevant Investment, the Consulting Fee in an amount equal to the Consulting Fee Percentage times the difference between (A) Anticipated Leverage less, (B)  Leverage actually obtained and invested within such nine (9) month period. As used herein, "Leverage" shall  mean any amounts invested by Cerberus in a Proposed Investment from the proceeds of loans, borrowings or other indebtedness or credit support obtained from a third party which is not an Affiliate of Cerberus and which in consideration of providing the relevant financing does not obtain an equity participation in the Proposed Investment or other share in its profits.

3.2          Retainer Fee. Cerberus shall pay to the Consultant a retainer fee (the "Retainer Fee"), starting from November 1, 2003 for the duration of Project Phoenix which has been introduced by the Consultant to Cerberus.. The Retainer Fee shall be equal to Euro 12,000 per month, starting from the month in which Cerberus closes the Exclusive Investment until the Termination Date. The Retainer Fee shall be payable by Cerberus to the Consultant within 90 days of the last day of each month with respect to which the Retainer Fee is due.

3.3          Incentive Allocation; Claw-back. (a) The Consultant shall be entitled to receive a twenty (20.0%) percent incentive allocation (the "Incentive Fee") with respect to each Investment made by Cerberus after the receipt by the members of the Cerberus Group of their Preferred Return (as defined below). The Incentive Fee shall be payable from time to time promptly after a Profit (as defined below) exceeding the Preferred Return has been realized.

(b) A "Profit" shall mean the aggregate of all amounts received by the members of the Cerberus Group in relation to the relevant Investment on account of current distributions (dividends, interest and other payments on account of the money invested or interests held) and proceeds of liquidation or sale of an Investment in whole or in part (all such amounts received together the "Earnings") if and to the extent such aggregate Earnings exceed an amount equal to the sum of (i) all Invested Amounts relating to the relevant Investment, plus (ii) all Deal Expenses, plus (iii) the aggregate amount of the Consulting Fees paid to the Consultant pursuant to Section 3.1 hereof, plus (iv) an amount in US$ (converted, with respect to proceeds in other currencies, at the mid exchange rate applicable at the time of receiving the relevant Earnings) representing a 20% compounded unlevered internal rate of return on the amounts described in clauses (i) through (iii) above (the "Preferred Return"). The "compounded unlevered internal rate of return" within the meaning of the preceding sentence shall mean _____.

(c) At the latest on the last Business Day of each August and March during the Effective Period and on the Final Calculation Date, Cerberus shall provide or cause a member of the Cerberus Group to provide a calculation of the

Incentive Fee, if any, owing as of such date. If the Consultant does not object to such calculation within 10 Business Days, such calculation shall be conclusive and binding on the parties. If the Consultant notifies Cerberus in writing within such ten Business Day period that it disputes such calculation, Cerberus shall provide a copy of such calculation to PricewaterhouseCoopers (or any other nationally recognized accounting firm that provides auditing services to Cerberus) for verification and adjustment if necessary. The determination of such accounting firm as to whether any Incentive Fee is payable and the amount of any Incentive Fee payable shall in the absence of obvious error be conclusive and binding upon Cerberus and the Consultant, and within 10 Business Days of receipt of such determination Cerberus shall cause the Incentive Fee, if any, in the amount so determined to be paid to the Consultant in accordance with wire instructions provided by the Consultant in writing.

3.4        Reimbursement of Deal Expenses. Cerberus will reimburse the Consultant of all its reasonable and documented Deal Expenses other than finder's fees paid by the Consultant to any third parties on a monthly basis, up to a maximum amount of US$ 12,000 per month. Such amount shall be payable by Cerberus to the Consultant within 90 days of receipt by Cerberus of the relevant invoice issued by the Consultant.

