UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
DIRECT INVESTMENT PARTNERS AG,

                          Plaintiff,

     - against -

CERBERUS GLOBAL INVESTMENTS, LLC,
CERBERUS CAPITAL MANAGEMENT, L.P.,
CERBERUS PARTNERS, L.P., and CERBERUS
GLOBAL INVESTMENT ADVISORS, LLC,

                       Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

07 Civ. 3310 (LLS) (RLE)

(Filed via ECF)

_____

**DIRECT INVESTMENT PARTNERS AG'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

_____

WUERSCH & GERING LLP

Counsel for Plaintiff Direct Investment
Partners AG
100 Wall Street, 21st Floor
New York, New York 10005
212-509-5050

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 3

    A.    The Parties ................................................................................................................. 3

    B.    Cerberus Asks Direct to Introduce Cerberus to the German Market .................................. 4

    C.    Cerberus Presents Direct with its Standard Consulting Agreement .................................. 6

    D.    Making the Consulting Agreement Consistent With the Key Commercial Terms ............ 8

    E.    Direct Introduces IRU to Cerberus ................................................................................. 15

    F.    Cerberus's Tactics to Avoid Direct's Fees ..................................................................... 19

    G.    Cerberus Further Relies on Direct ................................................................................. 20

    H.    Cerberus Closes the dAF Deal ..................................................................................... 21

    I.    Cerberus Declines to Pay Direct ................................................................................... 22

STANDARD OF REVIEW ................................................................................................ 21

ARGUMENT ...................................................................................................................... 24

    Point I ........................................................................................................................... 24

        A.    The Parties Did Not Require a Signature to Trigger Their Contractual
             Obligations ......................................................................................................... 24

        B.    At Worst, the Consulting Agreement is an Enforceable Preliminary Agreement ........ 27

    Point II .......................................................................................................................... 45

        A.    The Consulting Agreement was Capable of Being Performed Within One Year ........ 45

        B.    The Statute of Frauds Does Not Apply Because the Agreement Was Evidenced
             By a Writing, Confirmed by the Party to be Charged With Performance .................... 47

        C.    Partial Performance ......................................................................................... 48

    Point III ......................................................................................................................... 54

        A.    Promissory / Equitable Estoppel ..................................................................... 54

B.    Unjust Enrichment & Quantum Meruit ......................................................................... 59

Point IV ......................................................................................................................................... 62

CONCLUSION ............................................................................................................................. 66

## Table of Authorities

**Cases**

Adjustrite Sys., Inc. v. GAB Bus. Serv., Inc., 145 F.3d 543 (2d Cir. 1998) .............. 27, 28, 29, 42

AmBase Corp. v. City Invest. Co. Liquid. Trust, 326 F.3d 63, 72
(2d Cir. 2003)........................................................................................................................... 22

Anostario v. Vicinanzo, 59 N.Y.2d 662, 664 (1983) ................................................... 52

Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69
(2d Cir. 1989).......................................................................... 28, 29, 42, 54, 59

Beautiful Jewelers Private Ltd. v. Tiffany & Co., No. 06 Civ. 3085, 2007
U.S. Dist. LEXIS 20263 (S.D.N.Y. March 21, 2007 .................................................. 59

Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007)................................ 21, 22, 23

Bellen v. Weiser, No. 05 Civ. 8775, U.S. Dist. 2007 LEXIS 75637
(S.D.N.Y. October 11, 2007) ................................................................................ 58

Belotz v. Jeffries & Co., No. 98 Civ. 2587, 1999 WL 587916, *5 (S.D.N.Y. Aug. 4,
1999).......................................................................................................................... 59

Blue Wolf Group, LLC v. Gaiam, Inc., 16 Misc.3d 1113A (N.Y. Cty. 2007) ............................ 61

Blye v. Colonial Corp. of Am., 102 A.D.2d 297, 298 (1st Dep't 1984)....................................... 48

Bonnie & Co. Fashions, Inc. v. Bankers Trust Co., 945 F. Supp. 693 (S.D.N.Y. 1996)............. 24

Brady v. Helmsley, 246 A.D.2d 486 (1st Dep't 1998) ................................................................. 52

Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, (2d Cir. 1996)............. 65

Brown Bros. Elec. Contr., Inc. v. Beam Const. Corp., 41 N.Y.2d 397 (1977)............................ 24

Brown v. Cara, 420 F.3d 148, 154 (2d Cir. 2007) .................................................................. 34, 42

Bruce Realty Company of Florida v. Berger, 327 F. Supp. 507 (S.D.N.Y. 1971) ...................... 43

Brylgrove Ltd. v. Tomkins, PLC, 172 A.D.2d 452, (1st Dep't 1991) .......................................... 59

Burke v. Bevona, 866 F.2d 532 (2d Cir. 1989)............................................................................ 45

C.R. Klein, Inc. v. Flagship Prop., Inc., 955 F.2d 5 (2d Cir. 1992)....................................... 57,58

Carruthers v. Flaum, 450 F. Supp. 2d 288 (S.D.N.Y. 2006) ...................................................... 50

Channel Master Corp. v. Aluminum Ltd. Sales, Inc., 4 N.Y.2d 403 (1958) ............................... 64

Chemtex, LLC v. St. Anthony Enter., Inc., 490 F. Supp.2d 536 (S.D.N.Y. 2007) ..................... 46

Ciarmella v. Reader's Digest Ass'n, 131 F.3d 320 (2d Cir. 1997)............................................. 25

Cinema North Corp. v. Plaza at Latham Assoc., 867 F.2d 135 (2d Cir. 1989) ......................... 58

Clark-Fitzpatrick, Inc. v Long Island Railroad Co., 70 N.Y.2d 382 (1987)............................... 62

Club Chain of Manhattan, Ltd. v. Christopher & Seventh Gourmet, Ltd., 74 A.D.2d
277, 281 (1st Dep't 1980) ........................................................................................................... 52

Conley v. Gibson, 355 U.S. 41 (1957)........................................................................................ 21

Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568 (2d Cir. 1993) ....................... 34, 51

Crabtree v. Elizabeth Arden Sales Corp., 305 N.Y. 48 (1953)............................................. 37, 50

Cron v. Hargro Fabrics, Inc., 91 N.Y.2d 362 (1998)................................................................. 46

Curtis v. Harry Winston, Inc., 653 F. Supp. 1504 (S.D.N.Y. 1987)........................................... 45

D & N Boening, Inc. v. Kirsch Bev., Inc., 63 N.Y.2d 449, 454 (1984) ...................................... 47

Davis v. Mamber, Ltd., 212 A.D.2d 424 (1st Dep't 1995).................................................... 61, 62

Deerfield Comm. Corp. v. Chesebrough-Ponds, Inc., 68 N.Y.2d 954 (1986)............................ 64

Del Monte Corp. v. Mercantum (U.S.) Corp., 175 A.D.2d 72 (1st Dep't 1991)......................... 50

Dornberger v. Metropolitan Life Ins. Co., 961 F. Supp. 506 (S.D.N.Y. 1997).......................... 64

Edelson v. Quad Sys., Inc., No. 83 Civ. 2492, 1984 U.S. Dist. LEXIS 17727, at *6
(S.D.N.Y. April 11, 1984) .......................................................................................................... 60

Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007)..................................................................... 22

Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co., 804 F.2d 787
(2d Cir. 1986)......................................................................................................................... 54, 58

Feingold v. Nankin, 91 Fed. Appx. 176 (2d Cir. 2004)............................................................... 59

Festa v. Local 3 Int'l Bhd. Of Elec. Workers, 905 F.2d 35 (2d Cir. 1990) ............................... 57

Flammia v. Mite Corp., 401 F. Supp. 1121 (E.D.N.Y. 1975)..................................................... 61

Frassetto v. Wallkill Gener. Co., L.P., 944 F. Supp. 275 (1996)............................................... 52

Freedman v. Chemical Const. Corp., 43 N.Y.2d 260 (1977) ..................................................... 51

Global Network Comm., Inc. v. City of N.Y., 458 F.3d 150 (2d Cir. 2006)................................ 22

Goldberg v. Select Indus., Inc., 202 A.D.2d 312 (1st Dep't 1994) ................................ 47

Grappo v. Alitalia Linee Aeree Italiane, 56 F.3d 427 (2d Cir. 1995)........................................... 59

Great Earth Int'l Franchising Corp. v. Milks Dev., 311 F. Supp. 2d 419,
425-26 (S.D.N.Y. 2004)........................................................................................................... 65

Great White Bear, LLC v. Mervyns, LLC, No. 06 Civ. 13358, 2007 U.S.
Dist. LEXIS 31224 (S.D.N.Y. April 26, 2007)......................................................................... 58

Grupo Sistemas Integrales de Tele. S.A. de C.V v. AT&T Comm., Inc.,
No. 92 Civ. 7862, 1994 U.S. Dist. LEXIS 11896 (S.D.N.Y. Aug. 24, 1994) ............................ 25

Gruppo, Levey & Co. v. GLC Sec. Corp., No. 01 Civ. 8922, 2004 U.S. Dist.
LEXIS 27320 (S.D.N.Y. June 28, 2004) ...................................................................................... 61

Henry L. Fox Co. v. William Kaufman Org., 74 N.Y.2d 136 (1989)........................................... 49

Hostcentric Tech., Inc. v. Republic Thunderbolt, LLC, No. 04 Civ. 1621,
2005 U.S. Dist. LEXIS 11130 (S.D.N.Y. June 9, 2005) .............................................................. 26

I.R.V. Merchandising Corp. v. Jay Ward Prod., Inc., 856 F. Supp. 168
(S.D.N.Y. 1994)........................................................................................................................ 37, 38

In re Sloan, 32 B.R. 607, 610 (E.D.N.Y. 1983)........................................................................... 52

Intercontinental Planning, Ltd. v. Daystrom, Inc., 24 N.Y.2d 372 (1969) ................................... 50

International Minerals & Res., S.A. v. Pappas, 96 F.3d 586
(2d Cir. 1996)................................................................................................................................ 34

International Telemeter Corp. v. Teleprompter Corp., 592 F.2d 49,
(2d Cir. 1979)................................................................................................................................ 34

Iqbal v. Hasty, 490 F.3d 143, 155-156 (2d Cir. 2007)................................................................. 23

Khazzam v. Tremont Advisers, Inc., 214 A.D.2d 515 (1st Dep't 1995) ....................................... 61

Klewin, Inc. v. Flagship Prop., Inc., 955 F.2d 5 (2d Cir. 1992) .................................................. 59

Kobre v. Instrument Sys. Corp., 54 A.D.2d 625 (1st Dep't 1976) ............................................... 50

Kule Res. Ltd. v. Reliance Group, Inc., 49 N.Y.2d 587 (1980) ................................................... 52

Lalonde v. Modern Album and Finishing Co., Inc., 38 A.D.2d 960
(1st Dep't 1972) ............................................................................................................................ 50

Lauter v. W&J Sloane, Inc., 417 F. Supp. 252 (S.D.N.Y. 1976).................................................. 27

Lehman Bros Inc. v. Canadian Imperial Bank of Commerce, No. 97
Civ. 8226, 2000 U.S. Dist. LEXIS 13979 (S.D.N.Y. Sept. 27, 2000).........................................51

Lehman v. Dow Jones & Co., Inc., 783 F.2d 285 (S.D.N.Y. 1986) ..............................................64

MacEdward v. Northern Elec. Co. Ltd., 595 F.2d 105
(2d Cir. 1979)..................................................................................................................................58

Manhattan Fuel Co., Inc. v. New England Petro. Corp., 422 F. Supp.
797 (S.D.N.Y. 1976)........................................................................................................................49

Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.,
244 F.R.D. 204 (S.D.N.Y. 2007) .....................................................................................................9

Marcella v. ARP Films, Inc., 778 F.2d 112 (2d Cir. 1978) ..........................................................61

Marcraft Rec. Corp. v. Francis Devlin Co. Inc., 506 F. Supp. 1081
(S.D.N.Y. 1981) .......................................................................................................................49, 60

Marks v. New York Univ. 61 F. Supp.2d 81, 88 (S.D.N.Y. 1999)................................................24

Matcon, Inc. v. Canron Const. Corp., No. 96 Civ 4401, 1998 U.S. Dist
LEXIS 680 (S.D.N.Y. January 26, 1998) ......................................................................................50

McNamara v. Tug Diana L. Moran, No. 87 Civ 3096, 1989 U.S. Dist.
LEXIS 10634 (S.D.N.Y. Sept. 6, 1989) .........................................................................................53

Mesibov, Glibert & Levy v. Cohen Bros. Mfg. Co., 245 N.Y. 305 (1927).................................51

Messner Vetere Berger McNamee Schmetterer Euro RSCG v. Aegis
Group PLC, 150 F.3d 194 (2d Cir. 1998) ......................................................................................58

Missigman v. USI Northeast, Inc., 131 F.Supp.2d 495 (S.D.N.Y. 2001).....................................41

Morris Cohon & Co. v. Russell, 23 N.Y.2d 569, 574 (1969)...........................................48, 49, 60

Nakamura v. Fuji, 253 A.D.2d 387 (1st Dep't 1998) ....................................................................62

Nat Nal Serv. Stations, Inc v. Wolf, 304 N.Y. 332 (1952) ...........................................................46

Niederhoffer, Cross & Zeckhauser, Inc. v. Holiday Inns, Inc., No. 77
Civ. 5242, 1980 U.S. Dist. LEXIS 10906 (S.D.N.Y. March 27, 1980).........................................62

North Shore Bottling Co. v. Schmidt & Sons, Inc., 22 N.Y.2d 171 (1968) ...........................45, 64

Ohanian v. Avis Rent A Car Sys., Inc., 779 F.2d 101 (2d Cir. 1985) ..........................................46

Omega Eng'g, Inc. v. Omega SA, No. 3:98CV2464, 2004 U.S.
Dist. LEXIS 27908 (D. Conn. March 24, 2004)............................................. 26

Oxbridge Partner, L.P. v. New England Video, Ltd., 213 A.D.2d 361
(1st Dep't 1995) ............................................................................................. 52

P.A. Bergner & Co. v. Martinez, 823 F. Supp. 151 (S.D.N.Y. 1993) ........... 25

Panetta v. Kelly, 17 A.D.3d 163 (1st Dep't 2005)........................................ 51

Paper Corp. of the U.S. v. Schoeller Tech. Papers, Inc., 742 F. Supp.
808 (S.D.N.Y. 1990).................................................................................... 62

Perfect Trading Co. v. Goldman Sachs & Co., 236 A.D.2d 221
(1st Dep't 1997) ............................................................................................. 61

Philo Smith & Co. v. U.S. Life Corp., 420 F. Supp. 1266 (S.D.N.Y. 1976),
aff'd, 554 F.2d 34 (2d Cir. 1977)............................................................. 52.59

Precision Testing Labs., Ltd. v. Kenyon Corp. of Am., 644 F.
Supp. 1327 (S.D.N.Y. 1986)....................................................................... 24

R.G. Group, Inc. v. The Horn & Hardart Co., 751 F.2d 69 (2d Cir. 1984) .......................... passim

Rabus v. Silentradio, No. 90 Civ. 5037, 1992 U.S. Dist. LEXIS 4825
(S.D.N.Y. April 13, 1992) ........................................................................... 47

Rayward v. Silberman, 356 F.2d 611 (2d Cir. 1966).............................. 46, 52

Recital Foam Corp., Inc. v. Bay Indus., Inc., 128 Fed. Appx. 798
(S.D.N.Y. 2005)............................................................................................ 34

Riley v. N.F.S. Serv., Inc., 891 F. Supp. 972 (S.D.N.Y. 1995) ................... 47

RTC Properties, Inc. v. Bio Resources, Ltd., 295 A.D.2d 285 (1st Dep't 2002) ........................ 60

Rule v. Brine, Inc., 85 F.3d 1002 (2d Cir. 1996)................................... 44, 60

RUS, Inc. v. Bay Indus., 322 F. Supp.2d 302 (S.D.N.Y. 2003) .................. 34

Sea Trade Co. v. FleetBoston Fin. Corp., No. 03 Civ. 10254, 2000 U.S.
Dist. LEXIS 32167 (S.D.N.Y. May 1, 2007)............................................ 46

SD Protection, Inc. v. Del Rio, 498 F. Supp. 576 (S.D.N.Y. 2007) ............ 51

Shann v. Dunk, 84 F.3d 73 (2d Cir. 1996)................................................... 42

Shapiro v. Dictaphone Corp., 66 A.D.2d 882 (2d Dep't 1978) .................... 61

Smith v. Onyx Oil and Chem. Co., 218 F.2d 104 (3d Cir. 1955)........... 43, 58

Snay v. Wood, 50 A.D.2d 651 (3d Dep't 1975) .......................................................... 53

Solin Lee Chu v. Ling Sun Chu, 9 A.D.2d 888 (1st Dep't 1959).......................... 26, 27

Sorge v. Nott, 22 A.D.2d 768 (1st Dep't 1964)........................................................ 53

Special Event Entm't v. Rockefeller Ctr., Inc., 458 F. Supp. 72 (S.D.N.Y. 1978) ...... 58

Springwell Corp. v. Falcon Drilling Co., Inc., 16 F. Supp. 2d 300 (S.D.N.Y. 1998)................. 39

Stephen Pevner, Inc. v. Ensler, 309 A.D.2d 722 (1st Dep't 2003)........................ 26, 27

Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002) ..................................................... 22

Teacher's Ins. & Annuity Ass'n v. Tribune Co., 670 F. Supp. 491,
 (S.D.N.Y. 1987)................................................................................................ passim

