UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

DIRECT INVESTMENT PARTNERS AG,

                Plaintiff,

           - against -

CERBERUS GLOBAL INVESTMENTS, LLC,
CERBERUS CAPITAL MANAGEMENT, L.P.,
CERBERUS PARTNERS, L.P. and CERBERUS
GLOBAL INVESTMENT ADVISORS, LLC

               Defendants.

07 Civ. 3310 (LLS) (RLE)

FILED VIA ECF

---

## DEFENDANTS' REPLY MEMORANDUM OF LAW
## IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT

---

**LOWENSTEIN SANDLER PC**
1251 Avenue of the Americas
18th Floor
New York, New York 10020
Tel: 212.262.6700
Fax: 212.262.7402
- and -
65 Livingston Avenue
Roseland, New Jersey  07068
Tel: 973.597.2500
Fax: 973.597.2400
*Attorneys for Defendants Cerberus Global
Investments, LLC, Cerberus Capital Management,
L.P., Cerberus Partners, L.P. and Cerberus Global
Investment Advisors, LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................1

LEGAL ARGUMENT....................................................................................................2

I.  PLAINTIFF'S CLAIMS (EXCEPT THE THIRD CAUSE OF ACTION) ARE BARRED BY THE STATUTE OF FRAUDS. ...............................................2

    A.  Plaintiff Cannot Survive a Rule 12(b)(6) Motion by Engaging in Raw Speculation. .......................................................................................3

    B.  The Part Performance Doctrine Is Not Applicable to Finder's Contracts. ....................................................................................................4

    C.  Plaintiff Has Not Proffered a Writing Sufficient to Satisfy the Statute of Frauds. ....................................................................................7

    D.  Direct's Equitable Claims Also Fail as a Matter of Law. ..........................11

II.  NO CONTRACT WAS EVER FORMED BETWEEN THE PARTIES. .............14

III.  DIRECT HAS FAILED TO STATE A CLAIM FOR FRAUD. ..........................20

CONCLUSION............................................................................................................23

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*AG Ltd. v. Liquid Realty Partners, LLC*,
    448 F. Supp. 2d 583 (S.D.N.Y. 2006)..................................................................4, 5, 8, 9, 12

*ATSI Commc'ns, Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007).....................................4

*Allied Sheet Metal Works, Inc. v. Saunders*, 206 A.D.2d 166,
    619 N.Y.S.2d 260 (1st Dep't 1994).....................................................................................9

*Anostario v. Vicinanzo*, 59 N.Y.2d 662, 450 N.E.2d 215, 463 N.Y.S.2d 409 (1983) ................5, 6

*Beautiful Jewellers Private Ltd. v. Tiffany & Co.*, No. 06 Civ. 3085(KMW),
    2007 WL 867202 (S.D.N.Y. March 21, 2007) ......................................................12, 13, 21

*Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007) ..................................................................4

*Belotz v. Jefferies & Co., Inc.*, 213 F.3d 625,
    2000 WL 665564 (2d Cir. May 22, 2000) ..............................................................4, 6, 12

*Bronner v. Park Place Entm't. Corp.*, 137 F. Supp. 2d 306 (S.D.N.Y. 2001) ............................5, 6

*Cal Distrib. Inc. v. Cadbury Schweppes Am. Beverages, Inc.*,
    No. 06 Civ. 0496 RMB JCF, 2007 WL 54534 (S.D.N.Y. Jan. 5, 2007) ...........................20

*Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403 (1958)..................................21

*Conley v. Gibson*, 355 U.S. 41 (1957) .............................................................................................4

*Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 110 N.E.2d 551 (1953) ...........................8

*deCiutiis v. NYNEX Corp.*, No. 95 Civ. 9745 (PKL),
    1996 WL 512150 (S.D.N.Y. Sept. 9, 1996)........................................................................13

*DeRosis v. Kaufman*, 219 A.D.2d 376, 641 N.Y.S.2d 831 (1st Dep't 1996) ..................................9

*Ellis v. Provident Life & Accident Ins. Co.*, 3 F. Supp. 2d 399 (S.D.N.Y. 1998).........................12

*Freedman v. Chemical Const. Corp.*, 43 N.Y.2d 260, 372 N.E.2d 12,
    401 N.Y.S.2d 176 (1977)......................................................................................................2

*Greystone P'ships Group, Inc. v. Kominkluke Luchtvaart Maatschappij*,
    815 F. Supp. 745 (S.D.N.Y. 1993) ..............................................................................15, 16

*Gracie Square Realty Corp. v. Choice Realty Corp.*, 305 N.Y. 271,
    113 N.E.2d 416 (1953)........................................................................................6

*I.R.V. Merch. Corp. v. Jay Ward Productions, Inc.*, 856 F. Supp. 168 (S.D.N.Y. 1994)........17, 18

*Intercontinental Planning, Ltd. v. Daystom, Inc.*, 24 N.Y.2d 372,
    248 N.E.2d 576, 300 N.Y.S.2d 817 (1969).........................................................5

*Karlin v. Avis*, 457 F.2d 57 (2d Cir. 1972) ...........................................................7, 8

*Koch v. Mutiplan, Inc.*, No. 99 Civ. 11277 (CM) (LMS),
    2001 WL 210004 (S.D.N.Y. Feb. 16, 2001)......................................................13

*Kule Resources, Ltd. v. Reliance Group, Inc.*, 49 N.Y.2d 587 (1980) ............................5

*Lauter v. W & J Sloane, Inc.*, 417 F. Supp. 252 (S.D.N.Y. 1976).....................................9

*Longo v. Shore & Reich, Ltd.*, 25 F.3d 94 (2d Cir. 1994)...................................14, 15, 16

*Merex A.G. v. Fairchild Weston Sys., Inc.*, 810 F. Supp. 1356 (S.D.N.Y. 1993).................5, 8, 13

*Messner Vetere Berger McNamee Schmetterer Euro RSCG Inc. v. Aegis Group PLC*,
    93 N.Y.2d 229 (1999) ...............................................................................5, 6, 7

*Minichiello v. Royal Business Funds Corp.*, 18 N.Y.2d 521 (1966) .............................13

*Mobile Data Shred, Inc. v. United Bank of Switzerland*,
    No. 99 Civ. 10315, 2000 WL 351516 (S.D.N.Y. April 5, 2000)...........................6, 7, 13

*Morris Cohon & Co. v. Russell*, 23 N.Y.2d 569, 245 N.E.2d 712,
    297 N.Y.S.2d 947 (1969) ..........................................................................13, 14

*Newman v. Crazy Eddie, Inc.*, 119 A.D.2d 738, 501 N.Y.S.2d 398 (2d Dep't 1986)...................13

*Philo Smith & Co., Inc. v. USLIFE Corp.*, 420 F. Supp. 1266 (S.D.N.Y. 1976).......................2, 12

*Rayward v. Silbermann*, 356 F.2d 611 (2d Cir. 1966).......................................................6

*R.G. Group, Inc. v. The Horn & Hardart Co.*, 751 F.2d 69 (2d Cir. 1984) ...............14, 18, 19, 20

*Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257 (2d Cir. 1984) .......................................15, 16, 18

*Rosenblatt v. Christie, Manson & Woods Ltd*......................................................20, 21