3.5        Non – Exclusive Investments. In case Cerberus closes a Proposed Investment other than an Exclusive Investment, the Consulting Fee shall be discounted by 40% of the amount that would otherwise be payable to the Consultant according to Section 3.1 above. It is understood, however, that no Consulting Fee, or Incentive Fee or other amount or fee shall be payable by Cerberus to the Consultant if, in order to achieve the closing of the relevant Proposed Investment (whether it is an Exclusive Investment or not), Cerberus needs to hire any other consultant or advisor to carry out the services to be rendered by the Consultant hereunder (i.e. of identifying Proposed Investments and initiating negotiations). It is understood that the preceding sentence shall not apply to the services normally obtained in pursuing such investments from accounting, financial and legal advisors, and that it shall not apply unless Cerberus has notified the Consultant in writing and by reference to the present Clause of a perceived

default in providing services and if the Consultant has failed to cure the default within a period of not more than ten Business Days.

## ARTICLE IV

## EXCULPATION

4.1 <u>Exculpation</u>.    Provided they shall act in good faith and have not engaged in willful misconduct, gross negligence or any material breach of this Agreement, a Covered Person shall not be liable (i) for any mistake in judgment, (ii) for any action or inaction taken or omitted for a purpose which such Person believed in good faith to be consistent with the best interests of the Cerberus Group, or (iii) for any loss due to the mistake, action, inaction, negligence, dishonesty, fraud or bad faith of any broker or other agent, provided that such broker or other agent is not and was not an Affiliate of the Covered Person and was selected, engaged or retained without gross negligence.

## ARTICLE V

## MISCELLANEOUS

5.1 <u>Notice</u>.  (a)  Any notice to a party to this Agreement shall be in writing and sent to the address of such party set forth in below or such other mailing address of which a party shall advise the others in writing:

If to Cerberus:

450 Park Avenue, 28th Floor
New York, New York 10022
Attention:  Mark A. Neporent
Facsimile: 212-891-1540

For the sole purpose of Section 2.2 (b) hereof:

David Teitelbaum    email:

david.teitelbaum@cerberus-ger.de

Frank Bruno           email:

fbruno@cerberuspartners.com

If to the Consultant:

Direct Investment Partners Ltd.

Zimmergasse 16

8032 Zurich, Switzerland

Phone: +41 (1) 3966181

Fax: +41 (1) 3917484

e-mail: roman@koidl.com

Att: Mr. Roman Koidl

Cellphone: +49 (172) 4000 100

(b)   Any notice shall be deemed to have been duly given if personally delivered or sent by United States mail or by facsimile transmission and will be deemed received, unless earlier received, (i) if sent by first class air mail, fourteen days after mailing, (ii) if sent by overnight courier service, on the second business day after delivery to such service, (iii) if sent by facsimile transmission, on the date sent provided confirmation of transmission is obtained and (iv) if delivered by hand, on the date of receipt.

(c)           For the sole purpose of Section 2.2(b) hereof, transmission via email shall satisfy the requirements provided by this Section 5.1 and shall be deemed received upon receipt of the relevant receipt confirmation message (which receipt confirmation message each party shall cause to be sent promptly after receiving an email transmission).

5.2          Use of Fees / Representation / Certification.  The Consultant hereby represents, warrants and agrees that it will not directly or indirectly in connection with this Agreement, pay, promise, or offer to pay money or anything of value to any foreign official, foreign political party or official thereof, any candidate for political office or any other person for the purpose of: (a) assisting Cerberus or any member of the Cerberus Group in obtaining business, retaining business or directing business to Cerberus or a member of the Cerberus Group; (b) influencing any act or decision of such foreign official, political party or candidate; or (c) inducing such foreign official, political party or candidate to use his or its influence to affect or influence any act or decision of such person or entity; provided, however, that the Consultant may make any such payments required to facilitate, expedite or secure the performance of a routine or customary governmental action such as obtaining a license, permit or other official document necessary to qualify a person to do business, processing work orders, visas or similar government documents, providing phone, mail or power services or actions of a similar nature.  the Consultant will, on request from time to time certify that no such payments have been, or will be, made.