The Chariot Group, Inc v. American Acq. Partners, L.P., 751 F. Supp.
1144 (S.D.N.Y. 1990) ............................................................................................ 40

Total Plan Corp. of Am. v. Colborne, 14 F.3d 824 (2d Cir. 1994)............................. 55

Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d
89 (2d Cir. 2007)................................................................................................... 42

Transit Adver., Inc. v. New York, New Haven & Hartford R.R., 194 F.2d
907 (2d Cir.)......................................................................................................... 48

Unisys Corp. v. Hercules Inc., 224 A.D.2d 365(1st Dep't 1996)................................. 62

V'Soske v. Barwick, 404 F.2d 495 (2d Cir. 1968) ................................................. 28, 43

Viacom Int'l Inc. v. Tandem Prod., Inc., 368 F. Supp. 1264, aff'd, 526
F.2d 593 (2d Cir. 1973)....................................................................................... 43, 44

Villeroy & Boch S.A.R.L. v. THC Sys., No. 84 Civ 8073, 1991 U.S.
Dist. LEXIS 7352, (S.D.N.Y. June 3, 1991)......................................................... 25

Warnaco Inc. v. VF Corp., 844 F. Supp. 940 (S.D.N.Y. 1994)................................... 34

Warner v. Texas and Pacific Ry., 164 U.S. 418 (1896)............................................... 46

Wells Fargo Bank Minnesota v. BrooksAmerica Mortgage Corp., No. 02
Civ. 4467, 2004 U.S. Dist LEXIS 18573 (S.D.N.Y. September 14, 2004)................ 24

Wiener & Co. v. Teitelbaum, 107 A.D.2d 583 (1st Dep't 1984)................................. 49

Winston v. Mediafare Entm't., 777 F.2d 78 (2d Cir. 1985) ................................... passim

Zupan v. Lumberg, 2 N.Y.2d 547 (1957) ................................................................... 45

**Statutes**

2 Corbin on Contracts § 444 ........................................................................ 46

3 Williston, A Treatise on the Law of Contracts § 534 at 810-11 (3d ed. 1960) ......................... 58

4 Williston, Contracts (3d Ed.) § 567A ............................................................. 48

5B C. Wright & A. Miller, Federal Practice and Procedure § 1356 (3d ed. 2004) ....................... 22

N.Y. Gen. Oblig. § 5-703(4) (McKinney 2001) ....................................................... 51

N.Y. Gen. Oblig. Law § 5-701(3)(d) (McKinney 2002) .............................................. 47

N.Y. Gen. Oblig. Law § 5-701(a)(1) (McKinney 2002) ............................................. 45

**Rules**

Fed. R. Civ. P. 8(a)(2) .......................................................................... 21, 22, 23

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
DIRECT INVESTMENT PARTNERS AG,

                                        Plaintiff,

        - against -

                                                            **07 Civ. 3310 (LLS) (RLE)**

CERBERUS GLOBAL INVESTMENTS, LLC,
CERBERUS CAPITAL MANAGEMENT, L.P.,
CERBERUS PARTNERS, L.P., and CERBERUS
GLOBAL INVESTMENT ADVISORS, LLC,

                                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

        Plaintiff, Direct Investment Partners AG ("Direct"), respectfully submits this

memorandum of law in opposition to the July 27, 2007 motion to dismiss the Complaint by

defendants, Cerberus Global Investments, LLC, Cerberus Capital Management, L.P., Cerberus

Partners, L.P., and Cerberus Global Investment Advisors, LLC (collectively, "Cerberus"),

pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).


## PRELIMINARY STATEMENT

        This lawsuit is to recover substantial fees owed by Cerberus for the work

performed by Direct in presenting to Cerberus a lucrative investment opportunity.  More than a

"finder's fee" case, this action concerns a contract in which Direct was to introduce to Cerberus

investment opportunities in Europe, particularly in the then nascent German market to Cerberus,

for a fee based upon Cerberus's return from the investment.  As demonstrated below, this is not a

case in which a profit-minded broker presented speculative investment opportunities to an

investment fund, hoping to receive a fee.  Instead, Cerberus sought out Direct for the specific

purpose of locating particular distressed debt investment opportunities in Germany, Switzerland,

and Austria, where Cerberus had at the time little, if any, presence, but wanted to expand.

Cerberus entered into an agreement with Direct on terms offered by Cerberus for the express

purpose of locating investment opportunities, and when Direct located an investment that was attractive to Cerberus, Direct was excluded from negotiations for the investment and ultimately ignored when Direct sought its contractual fee. Cerberus's muse for not paying Direct: the contract was never signed, and certain particulars of the agreement were not finalized.

In its motion, Cerberus claims the arrangement between the parties was verbal, and even if there was an exchange of documents memorializing the agreement, they do not amount to an enforceable contract under New York law. Cerberus also argues that the contract is barred by the New York Statute of Frauds. What Cerberus does not mention, however, is that the parties conducted their relationship as if they were bound by the essential terms of the written agreement asserted in the Complaint.

There is no dispute that Cerberus and Direct performed the material requirements and obligations of the contract, save for one important omission: Cerberus failed to pay Direct after it made an investment in a portfolio company of the Institutional Restructuring Unit ("IRU") of Dresdner Bank AG, an investment first presented by Direct. Cerberus made other payments to Direct under the contract, and the parties met their other obligations; but when it came time to discharge its final duty, Cerberus balked, claiming the contract was not enforceable because it was not signed. This is exactly the scenario that is not subject to the Statute of Frauds, and exactly the situation that has been addressed by numerous New York courts in which the issue of whether an unsigned contract is enforceable was sent to a jury.

Cerberus cannot escape the fact that it (i) contacted and then met with Direct for the specific purpose of having Direct locate investment opportunities in Europe; (ii) assigned a managing director and other senior operatives to deal with Direct and establish the parameters of the business arrangement; (iii) proposed the terms of the contract it presented to Direct, and then conducted itself based upon the agreed-upon terms after promising that a signed contract was forthcoming; (iv) substantially performed the contract; and (v) made serial representations to Direct about the contract and that Direct would be paid after the investment opportunity

presented by Direct was closed.  This is not the type of contract or series of events that New York's Statute of Frauds was designed to bar.

Additionally, it is not disputed that Direct opened, participated in, and facilitated negotiations between IRU and Cerberus.  Through this introduction, Cerberus gained access to the investment opportunities provided by the IRU portfolio of assets valued at €31 billion, including debis AirFinance B.V., Amsterdam, the Netherlands ("dAF"), which was subsequently acquired by Cerberus in a transaction valued at $1.37 billion.  When Cerberus learned the value of the dAF deal after it was presented by Direct, Cerberus began to squeeze out Direct, seizing upon what it hoped would amount to the loophole of an unsigned contract.  Cerberus ultimately closed the dAF deal and then failed to pay Direct the fees contracted to between the parties for Direct's efforts in exclusively bringing together Cerberus and IRU.

While Cerberus contends the matter should not reach a fact-finder, New York law compels the opposite result.  Given the negotiations, transactions, and performance of the parties under the contract, a jury should decide whether Cerberus is bound to the unsigned agreement, and the amount of fees owed to Direct under the claims asserted in the Complaint.  A jury also should decide whether Cerberus defrauded Direct, as alleged in the Complaint, and whether Cerberus is liable in quantum meruit, unjust enrichment, and the other asserted claims.

## STATEMENT OF FACTS

### A.    The Parties

Direct is a Luzern, Switzerland based mergers and acquisition advisory firm that provides consulting services and advice to hedge funds, banks, and financial management advisors.  (See Complaint ¶¶ 4-5).  The primary activity of Direct is to source deals based in Europe, providing to clients advisory and investment services.  Id.

According to its website, Cerberus is one of the world's leading private investment firms, holding controlling or minority interests in global companies that generate

more than $60 billion in annual revenue, including Chrysler and GMAC, as well as numerous aviation investments, including Air Canada and the acquisition at issue in this lawsuit, dAF, since renamed AerCap Holdings N.V.  (See www.cerberus.com).

**B.**      **Cerberus Asks Direct to Introduce Cerberus to the German Market**

In 2002, the German market was considered ripe for investment opportunities in distressed debt, and Cerberus wanted to locate investment options because it did not have fixed German operations.  (See Complaint ¶ 12).  Direct's president, Roman Koidl, learned in mid 2002 from Dr. Pieter Korteweg, a Cerberus European advisor, that Cerberus was looking for GSA (Germany, Switzerland, Austria) investment opportunities.  Id. at ¶ 14.  Dr. Korteweg arranged for Direct to be introduced to Cerberus at its New York headquarters, informing Mr. Koidl in a December 10, 2002 e-mail that Frank Bruno, President of Cerberus Global Investments, LLC and head of Cerberus's international operations and investments, would *"spell out specifics and economics of working with you, including the terms of a contract."*  Id. at ¶¶ 13-14).

Mr. Koidl met with Cerberus in New York on December 13, 2002, and Mr. Bruno expressed Cerberus's desire to work with Direct in identifying investment opportunities.  Id. at ¶ 15.  Mr. Bruno explained that Cerberus typically offered a compensation package to advisors like Direct that included: (i) reimbursement for expenses; (ii) 1% of the equity Cerberus invested in an opportunity presented to Cerberus; (iii) an incentive fee of 15% - 20% after an internal rate of return ("IRR") 15% - 20% for the Cerberus entity making the investment; and (iv) a representation fee.  Id.   After discussing the particulars of a financial arrangement, Mr. Koidl of Direct agreed to work with Cerberus, and Mr. Bruno instructed Mr. Koidl to report in Germany to David Teitelbaum, a Cerberus Managing Director.  Id.

Five days later, Mr. Koidl met in Germany with Mr. Teitelbaum and confirmed the arrangement that was agreed upon in New York. Id. at ¶ 16. On December 26, 2002, Mr. Teitelbaum reduced to a writing the principal terms of the arrangement, describing the *"key commercial terms"* between Cerberus and Direct. Id. at ¶ 21; Complaint Ex. A. Cerberus now claims the language of the December 26th e-mail indicates the parties never intended to be bound unless there was a signed, written contract. (See Cerberus MOL pp. 3-4, 14-15). But what Cerberus ignores is that the language of the December 26th e-mail, which provides that *". . . this brief email only captures certain of the more important terms that we discussed but is not a legal obligation for Cerberus or you,"* upon which Cerberus essentially bases its entire dismissal motion, does not demand that the purported *"10 page contract"* be signed by the parties before the *"key commercial terms"* became effective. (See Complaint Ex. A). That is likely because in the December 26th e-mail, Cerberus focuses on the primary financial points that were addressed in New York and agreed upon by the parties, leaving to the *"10 page contract"* the items that Mr. Teitelbaum admits in the e-mail were *"not discussed,"* such as the length of the contract and other non *"key commercial terms."* Id.

Importantly, Mr. Bruno, who negotiated the *"key commercial terms"* with Mr. Koidl, was copied on the December 26th e-mail. Id. Mr. Bruno has never refuted the parties' agreement, defined by Mr. Teitelbaum in the e-mail as the parties' *"working relationship."* Id.; see Complaint ¶27.

The *"key commercial terms"* in the December 26th e-mail were the same terms Cerberus and Direct agreed upon in New York: (i) $12,000 per month paid to Direct at or about the time of an investment or acquisition by Cerberus exceeding €30 million; (ii) 1% of net invested amount by Cerberus for investments sourced exclusively by Direct; for non-exclusive

deals, the 1% consulting fee would be discounted by 40%; (iii) 20% of all profits from an investment made by a Cerberus entity above a 20% unleveraged IRR on the invested amount; and (iv) reimbursement of expenses not to exceed $12,000 per month.  Id.   If the *"key commercial terms"* were different than those agreed upon in New York, surely Mr. Bruno, a very senior Cerberus executive, would have objected or otherwise instructed Mr. Teitelbaum to renegotiate the terms.

## C.    Cerberus Presents Direct with its Standard Consulting Agreement

Mr. Teitelbaum followed his December 26th e-mail with another message on December 30, 2002, explaining to Mr. Koidl that *"my prior email did reflect how we intend to work with you and that email was also consistent with our conversation."*  Id. at ¶ 31 (emphasis supplied).  In the December 30th e-mail, Mr. Teitelbaum addressed the *"not discussed"* items in the December 26th e-mail, including the means by which Cerberus and Direct would communicate.  Id.  These were the type of items Mr. Teitelbaum had left to *"lawyers to write-up."*  Id. at ¶ 31; Complaint Ex. A.

It turns out that the *"10 page contract"* contemplated by Mr. Teitelbaum in his December 26th e-mail (id.) ended-up a 19 page "Consulting Agreement" delivered to Direct on January 25, 2003.  Id. at ¶35, Ex. B.  The Consulting Agreement was prepared by Cerberus's attorneys (id. at ¶ 35) and further memorialized the parties' *"key commercial terms."*  While Cerberus now maintains the Consulting Agreement deviated from the original deal terms proposed by Cerberus such that no contract could be implied, a direct comparison proves otherwise:

| **"Key Commercial Terms"<br>Agreed in New York and in<br>The December 26ᵗʰ E-Mail** | **Cerberus's January 25, 2003<br>Consulting Agreement** |
|---|---|
| $12,000 monthly retainer triggered by €30,000 Deal, months 4-8 inclusive (See Complaint Ex. A, ¶ 1). | Same. (See Complaint Ex. B, ¶ 3.2). |
| "1% of Cerberus net invested amount of exclusive deals you source exclusively" (See Complaint Ex. A, ¶ 2). | Same. (See Complaint Ex. B, ¶ 3.2). The amount invested by Cerberus is defined pursuant to the "leverage" Cerberus has in the investment deal. The 1% owed to Direct after the Cerberus investment is calculated is the exact same. |
| "20% of all profits above a US$20% unlevered IRR of exclusive deals you source exclusively." (See Complaint Ex. A, ¶ 3). | Same. (See Complaint Ex. B, ¶ 3.3). Direct's entitlement to a 20% "Incentive Fee" after a Cerberus 20% unlevered internal rate of return is the same; the details of the calculation of Cerberus's unlevered internal rate of return are introduced, but that does not change the requirement of the Incentive Fee payment to Direct. Only the calculation to figure Cerberus's return is introduced, the calculation of which Direct has no quarrel. Id. |
| Expense reimbursement for out-of-pocket Expenses incurred by Direct in sourcing deals. (See Complaint Ex. A., ¶4) | Same. (See Complaint Ex. B, ¶ 3.4). The details and amounts are the same. Id. |
| Non-exclusive deals are discounted by 40%. (See Complaint Ex. A, ¶ 5). Mr. Teitelbaum advises "the lawyers will write this-up." Id. | Same. (See Complaint Ex. B, ¶ 3.5). The 'lawyers did write-it up' the same as written by Mr. Teitelbaum. |
| Confirmation that a deal was introduced by Direct. (See Complaint Ex. A, ¶¶ 6,7). Mr. Teitelbaum advises, "let's see what the lawyers come up on this . . ." Id. | Same. (See Complaint Ex. B, ¶ 2.2). "The lawyers" drafted a mechanism for a deal to be considered exclusive as introduced by Direct. Id. |

It is no coincidence that Cerberus's January 25, 2003 Consulting Agreement

reflects nearly identically the terms discussed between Messrs. Bruno and Koidl in New York

and Messrs. Teitelbaum and Koidl in Germany, all as memorialized in the December 26th e-mail. Id. These terms were standard to Cerberus, and reflected the same terms that Mr. Bruno explained were common to Cerberus's advisors. Id. at ¶ 15. In fact, the terms were so standard that the January 25, 2003 Consulting Agreement was a template used for other Cerberus consultants – the version delivered to Direct was a copy of one used for Cerberus consultant, "Hamton Enterprise Inc." (See January 25, 2003 Consulting Agreement, p. 19, Complaint Ex. B). This was the standard contract Cerberus used with other parties who were asked to source investment deals, and the standard terms referred to so often by Mr. Teitelbaum in his dealings with Mr. Koidl.

That the terms were standard to Cerberus also is evidenced by the sequence of deal points presented in Mr. Teitelbaum's December 26th e-mail. The *"key commercial terms"* follow nearly exactly their presentation in the January 25, 2003 Consulting Agreement: Terms 1-5 apply, respectively, to Consulting Agreement paragraphs 3.2, 3.3, 3.4, 3.5. (Compare Complaint Ex. A to Complaint Ex. B). It appears Mr. Teitelbaum copied the *"key commercial terms"* from the Consulting Agreement, which were originally presented as the standard Cerberus terms by senior Cerberus executive Mr. Bruno. (See Complaint ¶¶ 35-38).

**D.    Making the Consulting Agreement Consistent With the Key Commercial Terms**

Cerberus bases nearly its entire motion on the fact that there was no signed contract between the parties, arguing that the December 26th e-mail from Mr. Teitelbaum references how the Cerberus attorneys would 'write-up' the language of the *"key commercial terms.*" (See Cerberus MOL pp. 4-17). But what Cerberus misunderstands is that these disclaimers by Mr. Teitelbaum are exactly what was left to reduce to a later writing – not the deal terms, they were standard to Cerberus – but the actual language of the details of how the

deal terms would be managed. Cerberus ignores that what was left to Cerberus's attorneys to draft was the language of how the *"key commercial terms"* would be reduced to a writing. The fundamental terms of the contract were agreed to; what was left, was to reduce to a *"10 page contract"* the things the *"lawyers had to write-up."* (See Complaint Ex. A). Indeed, as demonstrated below, there is a crucial difference in writing and awaiting the details of a contract, and agreeing to the contract itself.