*Scheck v. Francis*, 26 N.Y.2d 466, 260 N.E.2d 493, 311 N.Y.S.2d 841 (1970) ...............14, 15, 16

*Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91 (2d Cir. 1997) ............................22

*Solin Lee Chu v. Ling Sun Chu*, 9 A.D.2d 888, 193 N.Y.S.2d 859 (1st Dep't 1959) ....................8

*Springwell Corp. v. Falcon Drilling Co., Inc.*, 16 F. Supp. 2d 300 (S.D.N.Y. 1998) ..................13

*Stephen Pevner, Inc. v. Ensler*, 309 A.D.2d 722, 766 N.Y.S.2d 183 (1st Dept. 2003) ..............5, 7

*Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491 (S.D.N.Y. 1987) .........17

*The Horn & Hardart Co. v. The Pillsbury Co.*, 888 F.2d 8 (2d Cir. 1989) ..............................8, 11

*Valentino v. Davis*, 270 A..D.2d 635, 703 N.Y.S.2d 609 (3rd Dept. 2000) ...................................5

*Whitman Heffernan Rhein & Co., Inc. v. Griffin Co.*, 163 A.D.2d 86,
    557 N.Y.S.2d 342 (1st Dep't 1990) ..........................................................................2

*Winston v. Mediafare Entm't Corp.*, 777 F.2d 78 (2d Cir. 1986) ...............................................16

*Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998) .......................................................4

## **Statutes**

N.Y. Gen. Oblig. Law § 5-701 ............................................................................... *passim*

N.Y. Gen. Oblig. Law § 5-703 ...................................................................................5

Defendants Cerberus Global Investments, LLC ("Cerberus Global"), Cerberus Capital Management, L.P. ("Cerberus Capital"), Cerberus Partners, L.P. ("Cerberus Partners"), and Cerberus Global Investment Advisors, LLC ("Cerberus Advisors") (collectively "Defendants" or "Cerberus") respectfully submit this reply memorandum of law in further support of their motion to dismiss the Complaint.[1]

## PRELIMINARY STATEMENT

Plaintiff's Complaint is replete with deficiencies that require its dismissal. Nothing in its opposition brief alters that fact. All of Plaintiff's claims (except fraud) are barred by New York's statute of frauds, and none of the purported exceptions to the statute on which Plaintiff relies can salvage those claims. Even were the statute of frauds inapplicable, Cerberus expressly reserved the right not to be bound to a contract with Plaintiff until a mutually-satisfactory written agreement was executed by both sides. That never happened, which means as a matter of law that no contract was ever formed between the parties. Finally, Plaintiff's fraud claim fails because it is entirely duplicative of its breach of contract claim, and because Plaintiff has failed to allege the essential element of reasonable reliance given that it concededly never relied on the purported truth of any of Cerberus's alleged misrepresentations.

In short, Plaintiff has not satisfied the Supreme Court's requirement under Rule 12(b)(6) of pleading facts that demonstrate the existence of a plausible claim for relief. To the contrary, all of Plaintiff's claims are woefully deficient as a matter of law. The Court should grant Defendants' motion to dismiss the Complaint with prejudice.

---

[1]     The Memorandum of Law in Support of Defendants' Motion to Dismiss is referred to herein as "Mov. Br." Direct Investment Partners AG's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint is referred to as "Direct Br." Unless otherwise indicated, capitalized terms used herein have the same meaning as in Defendants' moving brief.

## LEGAL ARGUMENT

**I.    PLAINTIFF'S CLAIMS (EXCEPT THE THIRD CAUSE OF ACTION) ARE BARRED BY THE STATUTE OF FRAUDS.**

Plaintiff concedes, as it must, that the statute of frauds applicable to finder's fee cases set forth in N.Y. Gen. Oblig. Law § 5-701(a)(10) governs this case.  (Direct Br. at 51 (citing *Freedman v. Chemical Const. Corp.*, 43 N.Y.2d 260, 266 (1977))).[2]  Although (somewhat curiously) Plaintiff devotes three pages of its brief to arguing why a different provision of the statute of frauds -- N.Y. Gen. Oblig. Law § 5-701(a)(1), which concerns contracts that cannot be performed within a year -- does not apply to its alleged contract with Defendants, that argument is simply irrelevant.  (Direct Br. at 45-47).  Defendants rely on paragraph (a)(10) of section 5-701 to bar Plaintiff's claims, not paragraph (a)(1).  And, as noted, Plaintiff does not contest the conclusion that paragraph (a)(10) applies to its alleged finder's contract.  (Direct Br. at 51).  Since the only version of the document Plaintiff says was the parties' contract is unsigned by either party, and given that Plaintiff concedes in its Complaint that it never received such a signed document from Cerberus (Complaint, ¶¶ 76-78 and Ex. C), its claims for breach of contract and under related quasi-contract theories are barred as a matter of law.  *See Whitman Heffernan Rhein & Co., Inc. v. Griffin Co.*, 163 A.D.2d 86, 87, 557 N.Y.S.2d 342, 343 (1st Dep't 1990) (holding that an unsigned draft agreement, even if in final form and setting forth the terms of the performance fee, is insufficient to satisfy the statute of frauds); *Philo Smith & Co., Inc. v. USLIFE Corp.*, 420 F. Supp. 1266, 1271 (S.D.N.Y. 1976) (holding that due to the principal importance of protecting businesses from the "mischief" created by interlopers seeking

---

[2]    Section 5-701(a)(10) provides that "[e]very agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking . . . [i]s a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest.  'Negotiating' includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction.  This provision shall apply to a contract implied in fact or in law to pay reasonable compensation[.]"

compensation for their alleged role in consummating a business transaction, the New York Legislature made "absolutely clear that *all contracts* to pay compensation for the services rendered by a finder were void unless in a signed writing") (emphasis added), *aff'd*, 554 F.2d 34 (2d Cir. 1977).

Plaintiff makes essentially four arguments for why its Complaint should survive Defendants' 12(b)(6) motion notwithstanding the clearly-applicable statute of frauds bar. First, although it has no facts to support its unadulterated speculation, Plaintiff surmises that maybe, just maybe, Cerberus might have signed the February 2003 Draft Consulting Agreement all along and just failed to deliver it to Direct. (Direct Br. at 47-48). Second, it claims that Cerberus's part performance of the parties' alleged contract defeats the statute of frauds defense. (*Id*. at 51-54). Third, Direct tries to piece together a writing sufficient to satisfy the statute of frauds from various documents attached to or referred to in the Complaint. (*Id*. at 48-51). Finally, Plaintiff argues that, even if its breach of contract action is barred, Plaintiff's quasi-contract claims remain viable notwithstanding the applicability of N.Y. Gen. Oblig. Law § 5-701(a)(10). (*Id*. at 54-62). None of these arguments is even remotely persuasive.

### a. Plaintiff Cannot Survive a Rule 12(b)(6) Motion by Engaging in Raw Speculation.

Lacking any facts even suggesting that a signed version of the February 2003 Draft Consulting Agreement exists, Plaintiff speculates that "[a]s far as [it] knows, Cerberus actually signed the Consulting Agreement as Mr. Teitelbaum pledged, but neglected to return it for Mr. Koidl's signature." (*Id*. at 47-48). Plaintiff evidently believes that it can survive a 12(b)(6) motion simply by speculating that the facts are as it would hope them to be. The gambit fails.