5.3  Governing Law.   All questions concerning the construction, interpretation and validity of this Agreement shall be governed by and construed and enforced in accordance with the domestic laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether in the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.  In furtherance of the foregoing, the internal law of the State of New York will control the interpretation and construction of this Agreement, even if under such jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily or necessarily apply.

5.4          Entire Agreement. This Agreement constitutes the entire agreement among the parties; it supersedes any prior agreement or understandings among them, oral or written, all of which are hereby canceled.   There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties relating only to the subject matter of this Agreement which are not fully expressed herein.

5.5        Headings.  The headings in this Agreement are inserted for convenience of reference only and shall not affect the interpretation of this Agreement. Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in either the masculine or the neuter gender shall include the masculine, the feminine and the neuter.

5.6        Binding Provision; Assignment.   The covenants and agreements contained herein shall be binding upon and inure to the benefit of the heirs, executors, administrators, personal or legal representatives, successors and permitted assigns of the respective parties hereto.  This Agreement may not be assigned without the written consent of the other parties.  Any assignment in violation of this paragraph shall be null and void.  Assignment of this Agreement in accordance with this paragraph 5.5 shall not relieve the assignor from liability for its obligations hereunder.

5.7        No Waiver.  The failure of any party to seek redress for violation or to insist on strict performance, of any covenant or condition of this Agreement shall not prevent a subsequent act which would have constituted a violation from having the effect of an original violation.

5.8        Counterparts.    This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

5.9        Severability.  It is the desire and intent of the parties hereto that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies    applied in each jurisdiction in which enforcement is sought. Accordingly, if any particular provision of this Agreement shall be adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining

provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

5.10        Confidentiality.  Information furnished under this Agreement by any party to another party, including their respective agents and employees, is confidential and will not be disclosed to third parties without the prior permission of the other party, unless disclosure is requested by a regulatory authority or otherwise is required by law or applicable regulations.   This provision shall not apply to information that (i) is generally available to the public other than as a result of a disclosure by such party or its agents or employees, (ii) is in the possession of such party prior to its delivery, or (iii) is obtained, after the date hereof, by such party on a non-confidential basis from any person that is not known by such party to be in violation of any confidentiality agreement regarding such information.

5.11        No Agency.  The parties hereto are independent contractors and nothing contained in this Agreement shall be deemed to create the relationship of partners, joint ventures or of principal and agent, franchiser and franchisee, or of any association or relationship between the parties except as expressly provided in this Agreement.   Each party acknowledges that it does not have the right to make any representations to any third party or to act on behalf of, or bind, the other party except to the extent expressly contemplated by this Agreement.

5.12        Jurisdiction, Etc.  (a)  Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or federal court of the United States of America sitting in the State of New York and the county of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any related agreement or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees to institute any and all claims in respect of this Agreement or any related agreement to a New York State court or, to the extent permitted by law, in such federal court.   Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and

may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b) Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any related agreement in any New York State or federal court.  Each of the parties hereto irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

5.13        Waiver of Jury Trial. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENT.

IN WITNESS WHEREOF, the undersigned have hereunto set their hands as of January 1, 2003.

Direct Investment Partners Ltd.

By: _____

    Name:  Mr. Roman Koidl

    Title:  Chief Executive Officer

CERBERUS GLOBAL INVESTMENTS, LLC

By: _____

    Name:  Mark Neporent

    Title:  Chief Operating Officer

## Annex A

## Professional Rates

Further professional services rendered by the Consultant to Cerberus as described in point 2.2 (d) will be billed to Cerberus as follows:

| | |
|---|---|
| Roman Koidl or Partner/Senior Advisor | 350 € hour rate |
| Senior Consultant | 300 € hour rate |
| Management Consultant | 225 € hour rate |
| Junior Consultant | 100 € hour rate |
| Assistant Consultant/Back Office | 75€ hour rate |