This difference is well illustrated in the performance of the parties after Cerberus presented the writing confirming its standard *"key commercial terms."* (See Complaint Exs. A, B). For example, on February 10, 2003, Mr. Koidl presented to Cerberus some revised language, but did not change the *"key commercial terms"* that continued to define the parties' relationship: (i) $12,000 per month paid to Direct at or about the time of an investment or acquisition by Cerberus exceeding €30 million; (ii) 1% of net invested amount by Cerberus for investments sourced exclusively by Direct; and for non-exclusive deals, the 1% consulting fee would be discounted by 40%; (iii) 20% of all profits from an investment made by a Cerberus entity above a 20% IRR on the invested amount plus certain expenses; and (iv) reimbursement of expenses not to exceed $12,000 per month. (Id.; see February 10, 2003 Consulting Agreement, Complaint Ex. C).

From the time of Mr. Bruno's first meeting with Mr. Koidl in New York, to the verbal and written exchanges between Messrs. Koidl and Teitelbaum, to the exchange of the Cerberus-prepared Consulting Agreement, the *"key commercial terms"* did not change. Id.[1]

---

[1] At p. 5 of its Memorandum of Law ("MOL"), Cerberus curiously cites the Consulting Agreement's integration clause. If the merger clause applies, then the contract has to be valid; indeed, if Cerberus argues there was no contract between the parties, the integration clause is irrelevant. Moreover, integration clauses apply only to oral agreements made prior to the signing of the contract. Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A., 244 F.R.D. 204

Cerberus argues otherwise, spending the bulk of its factual recitation on the differences between the January 25th and February 10, 2003 drafts of the Consulting Agreement. Cerberus argues that the changes in the Consulting Agreements are so dramatic, that the parties could not have reached an agreement on a contract. (See Cerberus MOL pp. 5-9). A careful examination of the differences cited by Cerberus, however, reveals a different exchange between the parties:

**Paragraph 1.1:** The fact that Direct was entitled to a fee if it introduced an investment to Cerberus is not altered by the change proposed by Direct. (Compare January 25, 2003 and February 10, 2003 Consulting Agreements, Complaint Exs. B, C). The only proposed change concerned whether Cerberus had competition for the deal presented by Direct. Id. Moreover, the change reflects exactly the terms proposed by Mr. Teitelbaum in the December 26 and December 30th e-mails, and in his discussions with Direct about what would constitute a *"Koidl deal."* (See Complaint ¶¶ 30-31, 55; Ex. A). Because the January 15, 2003 Consulting Agreement version was Cerberus's standard contract for advisors, it naturally omitted the *"Koidl deal"* confirmation process addressed in Mr. Teitelbaum's December 30th e-mail, an omission corrected by Direct in the February 10, 2003 Consulting Agreement. Id. at ¶ 30. This adjustment did not alter that Direct was entitled to a fee for a deal presented to Cerberus, one of the *"key commercial terms."* Id.

**Paragraph 2.1:** Cerberus suggests the paragraph 2.1 change presented by Direct is "stark." (See Cerberus MOL p. 6). In the December 26th e-mail, Mr. Teitelbaum wrote that there should be a method for Cerberus, when presented with an investment opportunity by Direct, to characterize the deal as *"a Roman Koidl deal."* (See Complaint Ex. A). The language

_____

(S.D.N.Y. 2007). Cerberus made numerous actionable representations after the Consulting Agreements were exchanged.

presented by Direct does not actually make any change because it merely confirms, in more

detailed language, that in order for Direct to be paid, it must be the party which presented the

investment opportunity to Cerberus.  (Compare January 25, 2003 and February 10, 2003

Consulting Agreements, Complaint Exs. B, C).  In fact, the suggested language comports with

the mechanism suggested by Mr. Teitelbaum in his December 26th e-mail, rendering the change

not so "stark":

> . . . *The Parties acknowledge that an investment presented to Cerberus by the*
> *Consultant shall be treated as a Proposed Investment only if Cerberus became*
> ~~*becomes*~~ *aware of such investment, <u>until it was presented to Cerberus by the</u>*
> *<u>Consultant</u>, exclusively through the Consultant, <u>which shall be deemed the case if</u>*
> *<u>Cerberus does not notify the Consultant in writing within one week of receiving</u>*
> *<u>the presentation by the Consultant that the relevant investment opportunity was</u>*
> *<u>already known to Cerberus.</u>*

Id. at Ex. C, paragraph 2.1.

This comports with the confirmation method proposed by Mr. Teitelbaum himself

in the December 30, 2002 e-mail exchange with Mr. Koidl.  Id. at ¶¶ 30-31.  In fact, it was Mr.

Teitelbaum who suggested that Direct include a passage that requires Cerberus to notify Direct in

a writing if the deal presented to Cerberus was not already known to Cerberus.[2]  Id.

Cerberus also considers "stark" the language that if Cerberus declines an

investment opportunity, Direct is not prohibited from contacting a third-party about the deal.

(See Cerberus MOL p. 6).  Both sides agreed to a lock-up period for the exclusive presentation

of deals by Direct to Cerberus.  (See Complaint Exs. B, C, Article 2.1).  The only difference is

Direct's suggestion that if Cerberus declines an investment, Direct is not prevented from

---

[2]  Cerberus has a great interest in attacking this paragraph of the Consulting Agreement.
Cerberus now claims the dAF deal was not actually sourced by Direct, but by an unnamed
London banker at Rothschild.  Discovery will identify this banker and the extent to which he
informed Cerberus about the dAF investment opportunity.  But no matter the banker's
statements, Cerberus never notified Direct that it became aware of the dAF deal through another
consultant.  (See Complaint ¶ 139).

introducing the deal to another client.  This is not a "stark" change, but a reflection of the

commercial reality that if Cerberus declines an investment there is no reason to preserve it for

Cerberus.  This proposed language is not part of the *"key commercial terms"* between the parties

and certainly does not indicate a failure of the parties to have a meeting of the minds on the

essential terms of the contract.  In addition, the change is irrelevant to the performance of the

parties under the contract because Cerberus accepted from Direct the IRU investment

opportunities.  Moreover, the change could not have been that "stark" because Mr. Teitelbaum

informed Mr. Koidl that all proposed language changes in the February 10, 2003 version were

accepted by Cerberus, and that Cerberus would deliver a signed contract to Direct.  Id. at ¶ 46.

Messrs. Bruno and Teitelbaum further confirmed the contract on April 15, 2003.  Id. at ¶¶ 76-78.

**Paragraph 3.1:**  Cerberus again paints a disparate view of this clause, but a close

examination of the language reveals something different.  In redline form:

> *Fee*.  *Cerberus shall pay the Consultant a non-refundable fee ("Consulting*
> *Fee") for services relating to the identification of, and consultation regarding,*
> *Proposed Investments which are Exclusive Investments, during the Effective*
> *Period of this Agreement, in an amount equal to one percent (1.0%) percent*
> *<u>(the "Consulting Fee Percentage")</u> of the amount actually invested by*
> *Cerberus (or the investor who it is referring to the Proposed Investment) in a*
> *Proposed Investment <u>(the "Invested Amount")</u>, payable within sixty (60) days*
> *of the closing of such Proposed Investment.  (the percentage selected within*
> *this range is the Selected Fee Percentage").  In calculating the Invested*
> *Amount,  amount actually invested by Cerberus amounts obtained through*
> *Leverage (as defined below), or which Cerberus reasonably anticipates*
> *obtaining through Leverage within nine (9) months following the closing of*
> *such Investment (such future leverage defined as "Projected Leverage") shall*
> *not be included; provided, however, that if Cerberus has not actually obtained*
> *such Projected Leverage within such nine (9) month period then Cerberus*
> *shall pay to the Consultant, on the date nine (9) months after the closing of the*
> *relevant Investment, the Consulting Fee in an amount equal to the Consulting*
> *Selected Fee Percentage times the difference between (A) Anticipated*
> *Leverage less, (B)  Leverage actually obtained and invested within such nine*
> *(9) month period.  As used herein, "Leverage" shall mean any amounts*
> *invested by Cerberus in a Proposed Investment from the proceeds of loans,*
> *borrowings or other indebtedness or credit support obtained from a third*

> party which is not an Affiliate of Cerberus <u>and which in consideration of</u>
> <u>providing the relevant financing does not obtain an equity participation in the</u>
> <u>Proposed Investment or other share in its profits.</u>

<u>Id.</u> at Ex. C, paragraph 3.1.

Besides cleaning-up the prose, Direct's addition does not, as challenged by Cerberus, adjust the parties' financial relationship.  If a party loaned money to Cerberus to finance the transaction instead of taking an equity stake, this would not result in the fee set forth in paragraph 3.1.  The change suggested by Direct reiterates this principle already contained in the January 25, 2003 version presented by Cerberus.  This language only clarifies the term "Leverage," defined as the amount that would be deducted from the amount invested by Cerberus or investors  to which Cerberus referred an investment opportunity for purposes of calculating the basis of the 1% fee set forth in paragraph 3.1.  Besides, the dAF transaction was not financed in such a manner, rendering this change irrelevant to the amount of the incentive fee owed to Direct.  (<u>See</u> Complaint ¶¶ 117-118).  In addition, to the extent a transaction arose contemplating this change, it would be a matter of contract interpretation.  Similar to the other differences seized upon by Cerberus, none of the changes in the February 10, 2003 Consulting Agreement impact the *"key commercial terms"* between the parties or the payment that is owed Direct as a result of Cerberus closing the dAF investment.

**Paragraph 3.2:**  This example magnifies the strained interpretation Cerberus applies to the two Consulting Agreement versions.  Direct inserted the Project Phoenix language because it was one of the first investment opportunities being worked on at the time.  <u>Id.</u> at ¶¶ 69, 90.  In the first version, the contract was silent as to this point because there was no deal at the time.  The language of this clause comports with the term suggested by Mr. Bruno in New York and, as Cerberus concedes, the term in Mr. Teitelbaum's December 26th e-mail.  (<u>See</u> Cerberus MOL p. 7; Complaint Ex. A).

**Paragraph 3.3:**  Cerberus speculates that the incentive fee change submitted by Direct manifestly alters the parties' agreement.  (See Cerberus MOL p. 8).  Cerberus is wrong. Mr. Bruno in New York and Mr. Teitelbaum in his December 26th e-mail offered, and Direct accepted, a contract in which Direct was to receive *"20% of all profits above a US$20% [sic] unlevered IRR of exclusive deals you source exclusively."*  (See Complaint ¶ 15; Ex. A).  When Cerberus presented the January 15, 2003 Consulting Agreement, it contained language that was outside the parties' *"key commercial terms,"* that is, the incentive fee agreed to by the parties. The change presented by Direct did not adjust the incentive fee as suggested by Cerberus, but comports with the December 26th e-mail and the terms presented to, and accepted by Mr. Koidl. Direct merely redirected the terms to the parties' agreement, particularly given that the January 25, 2003 Consulting Agreement was actually one used for another consultant and did not entirely reflect the *"key commercial terms."*  Id. at ¶¶ 36, 38.  And since Mr. Teitelbaum assented to the change, it could not have been a material difference.  Id. at ¶¶ 40, 44, 46.

**Paragraph 3.3(d):**  Cerberus believes the addition that a determination by the accounting firm of the incentive fee allocation is binding absent *"an obvious error"* is material enough to take the parties' exchanges out of a contract.  (See Cerberus MOL p. 8; Complaint Ex. C).  This term was not discussed by the parties during the exchange that formed the contract, and is not material to the fundamental terms of the parties' contract.  In fact, the change merely confirms the parties' right under the law to challenge an accounting error.  This is exactly the type of open term that parties leave for future discussion after they enter into an enforceable agreement, as explained under New York law in Point I, supra.

**Paragraph 3.5:**  The parties' agreement, confirmed by Messrs. Bruno and Teitelbaum, that a non-exclusive deal presented by Direct results in a 40% reduction in the

consulting fee is not changed by the language suggested by Direct.  (Compare January 25, 2003

and February 10, 2003 Consulting Agreements, Complaint Exs. B, C).  The standard Cerberus

language potentially excluded Direct if Cerberus arbitrarily elected to retain another consultant to

perform Direct's consulting and advisory duties, a provision not consistent with the *"key*

*commercial terms"* or the other written and verbal exchanges between Cerberus and Direct.

Direct made the change to reflect the reality of the parties' agreement, a reality confirmed by Mr.

Teitelbaum when he approved the change.  (See Complaint ¶¶ 44, 46).

   As seen by these passages, the *"key commercial terms"* between Cerberus and

Direct never changed.  The only suggested changes by Direct concerned matters that further

defined the *"key commercial terms"* or that were *'left to the lawyers,'* as Mr. Teitelbaum wrote.

Id. at Ex. B.  Moreover, the changes proposed by Direct could not have been as "stark" as

Cerberus maintains because they all were accepted by Cerberus, which promised that the signed

Consulting Agreement would be delivered to Direct after it was received from New York.  Id. at

¶ 46.  But rather than examining the issue in terms of the parties' interpretation of the differences

between the Consulting Agreement versions, more relevant is the parties' conduct after the

exchange.

**E.  Direct Introduces IRU to Cerberus**

   There can be no dispute that Cerberus, by its consent, actions, deeds, and oral and

written words, agreed and contracted that the *"key commercial terms"* proposed by Cerberus in

the December 26th e-mail and the follow-up Consulting Agreement, governed the parties'

relationship.  Id. at ¶¶ 44-46.  After the exchange of the Consulting Agreement versions, Mr.

Teitelbaum advised that the changes by Direct were acceptable, and that a signed copy was

forthcoming.  Id. at ¶ 46.  Direct relied on the repeated promise by Mr. Teitelbaum that Direct

would be compensated for its work in presenting deals in which Cerberus made an investment. Id. at ¶ 52.

On March 6, 2003, Cerberus wrote to Direct to advise that Mr. Koidl should deal directly with Mr. Teitelbaum.  In the correspondence, Cerberus acknowledged that it had *"contracted"* with Direct.  Id. at ¶ 53.  Days later, Mr. Bruno wrote Direct confirming Cerberus's interest in working with Direct on five exclusive transactions with certain enumerated investment targets, all of which opportunities were presented to Cerberus by Direct in accordance with the parties' contract.  Id. at ¶ 55.  Mr. Bruno's March 12, 2003 e-mail,  titled *"transactions,"* comported with the confirmation process in Mr. Teitelbaum's December 30, 2002 e-mail and the Consulting Agreement, and which was addressed with Mr. Teitelbaum to acknowledge '*Koidl deals,'* investment opportunities that were sourced by Direct.  Id.

As Direct was researching investment opportunities for Cerberus, it contacted IRU, a special purpose vehicle established by Dresdner Bank in early 2003 to sell distressed, non-performing, sub-performing and other non-strategic investments valued at approximately €31 billion.  Id. at ¶ 58; see Dresdner Bank AG Financial Report at www.dresdner-bank.com/content/03_unternehmen/01_zahlen_fakten/051_finanzbericht_ag/pdf/05_financial_report_ag.pdf.   In fact, on behalf of Cerberus, Direct contacted Dresdner Bank about IRU and the investment opportunities presented thereby shortly after IRU was formed.  (See Complaint ¶ 59).

When Mr. Koidl informed Cerberus about IRU, Mr. Teitelbaum responded that Cerberus had no contacts at IRU and was very interested in pursuing IRU investment opportunities.  Id. at ¶ 60.  Mr. Teitelbaum directed Mr. Koidl to introduce Cerberus to IRU.  Id. Following these instructions, on April 9, 2003, Direct initiated a telephone conference with senior Dresdner Bank officials to facilitate a meeting with Cerberus, the purpose of which was to

introduce Cerberus to IRU and its assets.  Id. at ¶ 63.  The Dresdner Bank officials confirmed to Direct that they had never heard of Cerberus.  Id. at ¶ 64.

When Mr. Koidl informed Cerberus about a meeting he would arrange that would give Cerberus access to the portfolio of distressed assets assembled in IRU, Mr. Teitelbaum expressed that this was exactly the type of investment opportunity Cerberus was interested in pursuing, instructing Direct to continue its efforts to make the introduction.  Id. at ¶ 65.  Direct complied, and Mr. Koidl met with IRU officials on April 14, 2003.  Id. at ¶¶ 65-67.  During the meeting, several portfolio investments, including dAF and a portfolio of German non- and sub-performing loans that later became known as "Project Phoenix," were addressed.  Id. at ¶¶ 69-70.

After the April 14, 2003 meeting, Mr. Teitelbaum expressed to Mr. Koidl how interested he was about the prospect of a Cerberus investment in IRU's portfolio of assets, remarking that this would be a *"landmark transaction."*  Id. at ¶¶ 72-73.  Mr. Bruno used the same expression in a November 10, 2003 letter to IRU concerning Cerberus's possible investment in the IRU assets combined in Project Phoenix.  Id.  In fact, Cerberus was so excited about the investment opportunities at IRU that it wanted to immediately discuss possible transactions with IRU.  Id. at ¶¶ 74-75.  At IRU's urging, Mr. Koidl recommended to Messrs. Bruno and Teitelbaum that Cerberus prepare a letter of introduction to IRU.  Id.

Mr. Koidl helped prepare and edit Cerberus's introduction letter.  Id. at ¶¶ 75-76. Given that no signature had been obtained on the Consulting Agreement by this time, Messrs. Koidl, Bruno, and Teitelbaum specifically discussed that the introduction letter would serve as written confirmation and acknowledgement of the contract between the parties, and that IRU and its portfolio of investments was introduced to Cerberus by Direct.  Id. at ¶¶ 76-77.  Cerberus agreed to this important exchange.  Id.  In fact, the April 15, 2003 letter acknowledged to IRU

Mr. Koidl's role in introducing Cerberus to IRU, referring to Mr. Koidl as Cerberus's "advisor." Id. at ¶ 77.