As a preliminary matter, Plaintiff's unadorned surmise appears nowhere in the Complaint (as the lack of a citation in Plaintiff's opposition brief confirms). (Direct Br. at 48). What is more, it actually contradicts what Plaintiff does allege -- namely that Cerberus's April 15, 2003 letter of introduction to the IRU "signified Cerberus's execution of" the February 2003

Draft Consulting Agreement. (*Id.* at 47 (citing Complaint, ¶¶ 76-78)). While (as explained below) the plausibility of this allegation is open to serious question, one thing is for certain: it would have made no sense for Cerberus to sign the February 2003 Draft, keep it hidden from Direct in its files, and yet two months later sign a different letter to "signif[y]" its supposed "execution" of that same draft. Leaving aside the black letter principle that a plaintiff cannot amend its complaint through its brief in opposition to a motion to dismiss, *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998), the new allegation is simply implausible -- if not irrational -- in light of what Plaintiff has already alleged. *See Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1974 (2007) (to survive a motion to dismiss, the claim must be "plausible on its face").

Moreover, Plaintiff's merely throwing out the possibility that a signed version of the February 2003 Draft Agreement exists somewhere is exactly the kind of speculative, inadequate allegation that is no longer permissible after the Supreme Court's abrogation in *Twombly* of the "any set of facts" language from *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Because pleading in this manner is insufficient to raise its right to relief above the speculative level, Plaintiff cannot survive a motion to dismiss by pointing to some theoretically conceivable set of facts that might give it the basis for a claim. *ATSI Commc'ns, Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

**b.    The Part Performance Doctrine Is Not Applicable to Finder's Contracts.**

Direct's attempt to avoid the statute of frauds by invoking the part performance doctrine also fails. There is a consistent, unbroken line of case law establishing that the doctrine of partial performance does not apply to finder's fee contracts like the one under which Direct seeks to recover here. *Belotz v. Jefferies & Co., Inc.*, 213 F.3d 625, 2000 WL 665564, at *2 (2d Cir. May 22, 2000) (unpublished opinion) ("Section 5-701(a)(10) does not expressly provide a part performance exception, and the New York Court of Appeals has firmly stated that there is no such exception"); *accord AG Ltd. v. Liquid Realty Partners, LLC*, 448 F. Supp. 2d 583, 588

n.2 (S.D.N.Y. 2006); *Messner Vetere Berger McNamee Schmetterer Euro RSCG Inc. v. Aegis Group PLC*, 93 N.Y.2d 229, 234 n.1, 711 N.E.2d 953, 956 n.1, 689 N.Y.S.2d 674, 677 n.1 (1999) (stating that the Court has "not … adopted [the] proposition" that there is a "judicially-created part performance exception to" section 5-701); *Kule Resources, Ltd. v. Reliance Group, Inc.*, 49 N.Y.2d 587, 592, 404 N.E.2d 734, 736, 427 N.Y.S.2d 612, 614 (1980); *Stephen Pevner, Inc. v. Ensler*, 309 A.D.2d 722, 722, 766 N.Y.S.2d 183, 184 (1st Dept. 2003); *Valentino v. Davis*, 270 A..D.2d 635, 637, 703 N.Y.S.2d 609, 611 (3rd Dept. 2000).  Indeed, the Court of Appeals in *Messner Vetere* expressly stated that it had refused to apply part performance as an exception to the statute of frauds outside the context of contracts for the conveyance of interests in real property governed by N.Y. Gen. Oblig. Law § 5-703.  93 N.Y.2d at 234 n. 1, 711 N.E.2d at 956 n.1, 689 N.Y.S.2d at 677 n.1.  Since this case is governed by section 5-701 -- not 5-703 -- Plaintiff cannot invoke part performance to escape the statute of frauds bar.

This result makes perfect sense in light of the purpose the New York Legislature sought to achieve when it amended N.Y. Gen. Oblig. Law § 5-701(a)(10) in 1964.  Prior to the statute's enactment, "courts were clogged with oral brokerage contract cases which all too often degenerated into swearing contests."  *Merex A.G. v. Fairchild Weston Sys., Inc.*, 810 F. Supp. 1356, 1366 (S.D.N.Y. 1993), *aff'd*, 29 F.3d 821 (2d Cir. 1994).  In order to defend itself "from what was perceived to be widespread perjury," as well as its reputation as a national and international center for the purchase and sale of businesses and interests therein, New York sought to protect businesses against unfounded claims of brokers and finders. *Id.*; *see also Intercontinental Planning, Ltd. v. Daystom, Inc.*, 24 N.Y.2d 372, 383, 248 N.E.2d 576, 582, 300 N.Y.S.2d 817, 826 (1969) (The nature of business brokers' contracts for commissions "is such that, in the absence of the requirement of a writing, unfounded and multiple claims for commissions are frequently asserted[.]") (quoting 1949 Report of N.Y. Law Rev. Comm.[N.Y. Legis. Doc., 1949, No. 65 (G)], p. 615.)).  As New York courts have consistently noted, too often, as in this case, finder-plaintiffs undertake "preparatory steps" "with a view toward consummation of an agreement in the future." *Anostario v. Vicinanzo*, 59 N.Y.2d 662, 664, 450

N.E.2d 215, 216, 463 N.Y.S.2d 409, 410 (1983) (citing *Gracie Square Realty Corp. v. Choice Realty Corp.*, 305 N.Y. 271, 282, 113 N.E.2d 416 (1953)); *Bronner v. Park Place Entm't. Corp.*, 137 F. Supp. 2d 306, 313 (S.D.N.Y. 2001). If courts were to lend credence to the part performance doctrine in finder's fee cases, the exception would soon thereafter swallow the rule. Scores of plaintiffs would, in the absence of a signed agreement, make self-serving allegations of their own partial performance, which may seem reasonable to a jury and, ultimately, be difficult to disprove -- precisely the outcome that the Legislature sought to prevent when it enacted the statute in the first place.

The *only* authority cited by Direct for the contrary proposition is the Second Circuit's decision in *Rayward v. Silbermann*, 356 F.2d 611 (2d Cir. 1966). (Direct Br. at 52). But *Rayward* does not say that part performance can be used to escape the statute of frauds bar in finder's cases. To the contrary, the Second Circuit merely construed the pre-1964 predecessor to N.Y. Gen. Oblig. Law § 5-701(a)(10) and held that it did not apply to finder's contracts at all -- a result the New York Legislature repudiated by amending the statute in 1964. 356 F.2d at 613. In any event, the *Rayward* Court never had occasion to consider the issue presently before this Court, and its decision cannot overcome the clear instruction of cases like *Belotz* and *Messner Vetere* that the part performance doctrine does not apply here.