After the April 15, 2003 letter, Mr. Teitelbaum remained extremely interested in the IRU opportunities, pressing Mr. Koidl to further engage IRU and arrange meetings. Id. at ¶¶ 79-82. Nearly two weeks later, on April 27, 2003, Direct arranged a meeting between IRU and Cerberus. Attending the meeting with Mr. Koidl were senior IRU officials; Messrs. Bruno and Teitelbaum of Cerberus; and David Knower, head of Cerberus's German operations. Id. Among other topics and investment opportunities, dAF and the project finance business of IRU were discussed at the meeting. Id.

At the April 27, 2003 meeting, Mr. Bruno, who traveled from New York, commented that the investments of IRU matched the business model being pursued by Cerberus in Germany. Id. At the time of the meeting and throughout 2003, Cerberus's discussions with IRU were focused on Cerberus acquiring all interests in IRU portfolio assets, including dAF. Id. This meeting arranged by Direct was important because IRU had not yet publicly announced its intention to liquidate its distressed debt portfolio. Id. at ¶ 86.

During this period, Direct continued to work on other investment opportunities for Cerberus. Id. at ¶¶ 84-85. As part of its efforts, Direct on June 18, 2003 hosted a private dinner in Germany, which was attended by senior Cerberus officials including Mr. Teitelbaum; senior Dresdner Bank officials; along with Germany's Vice Minister of Economics and Labor, Rezzo Schlauch; the former CEO of the German State Bank, Kreditanstalt für Wiederaufbau, Dr. Gert Vogt; and other dignitaries. Id. at ¶ 85. The purpose of the dinner was to foster the relationship between Cerberus and IRU officials. Id.

While Cerberus was meeting with IRU officials during the first half of 2003, IRU was structuring its portfolio for investment by third-parties.  Id. at ¶¶ 86-88.  Cerberus's access to IRU during this period was privileged because IRU had not announced that Dresdner Bank intended to sell its portfolio assets.  Id.  The disclosure occurred on June 24, 2003, when IRU's Chief Executive Officer, Jan Kvarnstrom, publicly announced that IRU intended to divest Dresdner Bank of non- and sub-performing assets and loans and non-strategic investments.  Id.

After IRU's public announcement, Cerberus became concerned that other banks or investors might compete with Cerberus for IRU's business.  Id.  Mr. Teitelbaum repeatedly asked Mr. Koidl to make sure IRU was considering Cerberus for an investment in all or part of IRU's portfolio.  Id.  At Cerberus's request, Direct continued to contact IRU officials and worked to maintain the relationship that it formed between IRU and Cerberus.  Id.  During this period, Direct took numerous steps to preserve the relationship between Cerberus and IRU, contacting IRU officials on behalf of Cerberus, all of which activities were made known to Cerberus and not only embraced, but encouraged by Cerberus.  Id.  In fact, Cerberus officials, including Mr. Teitelbaum, repeatedly assured Direct that its efforts to bring Cerberus together with IRU would be rewarded if any deal was consummated between Cerberus and IRU.  Id. at ¶ 110.

## F.    Cerberus's Tactics to Avoid Direct's Fees

After the public announcement by Dresdner Bank officials of its intention to shed IRU portfolio assets, and after Cerberus had gained an advantage and access to IRU officials through the efforts of Direct, Cerberus began taking steps to disassociate itself from Direct in order to avoid paying Direct any fees.  Cerberus concluded that it did not need Direct to negotiate the acquisition of IRU assets, including dAF, but only needed an introduction and

knowledge of the deal.  The Complaint at ¶¶ 90 -115 describes the efforts by Cerberus to squeeze

Direct out of its pursuit of IRU assets because Direct had already performed its job:  Direct

located IRU and its portfolio of assets, including dAF, and now the deal making was left to

Cerberus.  Id. at ¶¶ 90-115.  For brevity, Direct refers to these paragraphs of the Complaint,

adopting them by reference.

**G.    Cerberus Further Relies on Direct**

Cerberus concluded that it did not need Direct to close the acquisition of IRU

assets, but Cerberus continued to rely on Direct to maintain the relationship developed with IRU

officials.  For instance, Cerberus asked Direct to deliver to IRU a presentation for a deal that

Cerberus ultimately would not close, Project Phoenix.  Id. at ¶¶ 99-100.  When Cerberus began

negotiating the dAF deal, a senior Cerberus official, David Knower, informed Mr. Koidl that

Direct had performed its role in presenting IRU to Cerberus, and because Cerberus was already

known to IRU through Direct's efforts, Mr. Koidl's advice was no longer necessary.  Id. at ¶ 107.

While Cerberus was negotiating with IRU, it still relied on Mr. Koidl, inviting

him to a dinner in late 2003 that included senior Cerberus and IRU officials.  Id. at ¶ 108.  Later,

when Mr. Koidl visited Cerberus at its office, Mr. Koidl confronted Mr. Bruno to remind him of

the parties' contract, to which Mr. Bruno replied, *'Roman, we do not have amnesia.  We know*

*about your involvement, and you will get paid if we get something closed at IRU.'*  Id. at ¶ 110.

Although Mr. Bruno asked Direct to cap its fees if Cerberus closed an IRU asset, Mr. Koidl

declined.  Id. at ¶ 114.

## H.    Cerberus Closes the dAF Deal

In April 2005, Defendant Cerberus Capital Management, L.P., through a special

purpose vehicle known as FERN S.à.r.l., completed a $1.37 billion acquisition of dAF.[3]

Cerberus funded the acquisition by committing $370 million; $1 billion was funded through a

term loan to dAF by a banking syndicate under the lead of Lehman Brothers.  Id. at ¶ 117.

Details of the acquisition, including the very profitable structure to Cerberus, are described in ¶¶

116-126 of the Complaint and are not repeated here.  The Court is encouraged to review these

important deal terms.

## I.    Cerberus Declines to Pay Direct

Direct demanded payment from Cerberus as a result of the dAF acquisition, but

Cerberus declined.  It is not known whether Cerberus closed other IRU assets or investment

opportunities introduced by Direct, but the publicly available information on the dAF deal

demonstrates that the fees owed to Direct are potentially in the hundreds of millions.  Id.

## STANDARD OF REVIEW

Rule 8(a)(2) requires only "a short and plain statement of the claim showing that

the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Specific facts are not required to be

pleaded; instead the pleading need only "'give the defendant fair notice of what  . . . the claim is

and the grounds upon which it rests.'"  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964

(2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).

In this case, Direct has more than met this minimum pleading requirement.  The

Complaint numbers 54 pages and is replete with specific dates, events, and facts which detail

each claim, including the underlying events which give rise to the parties' relationship and the

---

[3]  Mr. Teitelbaum currently is a director of AerCap Holdings N.V. (formerly dAF).  (See March
22, 2007 Form 2-F filing of AerCap Holdings N.V., http://sec.edgar-
online.com/2007/03/22/0001104659-07-021402/Section11.asp).

creation of their contract.  (See Complaint, *passim*).  Cerberus not only has "fair notice" of the claims and the grounds upon which they rest, but Cerberus has been presented with detailed accounts of exchanges between the parties.

Defendant's Rule 12(b)(6) motion triggers a superficial review of the Complaint, limited to testing whether Direct stated a plausible claim without examining the evidence supporting those allegations.  Global Network Comm., Inc. v. City of N.Y., 458 F.3d 150, 155 (2d Cir. 2006) (citing AmBase Corp. v. City Invest. Co. Liquid. Trust, 326 F.3d 63, 72 (2d Cir. 2003)); 5B C. Wright & A. Miller, Federal Practice and Procedure § 1356 (3d ed. 2004).  The Second Circuit has recognized that a 12(b)(6) motion tests only the sufficiency of the plaintiff's statement of claim for relief without resolving the substantive merits of the claim.  Id.

When considering a defendant's motion to dismiss, a court must accept as true all of the factual allegations contained in the Complaint.  Bell Atlantic Corp. v. Twombly, 127 S. Ct. at 1965 (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 (2002)); see also Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.").

The Bell Atlantic Court articulated a "plausibility" standard for pleading under Rule 8(a)(2), pursuant to which "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true." Id. at 1965.  Later in the Bell Atlantic term, the Supreme Court reaffirmed that the plausibility criterion did not impose the heightened Rule 8(a)(2) pleading standard now suggested by Cerberus (see Cerberus MOL pp. 10-11), holding in Erickson v. Pardus, 127 S. Ct. at 2200, that "[s]pecific facts are not necessary" and that the Complaint "need only 'give the defendant fair

notice of what the . . . claim is and the grounds upon which it rests.'" (quoting Bell Atlantic Corp. v. Twombly, 127 S. Ct. at 1964).

The Second Circuit in Iqbal v. Hasty, 490 F.3d 143, 155-156 (2d Cir. 2007) concluded that Bell Atlantic is "not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." Id. at 157-158.

Under this framework, Direct has more than met its Rule 8(a)(2) burden, pleading specific and detailed facts which not only make the claims asserted "plausible," but demonstrate that Cerberus and Direct had a contract that was performed by Direct but breached by Cerberus, and that Cerberus decided, after being presented to IRU, that it would defraud Direct by excluding it from the deal process in order to later claim Direct had no involvement in dAF. The 'plausibility' of these and the other claims asserted in the Complaint is supported with detailed facts, including dates of events, meetings and participants, and other facts. (See Complaint, passim).

## ARGUMENT

### Point I

### CERBERUS AND DIRECT INTENDED TO BE BOUND TO A CONTRACT IN WHICH DIRECT INTRODUCED AND SOURCED INVESTMENT DEALS FOR CERBERUS FOR A FEE IF CERBERUS MADE THE INVESTMENT

**A.    The Parties Did Not Require a Signature to Trigger Their Contractual Obligations**

Since Cerberus claims it never had a contract with Direct, the discussion should begin with the elements of a cause of action for breach of contract.  Under New York law, the elements are (i) formation of a contract; (ii) performance by plaintiff; (iii) defendant's failure to perform; and (iv) harm as a result of defendant's failure to perform.  Marks v. New York Univ. 61 F. Supp.2d 81, 88 (S.D.N.Y. 1999).  Formation of a contract requires (i) two parties with the legal capacity to consent; (ii) mutual assent to the terms of the contract; and (iii) consideration. Wells Fargo Bank Minnesota v. BrooksAmerica Mortgage Corp., No. 02 Civ. 4467, 2004 U.S. Dist. LEXIS 18573,at *6 (S.D.N.Y. Sept. 14, 2004); Bonnie & Co. Fashions, Inc. v. Bankers Trust Co., 945 F. Supp. 693, 711 (S.D.N.Y. 1996).

To determine whether an agreement that constitutes a legally binding contract was formed, "the intent of the parties is of central importance."  Precision Testing Labs., Ltd. v. Kenyon Corp. of Am., 644 F. Supp. 1327, 1343 (S.D.N.Y. 1986).  The parties' intention with regard to contract formation is measured objectively, looking to the actual exchanges, actions, words, and deeds.  Brown Bros. Elec. Contr., Inc. v. Beam Const. Corp., 41 N.Y.2d 397, 399-400 (1977).

Objectively measuring the parties' conduct in this case leaves but one result: Cerberus and Direct acted and performed under the terms of the Consulting Agreement. Direct investigated and presented investment opportunities; Cerberus reviewed the lists, selecting some, discarding others, and ultimately requested Direct to take the steps necessary to form the IRU relationship, which introduced Cerberus to IRU and its portfolio of assets, including the dAF investment. See Grupo Sistemas Integrales de Tele. S.A. de C.V v. AT&T Comm., Inc., No. 92 Civ. 7862, 1994 U.S. Dist. LEXIS 11896, at *3 (S.D.N.Y. Aug. 24, 1994) ("Under New York law, 'parties are free to enter into a binding contract without memorializing their agreement in a fully executed document.' . . . Parties who intend to be bound by informal agreement are so bound even if they contemplate later memorializing their agreement in writing.") (quoting Winston v. Mediafare Entm't Corp., 777 F.2d 78, 80 (2d Cir.1986)); Villeroy & Boch S.A.R.L. v. THC Sys., No. 84 Civ. 8073, 1991 U.S. Dist. LEXIS 7352, at *4 (S.D.N.Y. June 3, 1991) ("An informal agreement may be binding despite the parties' contemplation to memorialize the contract into a written document.")

Cerberus bases its entire argument on the premise that Cerberus never actually signed the Consulting Agreement because there were unresolved terms. There can be no dispute, however, that under New York law, parties may enter into binding oral contracts even if they intended to later commit the agreement to a writing. Winston v. Mediafare Entm't Corp., 777 F.2d 78, 80 (2d Cir. 1985); P.A. Bergner & Co. v. Martinez, 823 F. Supp. 151, 156 (S.D.N.Y. 1993). Parties who do not intend to be bound until the agreement is reduced to a signed writing are not so bound as long as they intended to have the writing executed among them. Ciarmella v. Reader's Digest Ass'n, 131 F.3d 320, 322 (2d Cir. 1997). In fact, in New York, "[i]t is well established that parties are bound to the terms of a contract even though it is not signed [or even

written]."  Hostcentric Tech., Inc. v. Republic Thunderbolt, LLC, No. 04 Civ. 1621, 2005 U.S. Dist. LEXIS 11130, at *17 (S.D.N.Y. June 9, 2005), citing Omega Eng'g, Inc. v. Omega, S.A., No. 98 Civ. 2464, 2004 U.S. Dist. LEXIS 27908, at *7 (D. Conn. Aug. 12, 2004).

Cerberus maintains the parties intended to be bound only pursuant to a signed writing, relying on the application of the "intent to be bound" factors in Winston v. Mediafare Entm't Corp., 777 F.2d 78, 80 (2d Cir. 1985).  (See Cerberus MOL pp. 12-17).  However, Cerberus cannot cite any document – or any exchange with Direct – in which the parties represented that an agreement among them had to be signed.  To the contrary, Mr. Teitelbaum represented to Direct that the February 10, 2003 Consulting Agreement was accepted by Cerberus and would be signed and returned to Direct.  (See Complaint ¶¶ 42, 46).  Thus, the only discussion concerning a formally signed contract came from Cerberus, which promised that the Consulting Agreement was accepted and would be signed.  Id.  Moreover, the quote from the principal case cited by Cerberus for this proposition, R.G. Group, Inc. v. The Horn & Hardart Co., 751 F.2d 69 (2d Cir. 1984), "a party's explicit statement that it reserves the right to be bound only when a written agreement is signed" (see Cerberus MOL p. 14), actually illustrates this point: there is no "explicit statement" in the December 26th e-mail or in the January 25, 2003 Consulting Agreement that the parties were "to be bound only when a written agreement is signed."  Id. at 75.  See Omega Eng'g, Inc. v. Omega SA, No. 3:98CV2464, 2004 U.S. Dist. LEXIS 27908, at *18 (D. Conn. Mar. 24, 2004) (since parties not explicitly include provision that agreement not binding unless signed by parties, no such clause imputed).

Solin Lee Chu v. Ling Sun Chu, 9 A.D.2d 888 (1st Dep't 1959) and Stephen Pevner, Inc. v. Ensler, 309 A.D.2d 722 (1st Dep't 2003) do not depart from this rule.  Both Solin and Stephen Pevner involved an alleged contract prepared by the plaintiff for the sale of personal

property (Solin) and to become a literary agent (Stephen Pevner), which were presented to the

defendants, who declined the agreement.  Solin Lee Chu v. Ling Sun Chu, 9 A.D.2d at 889;

Stephen Pevner, Inc. v. Ensler, 309 A.D.2d at 722.  Here, Cerberus presented the *"key*

*commercial terms"* and the Consulting Agreement to Direct.  Incidentally, the Appellate

Division in Solin preserved the plaintiff's fraud claim, sending it to a jury.  Solin Lee Chu v.

Ling Sun Chu, 9 A.D.2d at 889.

**B.      At Worst, the Consulting Agreement is an Enforceable Preliminary Agreement**

Even if the exchange of writings between Cerberus and Direct are considered

preliminary discussions, and the Court accepts that Cerberus did not intend to be bound until

there was a signed writing, that does not mean the Consulting Agreement is unenforceable.

Parties often enter into preliminary agreements which contemplate a more formal contract.  If the

parties neglect to execute or finalize the contract, leaving open terms, that does not mean they

did not intend to be bound.  Adjustrite Sys., Inc. v. GAB Bus. Serv., Inc., 145 F.3d 543 (2d Cir.

1998) (New York recognizes that certain enforceable preliminary agreements may bind parties

without comprising a complete contract).  In fact, under New York law, where a contract term is

left for future agreement, the law will imply reasonable terms.  Lauter v. W&J Sloane, Inc., 417

F. Supp. 252, 258-259 (S.D.N.Y. 1976).

In Teacher's Ins. & Annuity Ass'n v. Tribune Co., 670 F. Supp. 491 (S.D.N.Y.