Even if that doctrine were applicable, Plaintiff has not satisfied its requirements. Plaintiff recites *ad nauseam* what it claims Cerberus did to perform the alleged contract, ignoring the clear rule in New York that the defendant's conduct *is irrelevant* for purposes of determining whether part performance takes a contract out of the statute of frauds. *Messner Vetere*, 93 N.Y.2d at 237, 711 N.E.2d at 957, 689 N.Y.S.2d at 679 (holding that the only relevant acts under the part performance doctrine are "those of the party insisting on the contract, not those of the party insisting on the Statute of Frauds"). Because Direct's own alleged conduct is not "'unintelligible' or 'extraordinary'" in the absence of a contract, it is insufficient to constitute the requisite part performance. *Anostario*, 59 N.Y.2d at 664, 450 N.E.2d at 216, 463 N.Y.S.2d at 410; *see also Mobile Data Shred, Inc. v. United Bank of Switzerland*, No. 99 Civ. 10315 SAS,

2000 WL 351516, at *3 (S.D.N.Y. April 5, 2000); *Messner Vetere*, 93 N.Y.2d at 235, 711 N.E.2d at 956, 689 N.Y.S.2d at 677 (holding that to take an oral agreement out of the Statute of Frauds, the alleged acts of partial performance must be "unequivocally referable" to the agreement). Indeed, Plaintiff's alleged conduct in continuing to bring investment opportunities to Cerberus's attention and working to set up meetings is equally consistent with there being no contract between the parties. These activities can be explained just as persuasively by inferring that Plaintiff was making preparations for the contract it hoped would come into fruition, undertaking less than strenuous efforts to broker a deal that it might use to persuade Cerberus to provide some form of monetary reward at a later date, or merely attempting to curry favor with Cerberus in the hopes of expanding their business relationship in the future. *See Mobile Data*, 2000 WL 351516, at *3. Accordingly, the statute of frauds bars Plaintiff's claims.

   c. **Plaintiff Has Not Proffered a Writing Sufficient to Satisfy the Statute of Frauds.**

    In lieu of a signed Consulting Agreement, Plaintiff claims that some combination of the following documents is sufficient to satisfy the "writing" requirement of section 5-701(a)(10): (i) the December 26th E-mail; (ii) the January 2003 Draft; (iii) the February 2003 Draft; and (iv) the "follow-up writings," which presumably include the April 15, 2003 letter of introduction supposedly signed by a Cerberus representative. (Direct Br. at 50). Plaintiff is wrong.

    To begin, several of the documents on which Plaintiff relies cannot satisfy the writing requirement -- either alone or in combination with other documents -- as a matter of law. For example, the February 2003 Draft, which is an unsigned draft agreement prepared by Plaintiff itself, cannot be considered part of the alleged writing. *See Stephen Pevner, Inc. v. Ensler*, 309 A.D.2d 722, 722, 766 N.Y.S.2d 183, 184 (1st Dep't 2003) (holding that collective writings are insufficient to satisfy the statute of frauds where "they rely almost entirely upon the unexecuted agreements prepared by plaintiff himself"); *see also Karlin v. Avis*, 457 F.2d 57, 62

(2d Cir. 1972); *Solin Lee Chu v. Ling Sun Chu*, 9 A.D.2d 888, 889, 193 N.Y.S.2d 859, 860 (1st Dep't 1959) ("To permit the unsigned document prepared by the plaintiff to serve as a portion of the requisite memorandum would open the door to the evils the Statute of Frauds was designed to avoid."). Similarly, the April 2003 letter of introduction -- the only document of any apparent significance purportedly signed by Cerberus -- is irrelevant because it does not "itself establish 'a contractual relationship between the parties.'" *The Horn & Hardart Co. v. The Pillsbury Co.*, 888 F.2d 8, 11 (2d Cir. 1989) (quoting *Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 56, 110 N.E.2d 551, 554 (1953) (Fuld, J.)). Instead of establishing the existence of a contract between itself and Cerberus, Plaintiff alleges that the letter merely "acknowledged Mr. Koidl's role in introducing Cerberus to IRU, referring to Mr. Koidl as Cerberus's advisor." (Complaint, ¶ 77). Plaintiff does not allege that the letter itself (as opposed to what Cerberus representatives supposedly said about the letter) refers to either Direct or to the existence of a contract. Moreover, the mere acknowledgment that Koidl was serving as an "advisor" to Cerberus says nothing about whether Koidl -- much less Direct -- had a contract with Cerberus, or what the terms of that purported contract consist of. Without this letter, Plaintiff cannot point to a single document signed by Cerberus that even remotely relates to the alleged consulting agreement, which defeats its attempt to circumvent the statute. *See AG Ltd.*, 448 F. Supp. 2d at 586 (noting that documents offered as collective "writing" within meaning of statute of frauds must be "'connected with one another either expressly or by the internal evidence of subject-matter and occasion,'" and at least one of them must be signed by the defendant).

Also of no consequence to the statute of frauds analysis are Plaintiff's allegations about what Cerberus's representatives supposedly said concerning the significance of the documents on which it relies in an attempt to satisfy the statute. (E.g., id, ¶ 44 ("Mr. Teitelbaum represented that the terms of the February 10, 2003 Consulting Agreement were accepted, and also promised he would secure the signature of Cerberus to the February 10, 2003 Consulting Agreement."); ¶ 78 ("Messrs. Teitelbaum and Koidl agreed that the April 15th letter was the writing that confirmed that Direct introduced Cerberus to the IRU portfolio of investments and

recognized and confirmed and ratified the parties' contract.  Along with e-mail exchanges, this was an additional 'signature' to the Consulting Agreement."); Direct Br. at 47).  Parol evidence such as this is not admissible either as a substitute for the required writing or to render adequate a purported "writing" that fails to satisfy the statute's rigorous standards.  *See Merex A.G.*, 810 F. Supp. at 1367 ("Parol evidence, even in affidavit form, is immaterial to the threshold issue of whether the documents are sufficient on their face to satisfy the Statute of Frauds.  Consideration of parol evidence in assessing the adequacy of a writing for Statute of Frauds purposes would otherwise undermine the very reason for a Statute of Frauds in the first instance.").  Nor are the allegations plausible in any event.  Indeed, if Cerberus was inclined to sign the February 2003 Consulting Agreement, it would have just done so.  It is most implausible to believe that, in order to achieve the same result, Cerberus would have gone through the elaborate, indirect route of signing a separate letter that does not even mention either Direct or the Consulting Agreement.

However, even if the Court considers all of the materials proffered by Plaintiff, the statute's bar still applies.  Plaintiff acknowledges, as it must, that the documents collectively used to form the "writing" must contain all of the material terms of the alleged agreement. (Direct Br. at 49 and n. 2); *see Allied Sheet Metal Works, Inc. v. Saunders*, 206 A.D.2d 166, 168, 619 N.Y.S.2d 260, 262 (1st Dep't 1994); *DeRosis v. Kaufman*, 219 A.D.2d 376, 379, 641 N.Y.S.2d 831, 832-33 (1st Dep't 1996); *AG Ltd.*, 448 F. Supp. 2d at 586.  Indeed, they must collectively amount to "a complete reflection of the agreement that was made." *Lauter v. W & J Sloane, Inc.*, 417 F. Supp. 252, 259 (S.D.N.Y. 1976).  The documents proffered by Plaintiff simply do not satisfy that requirement.