1987), Judge Leval famously articulated a framework to discern whether a preliminary

agreement that is not signed and leaves open for further negotiation certain terms (Type I) is

binding or is considered an unenforceable agreement to negotiate in good faith (Type II):

> *Preliminary contracts with binding force can be of at least two distinct types.*
> *One occurs when the parties have reached complete agreement (including the*
> *agreement to be bound) on all the issues perceived to require negotiation. Such*
> *an agreement is preliminary only in form – only in the sense that the parties*

*desire a more elaborate formalization of the agreement. The second stage is not necessary; it is merely considered desirable. As the Court of Appeals stated with respect to such preliminary agreements in V'Soske v. Barwick, 404 F.2d 495, 499 (2d Cir.), cert. denied, 394 U.S. 921, 22 L. Ed. 2d 454, 89 S. Ct. 1197 (1969), "the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event . . . . Restatement (Second) of Contracts, § 26 (then Tert. Draft No. 1, 1964); 1 Corbin on Contracts § 30 (1950); 1 Williston on Contracts § 28 (3d ed. 1957)." . . . The second and different sort of preliminary binding agreement is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated. Although the existence of open terms generally suggests that binding agreement has not been reached, that is not necessarily so. For the parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement. To differentiate this sort of preliminary agreement from the first, it might be referred to as a binding preliminary commitment. Its binding obligations are of a different order than those which arise out of the first type discussed above. The first type binds both sides to their ultimate contractual objective in recognition that that contract has been reached, despite the anticipation of further formalities. The second type -- the binding preliminary commitment -- does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate objective within the agreed framework. In the first type, a party may lawfully demand performance of the transaction even if no further steps have been taken following the making of the "preliminary" agreement. In the second type, he may not. What he may demand, however, is that his counterparty negotiate the open terms in good faith toward a final contract incorporating the agreed terms. This obligation does not guarantee that the final contract will be concluded if both parties comport with their obligation, as good faith differences in the negotiation of the open issues may prevent a reaching of final contract. It is also possible that the parties will lose interest as circumstances change and will mutually abandon the negotiation. The obligation does, however, bar a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.*

Id. at 498.

        Judge Leval's framework has been adopted and applied by the Second Circuit.

See e.g., Adjustrite Sys., Inc. v. GAB Bus. Serv., Inc., 145 F.3d 543 (2d Cir. 1998); Arcadian

Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 71-72 (2d Cir. 1989).

To the extent the Court considers that a contract does not exist between the parties, the relationship described in the Complaint clearly meets the Type I agreement described by Judge Leval, a binding agreement which was not signed and left open terms, contemplating a more formal contract. Id. As set forth above and as detailed in the Complaint, Cerberus dictated the *"key commercial terms"* which were accepted by Direct, and they formed the basis of the parties' contract, the Consulting Agreement. This arrangement was not a preliminary commitment between the parties subject to future negotiations (Type II) because both parties performed under the contract – Direct working to source deals, and Cerberus accepting the lists of potential investments and participating in meetings and other events including pursuing investment opportunities within the IRU portfolio, and ultimately making the dAF investment.

The mere fact that Cerberus accepted the IRU introduction; accepted and then encouraged IRU meetings; and then negotiated a deal with IRU, is evidence that Cerberus not only considered the parties to have a contractual arrangement, but Cerberus was directing Mr. Koidl's performance under the contract when it instructed Direct to arrange meetings and do other things to preserve the relationship between IRU and Cerberus.

Judge Leval in Teacher's Annuity cautioned that a Court's task is to determine the intention of the parties "as well as their manifestations to one another by which the understanding was reached." Teacher's Ins. & Annuity Ass'n v. Tribune Co., 670 F. Supp. at 499; see Adjustrite Sys. Inc. v. GAB Bus. Servs. Inc., 145 F.3d at 548 ("[t]he key, of course, is the intent of the parties"). In judging intent, the context of negotiations, actions and activities of the parties, and other outward manifestations of the parties' understanding of whether they were bound should be considered. See Arcadian Phosphates Inc. v. Arcadian Corp., 884 F.2d at 72.

Every aspect of Cerberus and Direct's conduct and activities in this case objectively manifested their desire and intent to be bound to a contract, as noted by the following "Intent to be Bound Facts":

● At the request of Cerberus's European advisors, Direct agreed to furnish services to Cerberus and negotiated an agreement with Mr. Bruno at Cerberus's New York headquarters. Mr. Koidl was then instructed to coordinate with Managing Director, Mr. Teitelbaum. (See Complaint ¶¶ 12-15)

● Messrs. Teitelbaum and Koidl met in Germany to formalize the parties' relationship, agreeing to the *"key commercial terms"* negotiated in New York. Id. at ¶¶ 16-18.

● Mr. Koidl was directed by Mr. Bruno to report to Mr. Teitelbaum and instructed to deal with Mr. Teitelbaum by Mr. Korteweg of Cerberus, who acknowledged in a March 6, 2003 writing that Cerberus had *"contracted"* with Direct. Id. at ¶ 53.

● Cerberus confirmed the *"key commercial terms"* in the December 26th e-mail. Id. at Ex. A. After the December 26th e-mail, Mr. Teitelbaum reminded Mr. Koidl, *"Don't worry Roman, we always pay our consultants."* Id. at ¶ 29.

● Cerberus's own lawyers prepared and presented to Direct the Consulting Agreement. Id. at ¶¶ 23, 25. The parties exchanged Consulting Agreements in January and February 2003. Id. at Exs. B, C. The Consulting Agreement presented to Direct was a standard contract by Cerberus, so standard, that it was a copied version used by Cerberus with another advisor. Id. at ¶ 36.

● Cerberus never objected to the changes submitted by Direct in the February 10, 2003 Consulting Agreement, but instead accepted from Direct lists of potential investments. Id. at ¶¶ 40, 52, 82, 84. In fact, Cerberus requested from Direct, and accepted

various lists of potential investments, which lists Cerberus repeatedly requested that Mr. Koidl prepare.  Id.

- Mr. Teitelbaum of Cerberus informed Direct that the terms of the February 10, 2003 Consulting Agreement were accepted by Cerberus, promising that a signed copy was forthcoming.  Id. at ¶ 46.

- Mr. Bruno of Cerberus on March 12, 2003 wrote to Direct confirming that five of the potential investment transactions sourced and presented by Direct were acceptable, known in the December 26th e-mail as *"Koidl deals,"* and comporting with the confirmation process in the Consulting Agreement.  Id. at ¶ 55.

- Cerberus explained to Direct that it had no contacts or relationship with Dresdner Bank, certainly not IRU, and encouraged and requested Direct to arrange a meeting between Cerberus and IRU officials.  Id. at ¶¶ 61, 65, 72, 73, 74.

- Cerberus and Direct jointly prepared a letter of introduction from Cerberus to IRU.  Id. at ¶¶ 74-78.  The Cerberus letter acknowledged Mr. Koidl's role in introducing Cerberus to IRU.  Id.  Further, Messrs. Koidl and Teitelbaum expressly agreed that the letter would serve as the writing which confirmed the parties' contract and that Direct introduced Cerberus to the IRU portfolio of investments.   Id.

- During the Spring 2003, Mr. Teitelbaum repeatedly pressed Mr. Koidl to arrange more meetings, make more introductions, and continue to communicate with IRU because of Cerberus's keen interest in IRU and its portfolio of assets.  Id. at ¶ 79, 88, 89.

- Cerberus's senior advisor, Dr. Korteweg wrote to Direct on March 6, 2003 that Mr. Teitelbaum was to *"keep you in the loop of things happening in Cerberus-germany [sic]."*  Id. at ¶ 179.

- Direct arranged for an April 27, 2003 meeting between Cerberus and IRU officials, in which Mr. Koidl participated. Id. at ¶¶ 80-81. The parties also met with IRU officials at social engagements, designed to cultivate the relationship between Cerberus and IRU. Id. at ¶¶ 85, 108.

- IRU itself considered Mr. Koidl important to the developing relationship between Cerberus and IRU, inviting Mr. Koidl to attend meetings between the potential investment partners. Id. at ¶¶ 91-94.

- Mr. Koidl was requested to sign a confidentiality agreement as part of his involvement in the negotiations between Cerberus and IRU. Id. at ¶ 95.

- Direct arranged further meetings between IRU and Cerberus in which Mr. Koidl participated. Id. at ¶¶ 96-99. After a September 26, 2003 meeting, Cerberus asked Direct to submit a presentation to IRU officials. Id. at ¶ 99. Mr. Koidl assisted on other Cerberus presentation materials submitted to IRU. Id. at ¶ 109.

- While the dAF transaction was being negotiated, Mr. Bruno asked Mr. Koidl to "cap" the fees that would be owed under the Consulting Agreement if dAF closed, thereby clearly affirming the existence of this contract; Mr. Koidl declined. Id. at ¶ 114. Mr. Bruno further reminded Mr. Koidl on January 30, 2004 that when IRU closed, Direct would be paid its fees under the contract. Id. at ¶ 110.

- Mr. Koidl traveled throughout Europe on behalf of Cerberus, investigating deals and possible investment opportunities. Cerberus made numerous payments to Direct to reimburse Direct for the expenses it incurred in investigating and locating deals, including Mr. Koidl taking meetings in various countries and with numerous companies. Id. at ¶ 149.

These "Intent to be Bound Facts" are not just a recitation of the allegations in the Complaint, but each is an example of Cerberus and Direct objectively manifesting their intent to be bound to the Consulting Agreement. Why else would Direct have researched and acquired investment targets for Cerberus? Why would Cerberus review the investment opportunities presented by Direct and then notify Direct which ones should be pursued, and those that were declined? Why would Direct have arranged for Cerberus to be introduced to IRU if there was no agreement among the parties? Why would Direct have performed all of the other tasks and complied with all the instructions from Cerberus if it did not believe there was a contract? Why did Cerberus present a contract, the Consulting Agreement, to Direct? Why would Cerberus inform Direct that it should *"be kept in the loop of things"* and report to Mr. Teitelbaum? Why would Cerberus ask Direct to execute a confidentiality agreement for an IRU investment? Why would Cerberus have made repeated payments to Direct to reimburse the expenses Mr. Koidl incurred in attempting to source deals for Cerberus? More importantly, why would Cerberus have invited Direct to locate potential investments and present them to Cerberus if there was no agreement among the parties? And finally, why would Mr. Bruno ask Mr. Koidl to "cap" Direct's fees if Cerberus had not previously agreed to a contract with Direct? Surely, Cerberus cannot maintain that it received unsolicited investment opportunities from Direct and happened to seize one of them without any expectation that Direct should be compensated.

The allegations in the Complaint describing the parties' relationship and their performance under the Consulting Agreement are not indicative of a broker trolling for a finder's fee by providing unsolicited investment opportunities to a private equity fund. They instead reflect the product of a defined relationship in which Cerberus not only encouraged Direct to actively source deals, but when Cerberus learned of IRU from Direct, it practically pleaded for

Mr. Koidl to continue to make IRU accessible only to Cerberus. Id. at ¶¶ 74-76, 87. Moreover, if Direct was merely a speculator, 'swooping in for a fee' after dAF closed (see Cerberus MOL p. 9), why did Cerberus first present the Consulting Agreement to Direct?

The above "Intent to be Bound Facts" clearly manifest the parties' intent to contract; indeed, Cerberus even acknowledged in writing that it had *"contracted"* with Direct. (See Complaint ¶ 53). When a party objectively manifests its intent to be bound by a contract, that intent controls, even if the party does not sign the written agreement. Warnaco Inc. v. VF Corp., 844 F. Supp. 940, 946 (S.D.N.Y. 1994) ("[a] parent corporation may become a party to its subsidiary's contract if the parent's conduct manifests an intent to be bound by the contract"); RUS, Inc. v. Bay Indus., Inc., 322 F. Supp.2d 302 (S.D.N.Y. 2003).

Whether Cerberus intended to be bound to the Consulting Agreement is a question of fact. Recital Foam Corp., Inc. v. Bay Indus., Inc., 128 Fed. Appx. 798, 799 (S.D.N.Y. 2005). "Whether a contracting party intends not to be bound in the absence of a writing is a question of fact to be presented for resolution to the factfinder at trial." Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 576 (2d Cir. 1993); see also International Minerals & Res., S.A. v. Pappas, 96 F.3d 586, 593 (2d Cir. 1996) ("[T]he issue of whether and when the parties intended to be bound is a factual issue that should [be] submitted to the jury.").

On this basis alone, Cerberus's Rule 12(b)(6) motion should be denied. Id. See International Telemeter Corp. v. Teleprompter Corp., 592 F.2d 49, 56 (2d Cir. 1979) (party's intention to enter contract question of fact); cf. Brown v. Cara, 420 F.3d 148, 153 (2d Cir. 2005) (where question of intention is determinable by written agreements, question is one of law).

Cerberus cannot characterize the "Intent to be Bound Facts" as preliminary negotiations among parties looking to form a relationship (Type II). These statements clearly

support that the parties not only intended to contract in accordance with the *"key commercial terms"* (see Complaint Ex. A), but that they actually did contract, performing under the agreement that was reached in New York, codified in the written Consulting Agreement presented by Cerberus, and memorialized by words and deeds. Winston v. Mediafare Entm't Corp., 777 F.2d at 80 (quoting R.G. Group, 751 F.2d at 74 (courts look to "the words and deeds [of the parties] which constitute objective signs in a given set of circumstances.")).

Cerberus relies heavily on the factors articulated by Judge Pratt in Winston which are to be considered when discerning whether a party intended to be bound to an unsigned contract. These factors also are important when considering the Type I or Type II Teacher's Annuity contract, and are addressed to illustrate both points:

1. "Whether there has been an express reservation of the right not to be bound in the absence of a writing" (Winston v. Mediafare Entm't Corp., 777 F.2d at 80).

Cerberus relies on the disclaimer in Mr. Teitelbaum's December 26th e-mail that a *"a 10 page contract"* will reflect the *"key commercial terms of our working relationship"* and *"[l]et's see what the lawyers come up on this."* (See Cerberus MOL pp. 14-15). Cerberus portrays these words as indicating the parties intended to be bound only if there was a signed contract. (See Complaint Ex. A). A closer examination of the facts, however, indicates a different understanding among the parties.

First, it is important to remember that the December 26th e-mail from Mr. Teitelbaum arrived after the December 13, 2002 meeting in New York between Messrs. Bruno and Koidl. (See Complaint ¶¶ 13-15). During the New York meeting, Mr. Bruno identified the commercial terms for Direct to serve as an advisor to Cerberus, and the parties agreed upon the principal terms of their relationship, as confirmed in Mr. Teitelbaum's December 26th e-mail.

Id.; see Complaint Ex. A.  The *"key commercial terms"* never changed from the December 13, 2002 meeting in New York, to the December 26th e-mail, to the January 25 and February 10, 2003 Consulting Agreements.  Id. at ¶ 24; Exs. A, B, C.  The points to which Mr. Teitelbaum referred when he mentioned Cerberus's lawyer's involvement in the December 26th e-mail concerned matters other than the fundamental aspects of the *"key commercial terms."*  Id.

As Cerberus concedes, this first Winston factor requires an "express reservation of right not to be bound in the absence of a writing."  Winston v. Mediafare Entm't Corp., 777 F.2d at 80.  Here, it is undisputed that there is a writing between the parties, and the writing does not expressly reserve the right not to be bound absent a signed contract.  (See Complaint Exs. A, B, C).  While Cerberus's lawyers prepared the writing contemplated in the December 26th e-mail, as evidenced by the January 25, 2003 Consulting Agreement (id. at Ex. B), there is no reservation in the Consulting Agreement that requires dual signatures before the agreement is effective.  Id. at Exs. B, C.  Given that Cerberus was anxious for Direct to begin identifying investment opportunities, Cerberus was not likely to have demanded signatures before Direct started performing.  Moreover, the parties agreed that the April 15, 2003 letter from Cerberus to IRU was specifically intended not only to signify Cerberus's 'signature' to, and ratification of, the February 10, 2003 Consulting Agreement, but that Direct was the consultant who introduced Cerberus to IRU.  Id. at ¶¶ 76-77.

The reference by Mr. Teitelbaum that *"this is not a legal obligation for Cerberus or you"* in the December 26th e-mail (see Complaint Ex. A) merely refers to the Consulting Agreement that was to be delivered by Cerberus's lawyers.  The Consulting Agreement did not contain such similar language.  Id. at Exs. B, C.  Cerberus cannot simply isolate a single writing between the parties as evidence of the Winston factors; it is compelled to consider the other

writings, particularly the Consulting Agreement, which omits any reference to the parties not being bound until signatures are exchanged.  Id.  Crabtree v. Elizabeth Arden Sales Corp., 305 N.Y. 48, 54 (1953) (multiple writings considered to avoid Statute of Frauds).

It is well established that "a party that does not wish to be bound at the time of the preliminary exchange of letters [or other documents] can very easily protect itself by not accepting language that indicates a 'firm commitment' or 'binding agreement.'" Teachers Ins. and Annuity Ass'n of America v. Tribune Co., 670 F. Supp. at 499.  There is nothing in the Consulting Agreement or in the conduct and performance of the parties to indicate that Cerberus did not intend to be bound unless it committed to signing the Consulting Agreement.  To the contrary, there is every indication Cerberus intended to be bound when in April 2003 it began asking Direct to arrange for meetings with IRU, participated in meetings and other events, and then negotiated with IRU.  Cerberus's conduct, including Mr. Bruno's request for Direct to "cap" its fees, is absolutely referable to its belief that it had a contract with Direct, and, indeed, Cerberus enjoyed the benefits of the contract in being introduced to IRU and ultimately making an investment in dAF.

This case is similar to the facts in I.R.V. Merch. Corp. v. Jay Ward Prod., Inc., 856 F. Supp. 168 (S.D.N.Y. 1994), where the issue of whether the parties entered into a licensing agreement for cartoon characters was considered at the summary judgment stage.  Plaintiff IRV had desired to be a licensing agent, and the parties entered into a letter of intent which contemplated a formal contract.  Id. at 171.  The plaintiff undertook significant work for the owner to locate licensees, and was promised a final contract reflecting how it would be paid for its efforts.  Id. at 171-172.  The license owner was aware of the efforts being made by the

prospective agent, but declined to finalize the contract, consummating a deal with other licensees. Id.