The only three pieces of paper that even purport to discuss the terms of the contract are the December 26th e-mail, the January 2003 Draft Consulting Agreement and the February 2003 Draft.  But the descriptions contained in these documents of the terms that would govern the relationship between Cerberus and Direct cannot be reconciled with one another. Although Plaintiff now tries to downplay the significance of the substantive differences between the January and February Drafts (*see* Direct Br. at 8-15), that attempt flies in the face of its own

allegations.  Were the differences between the two drafts immaterial, Direct would not have insisted that its own draft be signed.  In any event, two examples suffice to show why those differences render any attempt to reconstruct the material terms of the supposed "contract" between the parties a futile exercise.

The December 26th E-mail refers to Direct receiving a fee in the amount of "1% of the Cerberus net invested amount of exclusive deals" it sourced exclusively."  (Complaint, Ex. A).  Under the January 2003 Draft, Cerberus proposed that "amounts obtained by Leverage" would be excluded from the calculation of the 1% fee, and defined Leverage as "any amounts invested by Cerberus in a Proposed Investment from the proceeds of loans, borrowings or other indebtedness or credit support obtained from a third party which is not an Affiliate of Cerberus." (*Id*., Ex. B, ¶ 3.1).  In its February 2003 Draft, Direct changed this definition by providing that amounts borrowed from a lender that also receives an equity participation in the Proposed Investment would not be considered part of Leverage.  (*Id*., Ex. C, ¶ 3.1).  Although both drafts are consistent with the concept of "net invested amount" discussed in the December 26th E-mail, they could not be more different in terms of their economic impact.  As explained in Cerberus's moving brief, the difference between the two drafts' respective definitions of Leverage could have resulted in multi-million dollar variances in Direct's 1% fee on a given transaction, depending on whether or not a lender providing financing for the transaction also received equity in the deal.  (Mov. Br. at 6-7).  That is material by any definition.

Even more striking are the two drafts' differences with respect to the 20% Incentive Allocation.  Again, the December 26th E-mail explained the concept behind this item of compensation -- that Direct would receive "20% of all profits above a US$20% unlevered IRR [*i.e.*, internal rate of return] of exclusive deals" sourced exclusively by Direct.  (*Id*., Ex. A).  But this formulation raised more questions than it resolved.  As an initial matter, the parties needed to figure out whether Cerberus's unlevered internal rate of return would be calculated on an investment-by-investment basis, which would have considered the performance of each investment in isolation, or across all investments sourced by Direct under the agreement with

-10-

gains in one investment offset against losses in another. Direct's February 2003 Draft takes the former approach (which is more favorable to Direct), while Cerberus's January 2003 Draft adopts the latter. Again, although **both** are consistent with the concept of a "20% unlevered IRR" set forth in the December 26th E-mail, they each represent radically different allocations of risk between the parties. As explained in Cerberus's moving brief, the economic results under the two approaches are radically different. Indeed, the decision of which approach to adopt would in many cases be determinative of not just how large a fee Direct received, but whether it would have received a fee at all -- needless to say, a point that it highly material. (Mov. Br. at 7-8 and n. 2). Moreover, as if to compound the discrepancy, Cerberus's proposed draft did not define the phrase "compounded unlevered internal rate of return". Direct's tried to, but left the definition blank. (*Id.*, Ex. C, ¶ 3.3(b) ("The 'compounded unlevered internal rate of return' within the meaning of the preceding sentence shall mean _____.")).

As these two examples demonstrate, one cannot tell just from reading the documents proffered by Plaintiff what the material terms of the alleged contract between Direct and Cerberus are. The documents generate the very kind of "speculation" and "hypothesis" that are anathema to the statute of frauds. *The Horn & Hardart Co.*, 888 F.2d at 11. Plaintiff can say that the unsigned February 2003 Draft contains the "real" terms as many times as it likes, but that simply begs the very question that must be answered in order to comply with the statute of frauds. Saying it does not make it so. Since the material terms of the contract cannot be ascertained from the documents Plaintiff has amassed, the statute of frauds bars Plaintiff's claims as a matter of law.

### d. Direct's Equitable Claims Also Fail as a Matter of Law.

Direct's inability to overcome the Statute of Frauds also bars its remaining claims sounding in promissory estoppel, unjust enrichment and quantum meruit. Although courts have, on rare occasion, permitted equitable claims such as promissory estoppel to proceed in the absence of a written, enforceable contract, those cases are distinguishable in one critical respect -

-11-

- the plaintiff's allegations established more than simply a failure to deliver fees purportedly due under a finder's contract. Unlike here, the injury alleged was "substantial" and the conduct of the defendant was "unconscionable" as a matter of law. *Philo Smith*, 554 F.2d at 36.

A mere failure to pay the finder his claimed fees does not meet the rigorous standard of unconscionability required to sustain a promissory estoppel claim in the absence of a writing sufficient to satisfy section 5-701(a)(10). *Belotz*, 1999 WL 587916, at *5 (Courts have "consistently held that 'lost fees . . . constitute insufficient injury to invoke the doctrine [of promissory estoppel as a bar to assertion of a Statute of Frauds defense].'") (quoting *Ellis v. Provident Life & Accident Ins. Co.*, 3 F. Supp. 2d 399, 410 (S.D.N.Y. 1998)) (alterations and ellipse in original). Indeed, the Second Circuit has noted that "it is difficult to imagine a case in which the mere failure to seek an uncertain prospective benefit could ever generate a sufficient level of unconscionability to warrant the application of the doctrine." *Philo Smith*, 554 F.2d at 36. This effectively forecloses claims for promissory estoppel where, like here, N.Y. Gen. Oblig. Law § 5-701(a)(10) has barred the plaintiff's contract claim.

Direct has not met the rigorous standard required to state a claim for promissory estoppel. Indeed, it does not cite to a single allegation in the Complaint that demonstrates it suffered a substantial injury separate and apart from the loss of its fees or that Cerberus engaged in conduct deemed unconscionable as a matter of law. That failure dooms Plaintiff's claim.

This Court's decision *Beautiful Jewellers Private Ltd. v. Tiffany & Co.*, No. 06 Civ. 3085(KMW), 2007 WL 867202 (S.D.N.Y. March 21, 2007) (cited in Direct Br. at 59), is not to the contrary. That case involved application of N.Y. Gen. Oblig. Law § 5-701(a)(1), not N.Y. Gen. Oblig. Law § 5-701(a)(10). *Id.* at *3. As a result, the Court was able to conclude that partial performance removed the case from the statute of frauds, including the plaintiff's claims for promissory estoppel. *Id.* at *3-4. In contrast, for the reasons discussed above, the part performance doctrine cannot be invoked in this case. *Belotz*, 213 F.3d at 625; *AG Ltd.*, 448 F. Supp. 2d at 588 n.2. Consequently, in order to keep the statute of frauds from barring its promissory estoppel claim, Direct was required plead both substantial injury and

unconscionability.  *See Beautiful Jewellers*, 2007 WL 867202, at *7.  Its failure to do so demands dismissal.