   Judge Tenney concluded that the plaintiff presented sufficient evidence to create a factual question as to whether the defendant licensor intended to be bound to the agreement. Id. at 172. Relying on the Winston factors, the Court acknowledged the disclaimer in the writing between the parties that they did not intend to be bound until a later formal writing. Id. However, noted the Court, the defendant's intent not to be bound in the preliminary writing did not preclude that the parties may have intended to be bound based upon their conduct and subsequent exchanges. Id. at 173. Judge Tenney observed that the plaintiff, having presented prospective licensees to the defendant, which names were accepted by the license owner, indicated that the parties intended to be bound to an agreement that would compensate the plaintiff in the event the licensees were selected. Id. The Court concluded there was a factual question as to whether the defendant intended the agreement to take effect. Id.

   Partial performance in I.R.V. Merch. also played a critical role. Noted the Court, "partial performance by one party, combined with acceptance by another party, signals that the parties believed that a binding agreement existed between them." Id., citing R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d at 75-76. Similar to the claims by Cerberus in this case, the defendant in I.R.V. Merch. argued that the plaintiff did not initiate the contacts with the licensees it ultimately contracted, and therefore was not entitled to payment. Id. At the summary judgment stage, however, such a claim amounted to a disputed factual question that could not be decided. Id. Open, unresolved contract terms about the defendant's obligation to pay the 'finder's fee,' like the ones presented by Cerberus in this motion, also presented factual questions. Id.

Springwell Corp. v. Falcon Drilling Co., Inc., 16 F. Supp. 2d 300 (S.D.N.Y. 1998),  also presents similar facts.  Springwell sued under an alleged oral agreement that Falcon would pay a commission if Springwell located a funding source.  Id. at 312.  Springwell argued that it located the bank, DLJ, for Falcon, and was entitled to a commission based upon DLJ's investment.  Id.  When Falcon declined to pay Springwell because there was no written agreement, Springwell sued in quantum meruit.  Id.  Like this case, Springwell maintained that not only did it make the introduction to DLJ, but engaged in various follow-up efforts to preserve DLJ's interest in Falcon.  Id.  Falcon admitted a DLJ meeting took place, but claimed the meeting addressed a different transaction.  Id.

Judge Sotomayor rejected Falcon's argument that the New York Statute of Frauds barred the claim, finding that a count for quantum meruit for the reasonable value of the services was a jury question.  Id. at 313, 317.  The Court noted that a letter addressing the claimed finder's fee could reasonably have been interpreted as Falcon engaging Springwell to introduce funding opportunities; Springwell having performed under the parties' oral contract; and that Falcon benefited from such performance.  Id. at 316.  Under such circumstances, the Court concluded a jury should determine the reasonable value of Springwell's services.  Id. at 317.

2.    "Whether there has been partial performance of the contract."  (Winston v. Mediafare Entm't Corp., 777 F.2d at 80).

The second Winston factor is perhaps the most telling about the parties' expectations.  As demonstrated above, both parties nearly fully performed under the contract, except for Cerberus tendering the fees owed to Direct as a result of Cerberus's return from the dAF transaction.  For example, the Consulting Agreement, codifying the "key commercial terms" (see Complaint Exs. A, B, C), required Cerberus to reimburse Direct for expenses Mr. Koidl incurred in locating investment opportunities.  Id.  During 2003, Direct submitted receipts

to Cerberus for reimbursement (for Mr. Koidl's various European travels and meetings on behalf of Cerberus) under the Consulting Agreement, and was paid by Cerberus. (See Complaint ¶ 149). Why would Cerberus have directed Mr. Koidl to travel to certain European destinations on its behalf, and why would Cerberus have reimbursed Direct tens of thousands of dollars if there was no agreement between the parties?

The most obvious example of partial performance, of course, is that Direct submitted investment targets to Cerberus, which responded by accepting some and declining others (id. at ¶¶ 55, 82), ultimately ending up with dAF. The Complaint is replete with statements which refer to the performance of Direct in identifying, soliciting, and taking steps to introduce investment opportunities to Cerberus, culminating in IRU. But for Direct's introduction, Cerberus may never have met IRU, and certainly would not have enjoyed the early and exclusive access to IRU prior to IRU's public announcement that it would entertain offers for its assets. Id. at ¶¶ 86-87. In fact, it was important to Cerberus that Mr. Koidl maintain the relationship that Cerberus was developing with IRU because Cerberus feared the public disclosure of IRU's intention to sell its portfolio might harm its negotiating position. Id.

Partial performance takes many forms, and in this case the parties nearly completely performed the entire goal of the contract: Direct was to research and investigate investment opportunities for Cerberus, present them to Cerberus, and then Cerberus was to consider whether to make an investment. See The Chariot Group, Inc v. American Acq. Partners, L.P., 751 F. Supp. 1144, 1159 (S.D.N.Y. 1990) (language parties use and their contemporaneous communications are important factors on whether they intended to be bound). That is exactly what occurred, save for Cerberus paying Direct as required under the Consulting Agreement.

3.    "Whether all of the terms of the alleged contract have been agreed upon."
(Winston v. Mediafare Entm't Corp., 777 F.2d at 80).

The mere fact that certain open terms are left to be negotiated does not mean the
parties did not intend to be bound.  Teacher's Ins. & Annuity Ass'n v. Tribune Co., 670 F. Supp.
at 501.  In many instances, parties intend to contract but leave open terms to be decided for
another day.  Id.  And in this case, the *"key commercial terms,"* which originated in New York,
followed to Germany, and ended-up in the Consulting Agreement, never changed.  Missigman v.
USI Northeast, Inc., 131 F. Supp.2d 495, 506 (S.D.N.Y. 2001) ("when all the essential terms and
conditions of an agreement have been set forth in informal written memoranda and all that
remains is their translation into a more formal document, such an agreement will be capable of
specific performance.").

While Cerberus argues that open language in the Consulting Agreement renders
the agreement a preliminary negotiation, there is no dispute that the fundamental terms of the
contract never changed, that is: (i) $12,000 per month paid to Direct at or about the time of an
investment or acquisition by Cerberus exceeding €30 million; (ii) 1% of net invested amount by
Cerberus for investments sourced exclusively by Direct; for non-exclusive deals, the 1%
consulting fee would be discounted by 40%; (iii) 20% of all profits from an investment made by
a Cerberus entity above a 20% IRR on the invested amount plus certain expenses; and (iv)
reimbursement of expenses not to exceed $12,000 per month.  (See Complaint ¶ 37, Exs. A, B,
C).

Even the existence of open secondary terms does not compel the conclusion that
parties do not intend to be bound.  "The hallmark of a Type I agreement is that the parties have
agreed to all necessary elements of the contract and are, therefore, bound to the ultimate

objective despite the fact that a more formal or elaborate writing has yet to be produced." Brown v. Cara, 420 F.3d 148, 154 (2d Cir. 2007).   "Parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement." Teachers Ins., 670 F. Supp. at 498; see also, Shann v. Dunk, 84 F.3d 73, 78 (2d Cir. 1996) (if open terms are not material to overall agreement they will not preclude finding of contract).

Cerberus cites Winston v. Mediafare Entm't Corp., 777 F.2d 78 (2d Cir. 1985) and R.G. Group v. Horn & Hardart Co., 751 F.2d 69 (2d Cir. 1984)  for the proposition that it could not have intended to be bound because there remained an unsigned Consulting Agreement and open terms presented by Direct.  (See Cerberus MOL p. 16). These decisions do not avoid the implication of a contract because of the existence of any single open term.  Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d. at 72-73; Teacher's Ins. & Annuity Ass'n v. Tribune Co., 670 F. Supp. at 501.  At most, the existence of such open terms indicates there was a preliminary expression of commitment to negotiate the open items in good faith.  Id.  When the parties otherwise indicate their intention to be bound, such open items will not render the agreement unenforceable.  Id.  "A party may demand performance of the transaction even though the parties fail to produce the 'more elaborate formalization of the agreement.'" Adjustrite Sys., Inc. v. GAB Bus. Serv., Inc., 145 F.3d at 548 citing Teacher's Ins. & Annuity Ass'n v. Tribune Co., 670 F. Supp. at 498.

Even in matters involving complex agreements, parties may be bound in the absence of a formal signed agreement.  See e.g., Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 96 (2d Cir. 2007) (parties bound to unsigned agreement if all material

terms evident and substantially performed); <u>V'Soske v. Barwick</u>, 404 F.2d 495 (2d Cir. 1968)

(agreement enforced for sale of multimillion dollar business despite failure to agree on several

significant terms), <u>cert. denied</u>, 394 U.S. 921 (1969); <u>Smith v. Onyx Oil and Chem. Co.</u>, 218

F.2d 104 (3d Cir. 1955) (under New York law, contract binding prior to signing because parties

did not "pretty clearly show that such signing is a condition precedent to legal obligation");

<u>Viacom Int'l Inc. v. Tandem Prod., Inc.</u>, 368 F. Supp. 1264, <u>aff'd</u>, 526 F.2d 593 (2d Cir. 1973)

(agreement enforced despite lack of delivery); <u>Bruce Realty Co. of Florida v. Berger</u>, 327 F.

Supp. 507 (S.D.N.Y. 1971) (agreement enforced on basis of letters exchanged between counsel).

       4.    "Whether the agreement at issue is the type of contract that is usually committed to writing."  (<u>Winston v. Mediafare Entm't Corp.</u>, 777 F.2d at 80).

      Cerberus contends that the size of the fee that is owed to Direct automatically

makes it the type of agreement that should be committed to a writing.  (<u>See</u> Cerberus MOL pp.

16-17).  Cerberus neglects, however, that the contract <u>is</u> in writing – the Consulting Agreement.

(<u>See</u> Complaint Ex. C).  No matter whether Cerberus signed or ignored the February 10, 2003

Consulting Agreement, the document represents a writing between the parties that reflects the

*"key commercial terms"* of the parties' relationship.  <u>Id.</u>  And since Mr. Teitelbaum represented

to Direct that the February 10, 2003 Consulting Agreement was accepted by Cerberus and would

be signed, Cerberus cannot maintain that the fourth <u>Winston</u> factor, a writing, indicates the

parties' intended not to be bound.  Further, Messrs. Bruno and Teitelbaum of Cerberus agreed

that the April 15, 2003 letter to IRU which Mr. Koidl helped prepare would serve as the

execution of the Consulting Agreement and that IRU was a *"Koidl deal."*  (<u>See</u> Complaint ¶¶ 76-

77).

This factor also should be considered relative to the scope of the <u>Winston</u> factors generally, that is, they are designed to ascertain the parties' intent with regard to contract formation. Discerning whether a contract is the type that ordinarily is in writing can be misleading because commercial parties almost always attempt to reduce their contractual relationship to a writing. But as set forth above, just because the writing is not signed or is incomplete does not mean the parties did not intend to be bound or are not legally bound. If dual signatures were required before any party began performance, commerce would take a great pause, and in this case, Cerberus may never have been introduced to IRU.

In sum, the <u>Winston</u> factors each indicate that the parties intended to be bound to the Consulting Agreement. The totality of Cerberus's conduct not only demonstrates partial performance under the contract, but, other than making the payments contested in this lawsuit, Cerberus performed the essential aspects of the agreement. <u>Rule v. Brine, Inc.</u>, 85 F.3d 1002, 1010 (2d Cir. 1996) (analysis of whether parties intended to be bound should not put "disproportionate emphasis . . . on any single act, phrase or other expression, but, instead [should consider] the totality of all these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain.").

As detailed above, Cerberus accepted and rejected proposed investment opportunities presented by Direct, made payments to Direct to reimburse Mr. Koidl for expenses he incurred in various travels on behalf of Cerberus, and otherwise made numerous admissions about the existence of the contract (including Mr. Bruno's remark about 'capping' Direct's fees). <u>See</u> <u>Viacom Int'l Inc. v. Tandem Prods., Inc.</u>, 368 F. Supp. at 1270 (performance of agreement for one year is "strong circumstantial proof that the minds of the parties had met on the essential elements and that they were not waiting for a formal written instrument.").

Our research reveals that Cerberus has a history of avoiding its payment obligations in these type of circumstances; the Court should not sanction Cerberus ignoring its contractual obligations at this stage of the case.  Instead, discovery of the facts and circumstances of Cerberus's conduct under the Consulting Agreement and the acceptance of Direct's performance will establish the extent to which the parties intended to be bound to the Consulting Agreement.

**Point II**

**THE NEW YORK STATUTE OF FRAUDS DOES
NOT BAR DIRECT'S CLAIMS IN THIS LAWSUIT**

Cerberus's argument that the New York Statute of Frauds is fatal to the claims in the Complaint is wrong on several counts.

**A.**      **The Consulting Agreement was Capable of Being Performed Within One Year**

First, the Statute of Frauds is not even applicable to the Consulting Agreement.  In order for a New York contract to be subject to the Statute of Frauds, it must not be capable of being performed within one year.  N.Y. Gen. Oblig. Law § 5-701(a)(1) (McKinney 2002).  "An oral agreement is enforceable under New York law and not within the Statute of Frauds if it can be construed as being capable of performance within one year of its making."  Curtis v. Harry Winston, Inc., 653 F. Supp. 1504, 1510 (S.D.N.Y. 1987) (emphasis supplied).  New York courts narrowly interpret the Statute of Frauds' application to oral agreements that are capable of being performed within one year.  North Shore Bottling Co. v. Schmidt & Sons, Inc., 22 N.Y.2d 171 (1968).  The amount of time it takes the parties to perform the contract requires a determination of whether there is the "possibility of performance within one year."  Burke v. Bevona, 866 F.2d 532, 538 (2d Cir. 1989) (citing Zupan v. Lumberg, 2 N.Y.2d 547, 550 (1957)).

The parties' obligations under the Consulting Agreement could easily have been completely performed within one year. For instance, there is no dispute that Direct performed its duties within one year with regard to IRU (actually within a few months), and had Cerberus acquired dAF and then immediately sold the investment, which is certainly possible with private acquisitions, the parties would have performed their contractual obligations within one year, taking the contract out of the statute of frauds. Id.; Ohanian v. Avis Rent A Car Sys., Inc., 779 F.2d 101, 106 (2d Cir. 1985) (one-year provision does not preclude oral agreement unless there is "not . . . the slightest possibility that it can be fully performed within one year.") (citing 2 Corbin on Contracts § 444, at 535); Warner v. Texas and Pacific Ry., 164 U.S. 418, 434 (1896) ("The question is not what the probable, or expected, or actual performance of the contract was; but whether the contract, according to the reasonable interpretation of its terms, required that it should not be performed within the year.").

Even though the Consulting Agreement has an 18 month effective period that could be extended by Cerberus, that does not mean performance could not be effected within one year. (See Complaint Ex. C, Articles 1.1, 2.3; Rayward v. Silberman, 356 F.2d 611, 613 (2d Cir. 1966) (three year contract calling for sale of property not subject to Statute of Frauds because broker could have located buyer in one year and closing could have taken place in one year) (citing, Nat Nal Serv. Stations, Inc. v. Wolf, 304 N.Y. 332 (1952)). See Chemtex, LLC v. St. Anthony Enter., Inc., 490 F. Supp.2d 536, 544 (S.D.N.Y. 2007) ("no matter how unlikely . . ., the mere fact that performance in less than one year was even possible precludes application of the statute of frauds.") (citing, Sea Trade Co. v. FleetBoston Fin. Corp., No. 03 Civ. 10254, 2000 U.S. Dist. LEXIS 32167, at * 3 (S.D.N.Y. May 1, 2007)); Cron v. Hargro Fabrics, Inc., 91 N.Y.2d 362 (1998) (only contracts which have no possibility of being performed in one year fall

under Statute of Frauds); <u>D & N Boening, Inc. v. Kirsch Bev., Inc.</u>, 63 N.Y.2d 449, 454 (1984)

("by their very terms have absolutely no possibility in fact and law of full performance within

one year").

       While Cerberus certainly will contest whether, by its terms, the Consulting

Agreement could be performed within one year, the inquiry creates a factual question which

should not be decided in a dismissal motion.  <u>Goldberg v. Select Indus., Inc.</u>, 202 A.D.2d 312,

314-315 (1st Dep't 1994); <u>see</u>  <u>Riley v. N.F.S. Serv., Inc.</u>, 891 F. Supp. 972, 974 (S.D.N.Y.

1995) (summary judgment denied if fact question exists as to whether particular contract covered

by Statute of Frauds); <u>Rabus v. Silentradio</u>, No. 90 Civ. 5037, 1992 U.S. Dist. LEXIS 4825, at *2

(S.D.N.Y. Apr. 13, 1992) (denying summary judgment on the basis of the Statute of Frauds

where the record did not sufficiently demonstrate that the contract could not be performed within

one year).

**B.**    <u>**The Statute of Frauds Does Not Apply Because the Agreement Was**</u>
       <u>**Evidenced By a Writing, Confirmed by the Party to be Charged With Performance**</u>

       The Statute of Frauds requires an agreement to be evidenced by a writing and

subscribed by the party to be charged therewith.  N.Y. Gen. Oblig. Law § 5-701(3)(d)

(McKinney 2002).  There is no dispute that a writing charging Cerberus with performance exists

between the parties: the Consulting Agreement.  (<u>See</u> Complaint Exs. B, C).  Messrs. Bruno and

Teitelbaum expressly represented to Direct that the April 15, 2003 letter Cerberus sent to IRU

authenticated not only that IRU was a *"Koidl deal,"* but signified Cerberus's execution of the

February 10, 2003 Consulting Agreement.  <u>Id.</u> at ¶¶ 76-78.  In addition, Mr. Teitelbaum

acknowledged that the terms of the February 10, 2003 Consulting Agreement were accepted by

Cerberus, and that a signature would be forthcoming.  <u>Id.</u> at ¶¶ 44, 46.  As far as Direct knows,

Cerberus actually signed the Consulting Agreement as Mr. Teitelbaum pledged, but neglected to

return it for Mr. Koidl's signature.  See Transit Adver., Inc. v. New York, New Haven & Hartford R.R., 194 F.2d 907, 910 (2d Cir.) (Statute of Frauds does not mandate delivery, so it is not relevant whether defendant failed to return signed contract), cert. denied, 344 U.S. 817 (1952).