Moreover, because section 5-701(a)(10) applies to bar the alleged finder's contract here, Direct "cannot circumvent the statute of frauds by merely recharacterizing [it]s contractual claim as one for recovery in quantum meruit."  *deCiutiis v. NYNEX Corp.*, No. 95 Civ. 9745 (PKL), 1996 WL 512150, at *3 (S.D.N.Y. Sept. 9, 1996); *Merex*, 810 F. Supp. 1368 (holding that in finder's cases the statute of frauds "cannot be avoided by an action for compensation in quantum meruit") (quotations omitted); *Minichiello v. Royal Business Funds Corp.*, 18 N.Y.2d 521, 527 (1966) ("The nature of the services rendered by business brokers and finders is such that a demand for payment is not usually made until they have completed their services.  Thus, to allow recovery for the reasonable value of these services is to substantially defeat the writing requirement."); (*see also* Mov. Br. at 27-29).

Plaintiff's reliance on *Morris Cohon & Co. v. Russell*, 23 N.Y.2d 569, 245 N.E.2d 712, 297 N.Y.S.2d 947 (1969), and its progeny is misplaced.  (Direct Br. at 60-61).  Those cases provide an extremely narrow exception for quantum meruit/unjust enrichment claims by finders where there exists a writing signed by the defendant that contains all of the material terms of a contractual relationship between the finder and the defendant *except* the rate of compensation. *See, e.g., Newman v. Crazy Eddie, Inc.*, 119 A.D.2d 738, 738-39, 501 N.Y.S.2d 398, 398 (2d Dep't 1986); *Koch v. Mutiplan, Inc.*, No. 99 Civ. 11277 (CM) (LMS), 2001 WL 210004, *5 (S.D.N.Y. Feb. 16, 2001).  Keeping this exception within narrow bounds is necessary to prevent the "risk that juries will erroneously award a plaintiff compensation based upon an unfounded claim or perjurious testimony[,]" which is the "very risk against which the Statute of Frauds was designed to guard."  *Springwell Corp. v. Falcon Drilling Co., Inc.*, 16 F. Supp. 2d 300, 315 (S.D.N.Y. 1998) (citing *Morris Cohon*, 23 N.Y.2d at 574, 245 N.E.2d at 715, 297 N.Y.S.2d at 952).

Plaintiff has not identified a writing that even comes close to meeting the stringent requirements of *Morris Cohon*.  The only signed document of significance to which it

has pointed is the April 15, 2003 letter of introduction, which does not identify *any* terms of the alleged business relationship between Plaintiff and Cerberus. None of the other documents relied upon by Plaintiff is signed, and in any event they are so inconsistent and contradictory of one another that numerous material terms besides just the rate of compensation cannot be ascertained. (*See* Mov. Br. at 5-8 (discussing differences between January and February 2003 Drafts with respect to such material terms as the definitions of "Exclusive Investment" and "Proposed Investment," Direct's ability to provide Proposed Investments rejected by Cerberus to third parties, dispute resolution procedures and the circumstances under which Direct forfeits its fee as a result of Cerberus's being forced to hire another consultant to consummate the investment). *Morris Cohon* provides no support for Plaintiff.

The statute of frauds bars Plaintiff's claims for promissory estoppel, unjust enrichment and quantum meruit, and those claims must be dismissed.

## II.    NO CONTRACT WAS EVER FORMED BETWEEN THE PARTIES.

In their moving brief, Defendants established that, irrespective of the applicability of the statute of frauds, the documents attached to Plaintiff's Complaint established beyond dispute that no contract was ever formed between the parties as a matter of law. (Mov. Br. at 12-18). The reason is that under New York law, if parties do not intend to be bound by an agreement until it is put in writing and signed, then there is no contract unless and until that event occurs -- even if the parties orally agreed on all of the alleged terms. *Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 97 (2d Cir. 1994); *R.G. Group, Inc. v. The Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir. 1984); *Scheck v. Francis*, 26 N.Y.2d 466, 469-70, 260 N.E.2d 493, 494, 311 N.Y.S.2d 841, 843 (1970). Cerberus expressed precisely such an intention not to be bound in Mr. Teitelbaum's December 26th E-mail, which made numerous references to the need for a written contract and stated in terms as clear as day that "this brief email only captures certain of the more important commercial terms that we discussed but is not a legal obligation for Cerberus or you." (Complaint, Ex. A). Moreover, the circumstances surrounding the parties' negotiations

strongly corroborate Cerberus's expressed intention not to be bound until both sides signed a comprehensive written agreement. The commercial terms described in the e-mail itself were highly conceptual, with numerous material aspects of the relationship remaining to be negotiated and drafted. And, the complexity of the terms was such that one would expect the agreement to be set forth in a formal written contract signed by both parties. Since Plaintiff concedes that the parties never signed a written agreement, no binding contract was ever formed.

Despite devoting more than twenty pages of the argument section of its brief to this issue (Direct Br. at 24-45), Plaintiff has put forth nothing that undermines the above analysis. However, a few specific points raised by Plaintiff warrant a response.

*First*, Direct's attempt to dismiss the plain language of the December 26th E-mail evincing Cerberus's intent not to be bound absent a signed, written contract defies credulity as well as the applicable case law. Its assertion that the "not a legal obligation" language referred merely to the "Consulting Agreement that was to be delivered by Cerberus's lawyers" is refuted by the e-mail's plain wording. (Direct Br. at 36). What Teitelbaum actually wrote was that "[t]here is a approx. 10 page contract that will reflect these terms which needs to be modified" and that "*this brief email* only captures certain of the more important commercial terms that we discussed *but is not a legal obligation for Cerberus or you*." (Complaint, Ex. A). There is no ambiguity in either sentence. Indeed, the *only* way to read the second sentence is as communicating that the e-mail was not a binding obligation for either party. Plaintiff only gets to its contrary reading by misquoting the sentence. (Direct Br. at 36 (incorrectly quoting the December 26th E-mail as saying that "this is not a legal obligation for Cerberus or you").

Moreover, the case law in this Circuit demonstrates that the two above-quoted sentences were more than adequate to convey Cerberus's intent not to be bound until both parties signed a mutually-satisfactory written contract. *Compare Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262 (2d Cir. 1984); *Longo*, 25 F.3d at 97 (letter asking to "please sign [contracts] and then pass them on to [company management]" deemed sufficient for explicit statement not to be bound); *Greystone P'ships Group, Inc. v. Kominkluke Luchtvaart Maatschappij*, 815 F. Supp.

-15-

745, 748 (S.D.N.Y. 1993) ("We are ready to proceed on this matter but we need a signed agreement."); *Scheck*, 26 N.Y.2d at 469, 260 N.E.2d at 494, 311 N.Y.S.2d at 843 (letter requesting that plaintiff "[p]lease sign all copies, have [the defendant] sign all copies and distribute the copies" sufficient for explicit statement not to be bound).