To satisfy the writing requirement, it is sufficient for just one of the parties to present a writing identifying the contract terms, which was agreed to by the party to be charged. For instance, in Blye v. Colonial Corp. of Am., 102 A.D.2d 297, 298 (1st Dep't 1984), the plaintiff sought commission payments for locating a manufacturer to produce clothes for the defendant's line, and the only writing was a letter from the defendant outlining certain financial terms, and that a future presentation to its customers was required.  Id.  The Appellate Division concluded the letter, while not including all of the parties' contract terms, was sufficient to satisfy the Statute of Frauds.  Id. at 299.

In a passage often quoted by New York Courts in Statute of Frauds cases, Professor Williston wrote:

> *The Statute of Frauds was not enacted to afford persons a means of evading just obligations; nor was it intended to supply a cloak of immunity to hedging litigants lacking integrity; nor was it adopted to enable defendants to interpose the Statute as bar to a contract fairly, and admittedly, made.*

4 Williston, Contracts (3d Ed.) § 567A, pp. 19-20.  See e.g., Morris Cohon & Co. v. Russell, 23 N.Y.2d 569, 574 (1969) (quoting Professor Williston).  The observation is particularly evident in this case because Cerberus refers to Direct as essentially an interloper on Cerberus's business, trying to seize a financial windfall without having contributed anything to the introduction to IRU and/or dAF.  But if that really was the case, Cerberus would not have delivered the January 25, 2003 Consulting Agreement to Direct and would never have involved Direct to the extent it

did in initiating, developing, preserving, and nurturing the IRU introduction.  And if Cerberus

really considered Direct a broker fishing for a fee without a contract, as Mr. Koidl is now

portrayed, Mr. Bruno would not have asked Direct to cap its fees after it appeared IRU was

going to make an investment in an IRU asset, nor would Mr. Bruno have commented that

Cerberus *"does not have amnesia"* with regard to the fee owed to Direct if Cerberus closed an

IRU deal.  (See Complaint ¶¶ 110-111, 114).

            The New York Court of Appeals has found that when a sufficient writing includes

a "reasonable construction and necessary implication a promise to pay compensation for the

services alleged to have been rendered" the absence of specific terms regarding the payment does

not require the claim to be barred by the Statute of Frauds.  Morris Cohon & Co. v. Russell, 23

N.Y.2d at 574.  In fact, Justice Scileppi observed in the employment case that "if it does not

appear that there has been an agreement on the rate of compensation, a sufficient memorandum

need only evidence the fact of plaintiff's employment by defendant to render the alleged

services. The obligation of the defendant to pay reasonable compensation for the services is then

implied."  Id. at 575.  See Wiener & Co. v. Teitelbaum, 107 A.D.2d 583, 584 (1st Dep't 1984)

(relevant writings creating contract may include memoranda unsigned by either party).

            An exchange of writings under New York law also satisfies the Statute of Frauds

if the writings together refer to the same subject matter and contain the material terms of the

agreement.[4]  Manhattan Fuel Co., Inc. v. New England Petro. Corp., 422 F. Supp. 797, 800

(S.D.N.Y. 1976), aff'd, 578 F.2d 1368 (2d Cir. 1978); Henry L. Fox Co. v. William Kaufman

Org., 74 N.Y.2d 136, 140 (1989).  The writings must be referable to the contract such that they

sufficiently evidence the parties' agreement.  Marcraft Rec. Corp. v. Francis Devlin Co. Inc., 506

---

[4]  Cerberus acknowledges that the multiple writings  must "as a whole set forth all of the material
terms of the agreement . . ."  (See Cerberus MOL p. 22).  There can be no dispute that the
writings among the parties in this case set forth the "material" terms.

F. Supp. 1081, 1085 (S.D.N.Y. 1981); Kobre v. Instrument Sys. Corp., 54 A.D.2d 625, 626 (1st

Dep't 1976) (memorandum must contain material terms and conditions to satisfy Statute of

Frauds).

Here, there are several writings that, taken together, clearly satisfy the

memorandum requirement under the Statute of Frauds.  For instance, the December 26th e-mail,

coupled with the Consulting Agreement and the follow-up writings in which Cerberus

acknowledged not only Direct's performance under the contract but its own, together reference

the parties' agreement, and are the type of writings that historically remove an unsigned contract

from the Statute of Frauds.  Crabtree v. Elizabeth Arden Sales Corp., 305 N.Y. 48, 55-56 (1953)

(all writings taken together must evidence contract terms); see Carruthers v. Flaum, 450 F. Supp.

2d 288, 309 (S.D.N.Y. 2006) (if parties reach meeting of the minds and draft preliminary

document that states with specificity all material elements, Statute of Frauds is satisfied even if

the parties contemplated redrafting that document); Intercontinental Planning, Ltd. v. Daystrom,

Inc., 24 N.Y.2d 372, 378-379 (1969) (in contract action, memorandum sufficient to satisfy

Statute of Frauds must by implication reflect materials terms, including rate of compensation);

Del Monte Corp. v. Mercantum (U.S.) Corp., 175 A.D.2d 72, 74 (1st Dep't 1991) (written

memoranda memorializing relationship between parties referring to nature of agreement satisfies

Statute of Frauds); Lalonde v. Modern Album and Finishing Co., Inc., 38 A.D.2d 960 (1st Dep't

1972) (even writing lacking essential term enough to satisfy Statute of Frauds).

Whether the writing(s) in this case satisfy the Statute of Frauds is a factual

question.  Matcon, Inc. v. Canron Const. Corp., No. 96 Civ. 4401, 1998 U.S. Dist LEXIS 680, at

*13, 15 (S.D.N.Y. Jan. 26, 1998) (question of fact regarding memorandum evidencing alleged

commission agreement challenged under Statute of Frauds).  It also is a factual question whether

the e-mails and other communications from Cerberus to Direct after the February 10, 2003

Consulting Agreement constitute a "signature" or authentication of the writing sufficient to take

it out of the Statute of Frauds.  Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d at 573

(whether correspondence and other documents create contract factual question); Panetta v. Kelly,

17 A.D.3d 163, 165 (1st Dep't 2005) (finding a question of fact where payment of full purchase

price and funding premises improvements were "singularly referable to the oral contract").

       In Mesibov, Glibert & Levy v. Cohen Bros. Mfg. Co., 245 N.Y. 305 (1927), the

New York Court of Appeals held that "a name, written or printed, is not to be reckoned as a

signature unless inserted with an intent, actual or apparent, to authenticate the writing." Id. at 310

(Cardozo, J.).  This rule is embodied in the Statute of Frauds, which requires a "present intention

to authenticate a writing."  Thus, the question is whether Cerberus through its writings and

actions authenticated the Consulting Agreement.  See SD Prot., Inc. v. Del Rio, 498 F. Supp.

576, 584 (S.D.N.Y. 2007) (question of fact requiring discovery whether e-mails authenticated

writing subject to Statute of Frauds); Lehman Bros. Inc. v. Canadian Imperial Bank of

Commerce, No. 97 Civ. 8226, 2000 U.S. Dist. LEXIS 13979, at *39 (S.D.N.Y. Sept. 27, 2000)

(series of faxes and Bloomberg communications sufficient to satisfy Statute of Frauds).

## C.    **Partial Performance**

       There is no dispute the Statute of Frauds applies to finder's fee cases, as this

lawsuit is characterized by Cerberus.  Freedman v. Chemical Const. Corp., 43 N.Y.2d 260, 266

(1977).  But there is no bar to recovery when a contract has already been performed and honored

by the party to be charged.  Pursuant to New York General Obligations Law § 5-703(4),

"[n]othing contained in this section abridges the power of courts of equity to compel the specific

performance of agreements in cases of part performance."  N.Y. Gen. Obl. § 5-703(4)

(McKinney 2001); Anostario v. Vicinanzo, 59 N.Y.2d 662, 664 (1983) ("The doctrine of part performance may be invoked only if plaintiff's actions can be characterized as 'unequivocally referable' to the agreement alleged."); see In re Sloan, 32 B.R. 607, 610 (E.D.N.Y. 1983) (party which honored challenged agreement cannot raise Statute of Frauds defense); Brady v. Helmsley, 246 A.D.2d 486, 487 (1st Dep't 1998) (payment of mortgage prevents defense that agreement is barred); Oxbridge Partner, L.P. v. New England Video, Ltd., 213 A.D.2d 361 (1st Dep't 1995) (in finder's fee case, question of fact whether series of writings subject to Statute of Frauds); Club Chain of Manhattan, Ltd. v. Christopher & Seventh Gourmet, Ltd., 74 A.D.2d 277, 281 (1st Dep't 1980) ("While the Statute of Frauds is a bar to an action on a contract which requires a writing, it will not prevent a court of equity from enforcing an oral contract where part performance has taken place and nonenforcement will result in injustice.").

Part performance that is clear, certain, and definite in object and design and unequivocally referable to the agreement removes the action from the Statute of Frauds. Frassetto v. Wallkill Gener. Co., L.P., 944 F. Supp. 275, 276 (1996).  Although Cerberus maintains that partial performance does not apply to finder's-type of cases, the Second Circuit has concluded otherwise.[5]  See e.g., Rayward v. Silberman, 356 F.2d 611 at 613.

In Philo Smith & Co. v. U.S. Life Corp., 420 F. Supp. 1266 (S.D.N.Y. 1976), aff'd, 554 F.2d 34 (2d Cir. 1977), the Court restated the criteria for estopping the Statute of Frauds: (i) fraudulent oral promise by the defendant; (ii) upon which plaintiff relies; (iii) by engaging in acts which are referable to the oral promise; and (iv) resulting in substantial injury to plaintiff.  Id. at 1273-1274.

---

[5]  Kule Res. Ltd. v. Reliance Group, Inc., 49 N.Y.2d 587 (1980), does not stand for the proposition that any person seeking payment under a contract, characterized as a finder's fee by Cerberus, is barred under the Statute of Frauds.  The New York Court of Appeals noted in Kule Res that the broker could not rely on part performance because it merely provided a name, without doing anything more.  Id. at 592.

In this case, Cerberus made numerous representations to Direct that it would be paid if Direct introduced an opportunity that resulted in a Cerberus investment in which Cerberus enjoyed a certain return.  The promises started in New York in December 2002 when Mr. Bruno presented the "standard" Cerberus consulting terms (see Complaint ¶¶ 12-15); continued through December when Mr. Teitelbaum made numerous promises about how Direct would be paid, culminating in the December 26th e-mail (id. at ¶¶ 16-22); became more refined with the Consulting Agreement prepared and delivered by Cerberus (id. at Ex. B); continued with Cerberus officials making numerous promises that Direct would be 'kept in the loop' and paid if an IRU investment closed (id. at ¶¶ 14, 29, 53, 110, 179); and concluded with Cerberus acknowledging that the Consulting Agreement would be signed and was acceptable (id. at ¶¶ 44, 46, 76-78).

Even if there is some doubt as the character, quality, and essential value of the elements of performance by either party with regard to the Consulting Agreement, the Statute of Frauds does not bar recovery, but instead a factual inquiry arises about the extent of such part performance.  McNamara v. Tug Diana L. Moran, No. 87 Civ. 3096, 1989 U.S. Dist. LEXIS 10634, at *5 (S.D.N.Y. Sept. 6, 1989) (whether integrated document has been assented to by party is fact question); Snay v. Wood, 50 A.D.2d 651 (3d Dep't 1975).  Indeed, in commission and finder's fee cases, a triable factual issue exists when the plaintiff directs correspondence about the agreement to the defendant, who responds with writings that may be susceptible of being interpreted as authenticating the plaintiff's statements.  Sorge v. Nott, 22 A.D.2d 768, 769 (1st Dep't 1964).

In sum, the activities, conduct, and statements of both Cerberus and Direct from December 2002 through the Fall 2003 all are undeniably referable to the *"key commercial*

*terms"* as memorialized in the Consulting Agreement.  It is not possible for Cerberus to identify

any other reason why it (i) accepted Direct's list of investment opportunities; (ii) met with Mr.

Koidl and IRU officials numerous times; (iii) called upon Direct to make presentations to IRU

and attend meetings with IRU; (iv) required Mr. Koidl enter into a confidentiality agreement

regarding IRU; (v) paid Direct its expenses for investigating investment opportunities throughout

Europe; (vi) asked Direct to "cap" its fees for the IRU transaction; and (vii) communicated and

corresponded with Direct numerous times over a short period of time about IRU and other

investment opportunities.

Because partial performance by both parties takes the Consulting Agreement

outside the Statute of Frauds, Cerberus's motion should be dismissed.

**Point III**

**DIRECT'S CLAIMS FOR PROMISSORY AND
EQUITABLE ESTOPPEL, QUANTUM MERUIT, AND
<u>UNJUST ENRICHMENT ARE SUFFICIENTLY PLEADED</u>**

Cerberus attacks the non-contract claims as being insufficiently pleaded.  Each of

the claims for promissory and equitable estoppel, quantum meruit, and unjust enrichment are

separate and apart from Direct's contract claim, and each count has been pleaded with the

requisite particularity to place Cerberus on notice of the claim and the grounds thereof.

**A.**     **<u>Promissory / Equitable Estoppel</u>**

"In New York, promissory estoppel has three elements: 'a clear and unambiguous

promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an

injury sustained by the party asserting the estoppel by reason of the reliance.'" <u>Arcadian</u>

<u>Phosphates, Inc. v. Arcadian Corp.</u>, 884 F.2d at 73 (<u>quoting</u> <u>Esquire Radio & Elecs., Inc. v.</u>

Montgomery Ward & Co., 804 F.2d 787, 793 (2d Cir. 1986)); see also Total Plan Corp. of Am. v. Colborne, 14 F.3d 824, 833 (2d Cir. 1994).

These elements of promissory estoppel are well explained in the Complaint: (i) Cerberus made a clear and unambiguous promise to Direct, specifically Mr. Koidl, that Cerberus would pay Direct the fees set forth in the December 26, 2002 e-mail and in the Consulting Agreement if Cerberus made an investment in an opportunity presented by Direct (id. at ¶¶ 200, 202); (ii) Direct reasonably and forseeably relied on the promises by Cerberus (id. at ¶¶ 201, 203, 204); (iii) Direct has been harmed by relying on Cerberus's promise to pay a fee if it invested in any investment presented by Direct (id.).

The promises by Cerberus that Direct was entitled to a fee for its work in procuring an investment opportunity accepted and ultimately made by Cerberus, and Direct's reliance thereon, are replete throughout the Complaint.  For example:

●  During the December 13, 2002 meeting in New York between Messrs. Bruno and Koidl, Cerberus represented that it typically paid advisors a fee (as described in Complaint ¶ 15), and Mr. Koidl accepted that arrangement;

●  On December 18, 2002, Mr. Koidl met with Mr. Teitelbaum in Germany, where Mr. Teitelbaum reconfirmed that Cerberus pays its advisors for deals in which Cerberus makes an investment and gains a certain return.  Id. at ¶ 16.  Mr. Koidl, relying on such promise, then identified certain potential Cerberus investment opportunities which were accepted by Mr. Teitelbaum.  Id.

●  Cerberus represented in the December 26th and December 30th e-mails and in contemporaneous exchanges with Mr. Koidl that Direct would be paid a fee for introducing an opportunity in which Cerberus made an investment.  Id. at ¶¶ 21-28, 30-31.

●   After receiving the December 26th e-mail, Messrs. Koidl and Teitelbaum had a telephone conference, during which conversation Mr. Teitelbaum remarked, *"Don't worry Roman, we always pay our consultants."*  Id. at ¶ 29.  Direct relied on this promise and began researching investments.

●   With Cerberus's knowledge and encouragement, after the December, January, and February writings and exchanges (Consulting Agreement), Direct began to investigate investment opportunities for Cerberus.  As an example, on January 23, 2003, Mr. Koidl met with Dr. Hans-Joachim Körber, CEO of Metro Holding AG in Düsseldorf about an €8 billion disinvestment vehicle known as Diavaco, which opportunity was presented to Cerberus. Id. at ¶¶ 32-33.

●   Mr. Teitelbaum informed Direct that the February 10, 2003 Consulting Agreement was accepted, and also promised he would secure the signature of Cerberus.  Mr. Teitelbaum also confirmed that e-mail exchanges served as the confirmation process between Cerberus and Direct, and the e-mail exchange between the parties confirmed the contract.  Id. at ¶ 46.

●   Relying on Mr. Teitelbaum's promises that Direct would be compensated for its work in presenting deals in which Cerberus made an investment, Direct explored investment opportunities for Cerberus during 2003, proceeding to make introductions on behalf of Cerberus to various banks, financial institutions, and others.  Id. at ¶ 52.

●   On March 6, 2003, Cerberus wrote to Direct to advise that Mr. Koidl should deal directly with Mr. Teitelbaum.  In the correspondence, Cerberus acknowledged that it had *"contracted"* with Direct.  Mr. Koidl honored the reporting instructions given to Direct by Cerberus.  Id. at ¶¶ 52-54.