  *Longo* is a typical example of the "explicit statement" required.  In *Longo*, an employee sued her employer to recover severance pay allegedly due to her pursuant to the terms of an unsigned employment contract.  *Id.* at 96.  The plaintiff negotiated and exchanged several draft contracts, but none were executed.  *Id.*  After commencing her employment, the defendant company sent the plaintiff a letter along with two unsigned copies of an employment contract. *Id.*  The letter stated as follows: "Enclosed are two execution copies of your employment agreement.  These reflect the changes we discussed by phone.  If the enclosed are satisfactory, please sign them both and then pass them on to [the company's Chief Executive Officer]."  *Id.* The plaintiff signed them and forwarded them along as instructed, but the Chief Executive Officer refused to sign.  After being terminated from her employment, the plaintiff sued to recover for the remaining term of the unsigned contract.  *Id.*  However, based on the employer's cover letter, however ministerial it may have seemed, and despite the conduct of the parties, Chief Judge Newman had little difficulty concluding that it "evidence[d] the intention of the parties not to be bound until the agreements were signed[.]"  *Id.* at 97 (quoting *Scheck*, 26 N.Y.2d at 494, 260 N.E.2d at 495, 311 N.Y.S.2d at 843) (some alternations in original). Therefore, no contract was found to exist.

  The central message of *Longo*, as well as *Reprosystem*, *Greystone P'ships* and the numerous cases they cite, is apparent -- no "magic words" or complicated, legalistic phraseology is required to convey an objective intent not to be bound.  Quite the contrary, a simple indication that a signed writing is expected and forthcoming is sufficient -- particularly in light of the "realities of the complex transaction at issue" and the "practical business need to record all the parties' commitments in definitive documents."  *Reprosystem*, 727 F.2d at 262; *see also Winston v. Mediafare Entm't Corp.*, 777 F.2d 78 (2d Cir. 1986) (indicating that a complex or lucrative

transaction is one usually put to writing). Under this standard, there is no doubt that Cerberus adequately communicated its intent not to be bound.

Second, Direct's reliance on *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491 (S.D.N.Y. 1987), and *I.R.V. Merch. Corp. v. Jay Ward Productions, Inc.*, 856 F. Supp. 168 (S.D.N.Y. 1994), is totally misplaced. (Direct Br. at 27-28, 37-38). Conceding that there is no Type II agreement under *Teachers Ins.* here (*i.e.*, a preliminary commitment giving rise to a mutual obligation to continue negotiations in good faith), Plaintiff nevertheless attempts to force the facts into Judge Leval's Type I category by calling the December 26th E-mail a "binding agreement which was not signed and left open terms." (*Id.* at 29). The argument does not work. As Judge Leval noted in *Teachers Ins.*, a *sine qua non* of a Type I agreement is that the parties "have *reached complete agreement (including the agreement to be bound) on all* the issues perceived to require negotiation." 670 F. Supp. at 498 (emphasis added). Indeed, the letter determined to constitute such an agreement in *Teachers Ins.* expressly stated that upon countersignature (which occurred) it was to "become a binding agreement" between the parties. *Id.* at 494. But the December 26th E-mail says exactly the opposite. Far from an agreement by both sides to be bound, the e-mail expresses in unmistakable terms *that neither party is bound*. Thus, Plaintiff's argument to the contrary notwithstanding, the December 26th E-mail cannot be a Type I agreement under *Teachers Ins.* Stated simply, *Teachers Ins.* has nothing to do with this case. If anything, it actually supports Cerberus's position, since Judge Leval followed the well-established principle that it "is fundamental to contract law that mere participation in negotiations and discussions does not create binding obligation, even if agreement is reached on all disputed terms," where one of the parties has an "understanding that neither side would be bound until final agreement was reached." *Id.*. at 497.

*I.R.V.* is no more supportive of Plaintiff's position. Similar to the agreement in *Teachers Ins.*, the Memorandum at issue in *I.R.V.* expressly stated that the parties' agreement was effective as of the date of the Memorandum. 856 F. Supp. at 173. The Court inferred quite reasonably from this statement that the parties intended to be bound to the deal from the date of

the Memorandum. *Id.* That is not the case here. Cerberus expressly informed Direct in the December 26th E-mail that there was no binding obligation on either party. (Complaint, Ex. A). Moreover, and also unlike the facts here, the Court in *I.R.V.* concluded that the type of agreement at issue in that case was simple enough that it would not have been expected to be memorialized in a formal, written contract, which rendered moot the fact that the Memorandum did not resolve all material issues between the parties. 856 F. Supp. at 173-74. By contrast, the size and complexity of the arrangement that Direct and Cerberus were discussing would ordinarily have been set forth in a formal document. *See R.G. Group*, 751 F.2d at 77 (holding that it was "most telling" that the parties contemplated an initial investment of approximately $2 million and that plaintiffs alleged damages of at least $80 million; "[w]ith that amount of money at stake, a requirement that the agreement be in writing and signed simply cannot be a surprise to anyone"); *Reprosystem, B.V.*, 727 F.2d at 262-63 (contract for $4 million sale of six companies was of the type that would normally be in writing). The December 26th E-mail's failure to resolve all material issues between Plaintiff and Cerberus is critical, and corroborates the conclusion that no contract was ever formed.

   *Third*, the documents attached to Plaintiff's Complaint clearly demonstrate that the parties still needed to engage in extensive negotiations before a final contract could be signed. To no avail, Plaintiff spills a great deal of ink trying to minimize the differences between Cerberus's January 2003 Draft Consulting Agreement, and the February 2003 Draft with which it countered. Although Plaintiff keeps harping that the "key commercial terms" supposedly never changed and that its alterations to the January 2003 Draft were merely attempts to conform the written document to those terms (*E.g.*, Direct Br. at 13-14), the reality is that ***both*** drafts were consistent with the conceptual terms discussed in the December 26th E-mail. As is often the case with complex contracts, it took the concrete nature of the drafting process to reveal that the parties actually had quite different understandings of the terms they had discussed. *See R.G. Group, Inc.*, 751 F.2d at 75 ("The actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution.

Details that are unnoticed or passed by in oral discussion will be pinned down when the understanding is reduced to writing. These considerations are not minor; indeed, above a certain level of investment and complexity, requiring written contracts may be the norm in the business world, rather than the exception."). That is precisely why Courts enforce statements of intention by parties -- like the one by Cerberus here -- not to be bound until a written contract is signed. Otherwise, the risk is too great that a party will be bound to an "agreement" into which it never intended to enter.

Two other points bear mention in this regard. The first is that the Complaint does not allege that Direct ever signed either draft of the Consulting Agreement. If Direct really believed the parties had reached a definitive agreement, one would have expected Direct to sign the draft of the agreement that it proffered to Cerberus. The only inference that can be drawn from Direct's failure to do so is that it too believed that negotiations had not been completed.

In addition, the Court should reject Plaintiff's attempt to gloss over material differences between the draft contracts on the grounds that the issues reflected by those differences would not have been relevant to the dAF investment (*i.e.*, the investment on which Direct claims it has a right to be paid). (*See* Direct Br. at 13 (explaining that the differences in calculation of the 1% fee were supposedly irrelevant because "the dAF transaction was not financed in such a manner")). The issue before the Court is whether Cerberus and Direct reached agreement on the terms of an enforceable contract to govern their business relationship. The fact that the two drafts circulated between them contained cavernous gaps on material financial and non-financial terms generates a strong inference that no such agreement was ever reached, particularly in light of Cerberus's expressed intention not to be bound until a definitive written agreement was signed by both parties. Plaintiff cannot come after the fact and claim those disagreements were irrelevant simply because, as things ultimately turned out, they would not have mattered to the investment on which he now seeks compensation. Such bootstrapping has no place here.