• Mr. Bruno wrote Direct on March 12, 2003, confirming Cerberus's interest in working with Direct on five exclusive transactions with certain enumerated investment targets. Id. at ¶ 55.

• Direct researched, investigated, and ultimately presented IRU to Cerberus, which investment opportunity was accepted by Cerberus. Id. at ¶¶ 58-89.

• Mr. Koidl was asked to execute a confidentiality agreement as part of the work he was performing to procure a Cerberus investment in an IRU portfolio investment. Id. at ¶ 95.

• Cerberus, representing that Direct was entitled to a fee, asked Mr. Koidl to research and submit presentations to IRU on behalf of Cerberus. Id. at ¶ 109. As Direct continued its efforts on behalf of Cerberus, Mr. Bruno reminded Mr. Koidl that Direct was entitled to a fee if Cerberus made an investment in an IRU portfolio asset. Id. at ¶ 110.

Whether these promises and reliance are sufficient to state a promissory/equitable estoppel claim is not relevant; the test is whether they have been properly pleaded. "The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." Festa v. Local 3 Int'l Bhd. Of Elec. Workers, 905 F.2d 35, 37 (2d Cir. 1990).

Under New York law, "the existence of an enforceable contract is not a necessary precondition to recovery under either quantum meruit or promissory estoppel doctrines." C.R. Klein, Inc. v. Flagship Prop., Inc., 955 F.2d 5, 7 (2d Cir. 1992). As Professor Williston commented, "[w]hether an agreement obnoxious to the Statute of Frauds is void or merely unenforceable, one who has partly performed the agreement and who is not in default in continuing performance should be compensated for any benefit which he has furnished the other

party if the latter refuses to perform." Id. (quoting 3 Williston, A Treatise on the Law of Contracts § 534 at 810-11 (3d ed. 1960)).

Cerberus is wrong in arguing that the Statute of Frauds prevents Direct's estoppel claim. Cinema North Corp. v. Plaza at Latham Assoc., 867 F.2d 135, 142 (2d Cir. 1989) (promissory estoppel not barred by Statute of Frauds); Esquire Radio & Elec., Inc. v. Montgomery Ward & Co., 804 F.2d 787, 794 (2d Cir. 1986) ("having reneged on its promise to repurchase Esquire's spare parts inventories . . . Ward is equitably estopped from raising the Statute of Frauds"); R.G. Group, Inc. v. The Horn & Hardart Co., 751 F.2d at 79 (Statute of Frauds not basis for dismissal of promissory estoppel, but because reliance not shown). The Statute of Frauds cannot contravene its own purpose by effecting a fraud. Messner Vetere Berger McNamee Schmetterer Euro RSCG v. Aegis Group PLC, 150 F.3d 194, 196 (2d Cir. 1998).

A party is not barred from asserting a claim for promissory estoppel merely because the Statute of Frauds is raised. MacEdward v. Northern Elec. Co. Ltd., 595 F.2d 105, 117 (2d Cir. 1979) (to avoid application of Statute of Frauds, sufficient reliance must be shown). Courts in this District have routinely considered estoppel claims in the face of a Statute of Frauds challenge, rejecting that the claim is barred. See e.g., Bellen v. Weiser, No. 05 Civ. 8775, 2007 U.S. Dist. LEXIS 75637, at *24-25 (S.D.N.Y. Oct. 11, 2007) (promissory estoppel issue a question of fact, despite Statute of Frauds); Great White Bear, LLC v. Mervyns, LLC, No. 06 Civ. 13358, 2007 U.S. Dist. LEXIS 31224, at *14 (S.D.N.Y. Apr. 26, 2007) (Statute of Frauds does not bar consideration of promissory estoppel); Special Event Entm't v. Rockefeller Ctr., Inc., 458 F. Supp. 72, 77 (S.D.N.Y. 1978) ("[t]he burden of proof will, of course, weigh heavily on plaintiff since the Statute of Frauds is not easily avoided. However, giving the complaint the

liberal construction to which it is entitled, I am not prepared to foreclose plaintiff's proof on the questions raised therein.").

Cerberus argues that if a party asserts an estoppel claim to avoid the Statute of Frauds, it is subject to the "unconscionable" injury standard announced in Philo Smith & Co. v. US Life Corp., 554 F.2d at 36. (See Cerberus MOL pp. 25-26). The cases cited by Cerberus (Belotz v. Jeffries & Co., No. 98 Civ. 2587, 1999 WL 587916, *5 (S.D.N.Y. Aug. 4, 1999), aff'd 213 F.3d 625 (2d Cir. 2000), et al.) address instances in which the parties raised estoppel to avoid application of the Statute of Frauds. Here, Direct has not raised its estoppel claim merely to avoid the Statute of Frauds, which, as detailed above, does not apply to Direct's causes of action, but instead because it has a 'plausible' claim. Beautiful Jewelers Private Ltd. v. Tiffany & Co., No. 06 Civ. 3085, 2007 U.S. Dist. LEXIS 20263, at *23 (S.D.N.Y. Mar. 21, 2007) (if complaint alleges reliance on promises to plaintiff's detriment, promissory estoppel claim not invoked to avoid application of Statute of Frauds). Direct asserts the count because Cerberus made numerous promises, inducing Direct to act, and then failed to meet such promises. Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d at 73 (promissory estoppel available in face of Statute of Frauds to avoid injustice).

## B.    Unjust Enrichment & Quantum Meruit

Cerberus argues the Statute of Frauds bars recovery in unjust enrichment and quantum meruit. (See Cerberus MOL pp. 27-28). Cerberus is wrong. See e.g., Feingold v. Nankin, 91 Fed. Appx. 176, 178 (2d Cir. 2004) (quantum meruit and unjust enrichment not barred by Statute of Frauds); Grappo v. Alitalia Linee Aeree Italiane, 56 F.3d 427, 433 (2d Cir. 1995) (quantum meruit available even if contract claim barred by Statute of Frauds); Klewin, Inc. v. Flagship Prop., Inc., 955 F.2d 5, 7 (2d Cir. 1992) (same); Brylgrove Ltd. v. Tomkins,

PLC, 172 A.D.2d 452, (1st Dep't 1991) ("requirement of complying with the statute of frauds in a contract claim would in no way undermine the validity of an otherwise properly pleaded cause of action for quantum meruit.").

Under New York law, if a plaintiff "fails to prove a valid contract, recovery is available in quantum meruit to assure a just and equitable result." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996). "A claim in quantum meruit does not depend upon a contract's compliance with the statute of frauds." Marcraft Rec. Corp. v. Francis Devlin Co., Inc. 506 F. Supp. at 1086; see Edelson v. Quad Sys., Inc., No. 83 Civ. 2492, 1984 U.S. Dist. LEXIS 17727, at *6 (S.D.N.Y. Apr.11, 1984) (if correspondence indicates parties reached understanding that if plaintiff found buyer, it would be paid a fee, and no contract was consummated, quantum meruit claim sustained). In fact, "the Statute of Frauds is not an automatic bar to a cause of action for unjust enrichment." RTC Prop., Inc. v. Bio Res., Ltd., 295 A.D.2d 285, 286 (1st Dep't 2002).

The New York Court of Appeals has held that even if a finder, as Mr. Koidl is characterized by Cerberus, is unable to recover on a contract claim by virtue of the Statue of Frauds, the finder may recover in quantum meruit for the reasonable value of the services rendered. Morris Cohon & Co. v. Russell, 23 N.Y.2d at 575-576. In Morris, a broker recovered compensation in quantum meruit where the writing relied upon identified the material terms except the rate of commission. Id. "In an action in quantum meruit," the Court stated, "if it does not appear that there has been an arrangement on the rate of compensation, a sufficient memorandum [to satisfy the Statute of Frauds] need only evidence the fact of plaintiff's employment by defendant to render the alleged services." Id.

Courts have authorized quantum meruit claims to continue even if the writing relied upon does not reflect all the material terms so long as the writing indicates the plaintiff's engagement to provide services in connection with a transaction that later was concluded.  See, e.g., Marcella v. ARP Films, Inc., 778 F.2d 112, 116 (2d Cir. 1978) (even if Statute of Frauds prevented contract claim, recovery for services authorized under New York law); Flammia v. Mite Corp., 401 F. Supp. 1121, 1133 (E.D.N.Y. 1975) (Statute of Frauds not bar to quantum meruit claim to recover broker's unpaid compensation); Davis v. Mamber, Ltd., 212 A.D.2d 424, 424-426 (1st Dep't 1995) (quantum meruit if defendant authorized plaintiff to approach company on its behalf); Shapiro v. Dictaphone Corp., 66 A.D.2d 882, 885 (2d Dep't 1978) ("the writings need not evidence an actual intention to pay.  It is sufficient if the evidence demonstrates that services were requested and the parties reasonably expected that such services were not to be performed gratuitously."); Perfect Trading Co. v. Goldman Sachs & Co., 236 A.D.2d 221, 222 (1st Dep't 1997) (quantum meruit claim even if no contract, and writings not clear as to compensation or duration); Khazzam v. Tremont Advisers, Inc., 214 A.D.2d 515, 517-518 (1st Dep't 1995) (trial required even though writings left open whether contract existed and if so, material terms); Blue Wolf Group, LLC v. Gaiam, Inc., 16 Misc.3d 1113A (N.Y. Cty. 2007) (quantum meruit and unjust enrichment claims proceed despite Statue of Frauds).

The same rule applies in finder's fee cases.  See e.g., Gruppo, Levey & Co. v. GLC Sec. Corp., No. 01 Civ. 8922, 2004 U.S. Dist. LEXIS 27320, at *36-38 (S.D.N.Y. June 28, 2004) (quantum meruit available in finder's fee case); Davis & Mamber, Ltd. v. Adrienne Vittadini, Inc., 212 A.D.2d at  425 (same).

Cerberus essentially argues that because under the Statute of Frauds, Direct cannot prove the existence of an enforceable contract, it should be prevented from raising an

unjust enrichment or quantum meruit claim.  That argument is exactly backwards.  "The existence of a valid and enforceable contract generally <u>precludes</u> quasi-contractual recovery." <u>Nakamura v. Fuji</u>, 253 A.D.2d 387, 390 (1st Dep't 1998) (<u>citing</u> <u>Clark-Fitzpatrick, Inc. v Long Island R.R. Co.</u>, 70 N.Y.2d 382, 388 (1987) (emphasis supplied); <u>accord,</u> <u>Unisys Corp. v. Hercules Inc.</u>, 224 A.D.2d 365, 370 (1st Dep't 1996).

Under these circumstances, in order for Direct's quantum meruit and unjust enrichment claims to advance, there only need be a writing that evidences Direct was engaged by Cerberus to assist in a transaction that was later consummated.  <u>Davis & Mamber, Ltd. v. Adrienne Vittadini, Inc.</u>, 212 A.D.2d at 424-426.  While Cerberus contests the existence of a contract, a party may plead under Rule 8 breach of contract and quantum meruit.  <u>Paper Corp. of the U.S. v. Schoeller Tech. Papers, Inc.</u>, 742 F. Supp. 808, 812 (S.D.N.Y. 1990); <u>Niederhoffer, Cross & Zeckhauser, Inc. v. Holiday Inns, Inc.</u>, No. 77 Civ. 5242, 1980 U.S. Dist. LEXIS 10906, at *28 (S.D.N.Y. Mar. 27, 1980).  In addition, given that Cerberus has challenged the existence of an enforceable contract, Direct's claim for quantum meruit and unjust enrichment is the proper vehicle for Direct to recover the damages it has suffered.

**Point IV**

**DIRECT HAS MORE THAN**
**<u>ADEQUATELY PLEADED A CLAIM FOR FRAUD</u>**

Cerberus argues that the Complaint does not differentiate the allegations in support of the fraud claim from those favoring the breach of contract count.  (<u>See</u> Cerberus MOL pp. 29-30).  Cerberus does not identify which paragraphs are redundant (perhaps it will on reply), but a close examination of the Complaint reveals Direct asserts facts in the fraud count that are different from those  alleged in the contract claim.

For instance, Direct does not allege that Cerberus set out to defraud Direct from the beginning of the parties' relationship; instead, after Cerberus learned the value of potential IRU transactions, Cerberus sought to marginalize Direct so that it later could claim Direct had nothing to do with dAF.  (See Complaint ¶¶ 102-104, 107).  In fact, when Cerberus realized Project Phoenix would be awarded to another buyer, it knew dAF would still be negotiated, and believed Cerberus could distance itself from Direct enough to later claim Direct had nothing to do with dAF.  Id.

These allegations have nothing to do with breach of contract, and are not asserted to support Direct's breach of contract claim.  Other fraud allegations by Direct serve the same purpose:

●    Direct was not made aware of the extent of dAF discussions, despite previous statements by Mr. Teitelbaum that Mr. Koidl was an integral player in assisting Cerberus with IRU; indeed, at one point in 2003, Mr. Koidl was informed by Cerberus that he was the only person who should be in contact with Dresdner with regard to IRU discussions.  Id. at ¶ 106.

●    After Mr. Koidl inquired about the status of Cerberus's discussions with IRU, he was informed that he was no longer necessary to Cerberus.  Id. at ¶¶ 107, 112.

●    That Cerberus had the mind-set to defraud Direct is evidenced by Mr. Bruno's comment after Project Phoenix, but during Cerberus's negotiations for dAF, asking Direct to agree to accept a "cap" on the fees that would be due Direct.  Id. at ¶¶ 115, 181.

●    Cerberus began making statements to Direct, including that Cerberus is too large and important not to already be known to Dresdner Bank, and, therefore to IRU; Direct had nothing to do with IRU and dAF; and other misrepresentations about the extent to which

Page 63 of 66

Direct introduced IRU and its investment opportunities to Cerberus sufficiently to warrant earning the fees.  Id. at ¶ 184.

●    Cerberus misrepresented to Direct in December 2003 that Dresdner wanted to be *"incognito"* when dealing with Cerberus on an IRU transaction, meaning that Direct should not contact IRU.  Id. at ¶ 184.

The New York Court of Appeals has held that a contracting party may be liable for fraud when at the time it made a promise, it did not intend to keep the promise.  Channel Master Corp. v. Aluminum Ltd. Sales, Inc., 4 N.Y.2d 403 (1958); see also Deerfield Comm. Corp. v. Chesebrough-Ponds, Inc., 68 N.Y.2d 954 (1986) (promise made with  preconceived notion of not performing is a misrepresentation).  A fraud count is not redundant of a contract claim "where the fraudulent inducement involves misrepresentations of present facts which are collateral to the contract."  Dornberger v. Metropolitan Life Ins. Co., 961 F. Supp. 506, 542 (S.D.N.Y. 1997).

New York Courts have long held that an action for fraudulent misrepresentation, independently pleaded, may constitute a cause of action which may be pleaded in addition, or as an alternative to, an action for breach of contract, including in finder's fee cases.  See e.g., Lehman v. Dow Jones & Co., Inc., 783 F.2d 285 (S.D.N.Y. 1986) (independent claim available (but not to the plaintiff therein) for fraud based upon unfulfilled fraudulent promise to pay finder's fee).   If a party pleads that false representations were made as to the defendant's intention to make payments, it is enough to sustain a cause of action for fraud.  Channel Master Corp. v. Aluminum Ltd. Sales, Inc., 4 N.Y.2d at 407-408; see also, North Shore Bottling Co., Inc. v. Schmidt & Sons, Inc., 22 N.Y.2d at 179.

For a fraud claim to co-exist with a breach of contract claim, "a plaintiff

must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996) (citations omitted); see also Great Earth Int'l Franchising Corp. v. Milks Dev., 311 F. Supp. 2d 419, 425-26 (S.D.N.Y. 2004).

   The Complaint asserts that when Cerberus learned of the value of dAF, the fraud began – the act of Cerberus distancing itself from Direct to marginalize Direct and later disclaim any obligation to pay Direct under the contract.  (See Complaint ¶¶ 102-104, 107).  Such allegations are different from the count for breach of contract because there, Direct alleges that it had a contract with Cerberus that was not honored.  In the fraud count, Direct asserts that Cerberus accepted the benefit of Direct's research and learned about dAF, and then decided to defraud Direct in order to avoid having to make a payment under the contract.  Id.

   Cerberus does not focus on the fact that at the time Cerberus decided to defraud Direct, Cerberus believed it had a contract with Direct, and was looking for a way to avoid paying Direct.  The fraud allegations do not derive from the contract statements; indeed, to sustain Direct's fraud count, a contract has to be assumed.  Instead, the Complaint asserts that after Cerberus believed it contracted with Direct, it wanted to invent a reason not to pay Direct, coming-up with the plan to avoid Direct and later claim dAF was derived from another source. Id.

   While Cerberus might challenge this theory, Cerberus cannot challenge that the pleadings in support of the fraud claim and breach of contract claim are different.  Although Cerberus also challenges that the fraud count is not pleaded with particularity under Rule 9(b),

the Complaint is replete with specific statements and dates, assigning the statements and conduct to particular persons.  (See Complaint, *passim*).  One review of the Complaint will reveal the detail in which the fraud allegations are pleaded.

## **CONCLUSION**

For the reasons set forth above, Cerberus's motion to dismiss the Complaint under Rules 9(b) and 12(b)(6) should be dismissed.

Dated: New York, New York
       November 9, 2007

                                          WUERSCH & GERING LLP

                                          /s/ Samuel D. Levy_____
                                          By: Samuel D. Levy (SDL9271)
                                          Counsel for Plaintiff DIRECT
                                          INVESTMENT PARTNERS AG
                                          100 Wall Street, 21st Floor
                                          New York, New York 10005
                                          212-509-5050