*Finally*, Plaintiff's allegations of part performance by the parties are simply too ambiguous to overcome the force of Cerberus's expressed intent not to be bound and the parties' evident failure to reach agreement on the terms of a written contract. Setting up some meetings, sending some letters and obtaining reimbursement of expenses is just not enough to warrant the conclusion that a binding contract was in place that purportedly entitled Direct to hundreds of millions of dollars in compensation from a single transaction. The alleged acts of partial performance do not confirm the terms of the agreement alleged by Plaintiff. If Plaintiff had actually closed a deal and obtained payment from Cerberus in accordance with what it claims the terms of the alleged contract were, it might have had a claim. But allowing this case to proceed on the basis of nothing more than the meager allegations of part performance presented by Plaintiff threatens the very freedom and flexibility in structuring one's private commercial arrangements that the courts have sought to protect by enforcing a party's right not to be bound to an agreement until a mutually-satisfactory contract document has been executed by both parties. *See R.G. Group, Inc.*, 751 F.2d at 74 ("The point of these rules is to give parties the power to contract as they please, so that they may, if they like, bind themselves orally or by informal letters, or that they may maintain 'complete immunity from all obligation' until a written agreement is executed.") (quoting 1 A. Corbin, CORBIN ON CONTRACTS § 30, at 98 (1963)). Plaintiff and Cerberus never formed a binding contract.

## III.    DIRECT HAS FAILED TO STATE A CLAIM FOR FRAUD.

Nothing in Plaintiff's opposition brief salvages its facially-deficient fraud claim. Because Plaintiff has failed to plead fraud independent of its claim for breach of contract, and has also failed to allege the essential element of reasonable reliance, the Complaint's Third Cause of Action must be dismissed.

Plaintiff concedes that the only "fraud" supposedly committed by Cerberus consisted of its making allegedly false statements to justify getting out of the contract Plaintiff claims had been formed between the parties. (Direct Br. at 65 (arguing that "the Complaint

asserts that after Cerberus believed it contracted with Direct, it wanted to invent a reason not to pay Direct, coming-up [*sic*] with the plan to avoid Direct and later claim dAF was derived from another source.")).  But that alleged conduct does not constitute fraud under New York law -- even if proven, it would amount merely to a breach of contract.  *E.g., Rosenblatt v. Christie, Manson & Woods Ltd.*, No. Civ. 4205(PKC), 2005 WL 2649027, at *10 (S.D.N.Y. Oct. 14, 2005) ("Under New York law, [i]t is well settled that a cause of action for fraud will not arise when the only fraud charged relates to a breach of contract.") (alteration in original) (quotations omitted), *aff'd*, 195 Fed. Appx. 11 (2d Cir. 2006); *Cal Distrib. Inc. v. Cadbury Schweppes Am. Beverages, Inc.*, No. 06 Civ. 0496 RMB JCF, 2007 WL 54534, at *8 (S.D.N.Y. Jan. 5, 2007).

At bottom, Plaintiff alleges nothing more than that Cerberus refused to pay Direct under the parties' alleged contract.  Its contention that Cerberus supposedly gave fanciful reasons for why it was refusing to pay does not alter the substance of that claim, since both the duty that Cerberus supposedly violated (its purported obligation to pay Direct a finder's fee) and the injury that allegedly flowed to Direct derive from the contract.  *Cal Distrib.*, 2007 WL 54534, at *8 (viable fraud claim requires plaintiff to demonstrate the existence of a legal duty "separate from the duty to perform under the contract" and "special damages that are caused by the misrepresentation *and unrecoverable as contract damages*") (emphasis added); *Rosenblatt*, 2005 WL 2649027, at *11 (no fraud claim where the plaintiff merely seeks recovery of the contractual benefit of the bargain).  As Plaintiff candidly observes, far from being separate and independent from its breach of contract claim, its fraud claim is entirely dependent on the success of its allegation that a contract existed between the parties.  (Direct Br. at 65 (conceding that "to sustain Direct's fraud count, a contract has to be assumed")).  That is the very antithesis of a viable fraud claim under New York law.

Although it is undoubtedly the case that "a contracting party may be liable for fraud when at the time it made a promise, it did not intend to keep the promise" (*id*. at 64 (citing *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403 (1958)), Plaintiff's own allegations disclaim reliance on this rule of law.  Not only does Plaintiff fail to allege that

Cerberus lacked the intent to honor its alleged contractual promises to Plaintiff at the time it supposedly made them, but it contends exactly the opposite.  According to Plaintiff, Cerberus did not develop the intent to "defraud" Direct until after the parties had begun performing under the alleged contract.  (Complaint, ¶¶ 103 ("*Cerberus did not enter into its contract and agreement intending to defraud Direct*, but after learning the value of IRU, and having gained the trust of IRU through its involvement in negotiating Project Phoenix, Cerberus decided that it did not need Mr. Koidl to negotiate dAF, and did not want to pay Direct if it closed a deal for dAF."); Direct Br. at 63 ("*Direct does not allege that Cerberus set out to defraud Direct from the beginning of the parties' relationship*; instead, after Cerberus learned the value of potential IRU transactions, Cerberus sought to marginalize Direct so that it could later claim Direct had nothing to do with dAF.") (citing Complaint, ¶¶ 102-104, 107) (emphasis added)).  Plaintiff has simply not made the necessary allegations to support a valid fraud claim.

In addition, although Defendants clearly argued in their opening brief that Plaintiff's own allegations establish beyond cavil that it did not rely on their alleged misrepresentations (Mov. Br. at 30-31), Plaintiff's opposition brief tellingly does not even address the point.  Plaintiff does not -- because it cannot -- deny that it always believed that Defendants' purported representations were false from the moment they were supposedly uttered.  As a matter of law and logic, a party cannot rely on the truth of a statement it believes to have been false when made.  *See Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91, 99 (2d Cir. 1997).  Thus, even assuming that Plaintiff pled fraud independent of its breach of contract claim, the fraud count is still deficient as a matter of law.[3]

---

[3] In its moving brief, Cerberus also argued that Direct's claim was not pled with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure.  In response, Direct merely asserts, without analysis, that "the Complaint is replete with specific statements and dates, assigning the statements and conduct to particular persons."  (Direct Br. at 66.).  That is not an adequate response, and the fraud claim should also be dismissed for failure to comply with Rule 9(b).

## CONCLUSION

For the foregoing reasons and those set forth in their moving brief, Defendants respectfully request that the Court grant their motion and dismiss the Complaint in its entirety with prejudice.

Respectfully submitted,

**LOWENSTEIN SANDLER PC**

By:   s/ Lawrence M. Rolnick
      Lawrence M. Rolnick (LR-0546)
      Thomas E. Redburn, Jr. (TR-3902)

Dated:  December 4, 2007

1251 Avenue of the Americas
18th Floor
New York, New York 10020
Tel: 212.262.6700
Fax: 212.262.7402
- and -
65 Livingston Avenue
Roseland, New Jersey  07068
Tel: 973.597.2500
Fax: 973.597.2400
*Attorneys for Defendants Cerberus Global Investments, LLC, Cerberus Capital Management, L.P., Cerberus Partners, L.P. and Cerberus Global Investment Advisors, LLC*