UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------x
DIRECT INVESTMENT PARTNERS AG,

                            Plaintiff,          07 Civ. 3310 (LLS)

          v.                                    OPINION and ORDER

CERBERUS GLOBAL INVESTMENTS, LLC,
CERBERUS CAPITAL MANAGEMENT, L.P.,
CERBERUS PARTNERS, L.P., and CERBERUS
GLOBAL INVESTMENT ADVISORS, LLC,

                            Defendants.
--------------------------------------x

     Plaintiff Direct Investment Partners AG ("Direct")
brings this action alleging breach of contract, breach of
the implied covenant of good faith and fair dealing, and
fraud.  It also seeks recovery under alternative theories
of promissory and equitable estoppel, unjust enrichment,
and quantum meruit.

     Defendants move to dismiss the complaint pursuant to
Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon
which relief can be granted.


                         BACKGROUND

     The following allegations are taken from the complaint
and are accepted as true on this motion to dismiss.  See
Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir.
1993).

Direct is a Swiss advisory firm that provides consulting services and advice about mergers and acquisitions. It specializes in identifying investment opportunities in Germany, Switzerland, and Austria. Roman Koidl is its Chief Executive Officer.

The Cerberus companies ("Cerberus") are a group of funds specializing in corporate restructuring. Frank Bruno is the President and Managing Director of Cerberus Global Investments, LLC.

In 2002, Cerberus wanted to enter the German market for investments in distressed companies needing restructuring and loans. Cerberus's European advisor arranged a meeting between Koidl and Bruno for December 13, 2002. During that meeting, Bruno told Koidl that Cerberus wanted Direct to identify investment opportunities and they discussed the compensation package Cerberus typically offered consultants and advisors such as Direct. Koidl agreed to work with Cerberus and Bruno told him to report to David Teitelbaum, a Cerberus Managing Director. Koidl and Teitelbaum met, and Teitelbaum agreed to define the terms expressed by Bruno to reflect a fee-based relationship for Direct's services and activities identifying investment opportunities for Cerberus. Less than a week later, Teitelbaum contacted Koidl to confirm

the arrangement, and on December 26, 2002, Teitelbaum sent

an email (Cmplt., Ex. A) to Koidl, with a copy to Bruno,

stating:

> Per our conversation, following, please find
> certain of the key commercial terms of our
> working relationship:
> 1) A retainer of US$12,000 month [sic] starting
> in the month when we close our first deal
> together, where the cumulative invested amount
> must exceed 30,000,000 euros. So, if we were to
> close a first deal in month 4 you would receive a
> retainer of $12,000 a month, related to months 4
> through 18 inclusive.
> 2) You received [sic] 1% of the Cerberus net
> invested amount of exclusive deals you source
> exclusively
> 3) 20% of all profits above a US$20% unlevered
> IRR [Internal Rate of Return] of exclusive deals
> you source exclusively
> 4) Expense reimbursement for direct out of pocket
> expenses related to Cerberus targeted investments
> (such expenses include travel, phone, fax but not
> office rental type expense) up to a maximum of
> US$12,000 per month. Cerberus will need complete
> receipts and it should be expected that it will
> take literally months for your [sic] to receive
> reimbursement.
> 5) If a deal is not an exclusive, all fee amounts
> are to be discounted by 40%., except for the
> retainer amount in (1) above. An exclusive is a
> deal where at the point that we submit any bid
> price (indication through final) there are no
> other third parties submitting bid prices. So,
> if it were a two step process where (Phase 1) we
> compete on qualitative criteria (commitment to
> the market, restructuring expertise, etc) and
> then (Phase 2) we are selected to negotiate one-
> on-one with the seller on price that would
> entitle you to the full fee. So, only if there
> are no others competing on price throughout the
> process would be [sic] pay you the full fee
> amount. I am not sure how the lawyers will write
> this up and this may take a bit of work as we
> otherwise pay people for true exclusives only.

> 6) We have some mechanism for something to become a Roman Koidl deal – like a reply email from either me or Frank Bruno. Let's see what the lawyers come up on this but your request is reasonable.
> 7) You work with Cerberus exclusively on "targeted investments" which will be defined in the contract.
>
>            . . . .
>
> There is a approx. 10 page contract that will reflect these terms which needs to be modified. Therefore, this brief email only captures certain of the more important commercial terms that we discussed but is not a legal obligation for Cerberus or you.

After receiving the e-mail, Koidl and Teitelbaum had a telephone conference during which Teitelbaum stated, "Don't worry Roman, we always pay our consultants." Cmplt. ¶ 29. Teitelbaum sent Koidl another e-mail on December 30, 2002 stating "my prior email did reflect how we intend to work with you and that email was also consistent with our conversation." Id. at ¶ 31.

On January 1, 2003 Direct began to investigate and present investment opportunities to Cerberus.

On January 25, 2003, Cerberus sent Direct a Consulting Agreement (Cmplt., Ex. B), which it referred to as a "standard" agreement (the "January Consulting Agreement"). On February 10, 2003, Koidl returned to Cerberus a copy with his proposed revisions (the "February Consulting Agreement") (Cmplt., Ex. C). Direct asserts that this

document accepted the "key commercial terms" of the relationship, as to which there was no disagreement, that the proposed revisions were minor, and that "Mr. Teitelbaum represented that the terms of the February 10, 2003 Consulting Agreement were accepted, and also promised he would secure the signature of Cerberus to the February 10, 2003 Consulting Agreement." Cmplt. ¶¶ 42-46.

"On or about March 6, 2003, Cerberus wrote to Direct to advise that Mr. Koidl should deal directly with Mr. Teitelbaum. In the correspondence, Cerberus acknowledged that it had 'contracted' with Direct." Cmplt. ¶ 53. On March 12, 2003, Bruno wrote to Direct confirming Cerberus's interest in working with Direct on five specific exclusive transactions.

In early 2003, Dresdner Bank established an Institutional Restructuring Unit ("IRU") to sell distressed, non-performing, sub-performing, and other non-strategic investments. IRU's assets included debis AirFinance, B.V. ("dAF") and a portfolio of German non-and sub-performing loans known as Project Phoenix.

At the request of Cerberus, Koidl initiated telephone calls to facilitate meetings between Cerberus and IRU. He also helped Cerberus prepare a letter of introduction, dated April 15, 2003, to IRU, which served "as written

confirmation and acknowledgement of the contract between the parties and that IRU and its portfolio of investments was introduced to Cerberus by Direct." Cmplt. ¶ 76. With Koidl's participation, Cerberus made bids to acquire Project Phoenix from IRU and competed through the final round of bidding, but it was awarded to another investor in March 2004.

Cerberus then turned its focus to acquiring dAF, which it had learned about at a meeting set up by Direct. Cerberus did not include Direct in important negotiations with IRU, and "Direct was not even made aware of all the dAF discussions, despite previous statements by Mr. Teitelbaum that Mr. Koidl was an integral player in assisting Cerberus with IRU." Cmplt. ¶ 106. Koidl informed David Knower (head of Cerberus's German operations) of his concern that Direct was being ignored by Cerberus, and Knower responded that because of the Project Phoenix dealings, Cerberus was already known to IRU and Direct's further involvement was no longer necessary.

On January 30, 2004, Koidl met with Bruno in Frankfurt and reminded him of the key commercial terms. "Mr. Bruno acknowledged the parties' agreement and Direct and Mr. Koidl's involvement in: (i) arranging the introduction to IRU; (ii) the investment opportunities presented as a

result of this introduction; and (iii) the efforts of
Direct in making the exclusive IRU introduction and
facilitating meetings and negotiations, among other
services furnished by Direct to Cerberus." Cmplt. ¶ 110.
Bruno stated:  "Roman, we do not have amnesia.  We know
about your involvement, and you will get paid if we get
something closed at IRU." Id.  After that meeting,
Cerberus no longer involved Direct in its negotiations with
IRU, and completed a $1.37 billion acquisition of dAF.

Direct has demanded payment for its consulting and
advisory services, which Cerberus has not paid.


DISCUSSION

Under Fed. R. Civ. P. 12(b)(6), on a motion to dismiss
a complaint for failure to state a claim upon which relief
may be granted, a court must accept the factual allegations
of the complaint as true, and draw all inferences in favor
of the plaintiff. Mills v. Polar Molecular Corp., 12 F.3d
1170, 1174 (2d Cir. 1993).  The court may consider exhibits
annexed to the complaint or incorporated in it by
reference. Brass v. American Film Technologies, Inc., 987
F.2d 142, 150 (2d Cir. 1993).  "In order to withstand a
motion to dismiss, a complaint must plead enough facts to

state a claim for relief that is plausible on its face."
Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007).

Defendants argue that the Court should dismiss the complaint because Cerberus did not demonstrate an intent to be bound, and therefore the parties never formed an enforceable contract. Further, it argues that any such agreement is void and unenforceable under the Statute of Frauds.

The parties agree that the terms of any agreement between them are governed by New York law.

## I.  Breach of Contract

### A. Existence of a Contract and Intent to be Bound

Cerberus argues that it did not manifest an intent to enter into a binding agreement with Direct and therefore there was no contract between the parties.

> Under New York law, if parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs. This rule holds even if the parties have orally agreed upon all the terms of the proposed contract. On the other hand, where there is no understanding that an agreement should not be binding until reduced to writing and formally executed, and "where all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement," then an informal agreement can be binding even though the parties contemplate memorializing their contract in a formal document. The point of these rules is to give

> parties the power to contract as they please, so
> that they may, if they like, bind themselves
> orally or by informal letters, or that they may
> maintain "complete immunity from all obligation"
> until a written agreement is executed. What
> matters are the parties' expressed intentions,
> the words and deeds which constitute objective
> signs in a given set of circumstances.

R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 74 (2d

Cir. 1984) (internal citations omitted).

In Teachers Ins. & Annuity Ass'n of America v. Tribune

Co., 670 F. Supp. 491, 498 (S.D.N.Y. 1987), adopted by the

Second Circuit in Arcadian Phosphates, Inc. v. Arcadian

Corp., 884 F.2d 69, 71 (2d Cir. 1989), then-District Judge

Leval described two categories of binding preliminary

contracts:

> Preliminary contracts with binding force can
> be of at least two distinct types. One occurs
> when the parties have reached complete agreement
> (including the agreement to be bound) on all the
> issues perceived to require negotiation. Such an
> agreement is preliminary only in form - only in
> the sense that the parties desire a more
> elaborate formalization of the agreement. The
> second stage is not necessary; it is merely
> considered desirable. As the Court of Appeals
> stated with respect to such preliminary
> agreements in V'Soske v. Barwick, 404 F.2d 495,
> 499 (2d Cir.), cert. denied, 394 U.S. 921, 22 L.
> Ed. 2d 454, 89 S. Ct. 1197 (1969), "the mere fact
> that the parties contemplate memorializing their
> agreement in a formal document does not prevent
> their informal agreement from taking effect prior
> to that event . . . . Restatement (Second) of
> Contracts, § 26 (then Tert. Draft No. 1, 1964); 1
> Corbin on Contracts § 30 (1950); 1 Williston on
> Contracts § 28 (3d ed. 1957)."

The second and different sort of preliminary binding agreement is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated. Although the existence of open terms generally suggests that binding agreement has not been reached, that is not necessarily so. For the parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement. To differentiate this sort of preliminary agreement from the first, it might be referred to as a binding preliminary commitment. Its binding obligations are of a different order than those which arise out of the first type discussed above. The first type binds both sides to their ultimate contractual objective in recognition that that contract has been reached, despite the anticipation of further formalities. The second type – the binding preliminary commitment – does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate objective within the agreed framework. In the first type, a party may lawfully demand performance of the transaction even if no further steps have been taken following the making of the "preliminary" agreement. In the second type, he may not.

(footnote omitted).

Direct argues that the agreement between itself and Cerberus is the first type of preliminary binding contract.

This involves consideration of: "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all

of the terms of the alleged contract have been agreed upon;
and (4) whether the agreement at issue is the type of
contract that is usually committed to writing." Winston v.
Mediafare Entertainment Corp., 777 F.2d 78, 80-81 (2d Cir.
1985).

1.   Express Reservation Of The Right Not To Be Bound

While the December 26 email contains language that it
is not a legal obligation, one month later Cerberus sent
the January Consulting Agreement to Direct.   In that
document, there was no statement requiring signatures
before it became effective.   The complaint alleges that
Cerberus demonstrated its intention to be bound:   Cerberus
stated that it always pays consultants (¶ 29), represented
that the terms of the February Consulting Agreement were
accepted (¶ 46), agreed that it had "contracted" with
Direct (¶ 53), stated that "We know about your involvement,
and you will get paid if we get something closed at IRU" (¶
110), requested that Koidl sign a confidentiality agreement
as part of his involvement in the negotiations between
Cerberus and IRU (¶ 95), requested that Direct cap its fees
(¶¶ 114-115), reimbursed Direct for expenses incurred in
investigating and locating deals (¶ 149), and asked Direct
to set up meetings with IRU and encouraged it to perform

other actions to facilitate the deal between Cerberus and IRU (¶¶ 32-34, 59, 63, 65-67, 71-75, 79-82, 85-85, 88-89, 96, 109).

Drawing all inferences in favor of plaintiff, the complaint plausibly sets forth Cerberus's manifestations of an intent to be bound to its agreement with Direct.


2.  <u>Partial Performance</u>

Accepting the factual allegations of the complaint as true, Direct performed its obligations under the agreement, and Cerberus accepted that performance, and reimbursed Direct's expenses.


3.  <u>Terms Left Open</u>

Cerberus argues that the following issues remained unresolved after the exchange of the Consulting Agreements:

a.  Definition of Exclusive Investment

The January Consulting Agreement defines "exclusive investment" as one "where no third parties are competing with Cerberus" whereas the February Consulting Agreement defines it as "where no third parties are known by the Consultant to be competing with Cerberus."

b.  Exclusivity

The January Consulting Agreement stated that Direct would submit proposed investments exclusively to Cerberus, and not to any third parties "including where such Proposed Investment or Target have been declined by Cerberus, unless authorized in writing by Cerberus." The February Consulting Agreement changed the language to state "unless such Proposed Investment or other transaction involving the Target has been declined by Cerberus." The February Consulting Agreement also requires Cerberus to "notify the Consultant in writing within one week of receiving the presentation by the Consultant that the relevant investment opportunity was already known to Cerberus."

c.  Leverage

Both Consulting Agreements provide that Direct would be entitled to a fee equal to 1% of the amount invested by Cerberus, excluding "amounts obtained by Leverage." The Consulting Agreements contain the same definition of leverage, but the February Consulting Agreement contains the additional clarification that amounts borrowed by Cerberus from a third party are not part of leverage if the lender obtains an equity participation in the proposed investment or other share in its profits.

d.  Timing of Retainer Fee

The January Consulting Agreement requires Cerberus to

pay the retainer fee "starting from the month in which Cerberus closes the Exclusive Investment until the Termination Date." The February Consulting Agreement contains the same language but also states that Cerberus shall pay from November 1, 2003 for the duration of Project Phoenix.

e.  Incentive Allocation

Cerberus argues that the Consulting Agreements contain an inconsistency over whether the unlevered internal rate of return would be calculated on an investment-by-investment basis or across all investments as a whole.

f.  Dispute Resolution Procedure

Under the January Consulting Agreement, if the parties disputed the calculation of the incentive fee, the dispute would be submitted to an accounting firm for a conclusive and binding determination, with protection for Cerberus's confidential information. Cerberus argues that the February Consulting Agreement weakens those protections by making the accounting firm's determination contestable where there is "obvious error" and eliminating the restriction on Direct's access to the underlying data.

g.  When Cerberus Needs to Hire Another Consultant

The January Consulting Agreement provided that Cerberus would not have to pay a fee if it needed to hire

another advisor to achieve a deal.  The February Consulting Agreement narrowed the types of advisors whose hiring would trigger this provision and also required Cerberus to notify Direct of the "perceived default."


                              x x x


    All those are minor matters whose resolution would facilitate administration of the core agreement but which, in the context of the larger, complex agreement, and considering Cerberus's affirmations that it was bound, do not preclude the existence of a binding agreement.


4.  <u>Type of Contract</u>

    In view of the large amounts at stake, the parties' agreement was the type that ordinarily would be committed to a formal written contract.  Here, two versions of the agreement were reduced to writing, yet both were apparently left unsigned.

    Drawing all inferences in favor of plaintiff, Direct nevertheless plausibly states a claim for breach of contract.  The complaint alleges that Cerberus manifested its intent to be bound, the parties exchanged writings in which they agreed on the fundamental terms of their

agreement, Direct performed in accordance with their agreement, and Cerberus accepted that performance.

   B. Statute of Frauds

   New York's General Obligations Law § 5-701(a)(10), which applies to this contract, provides that such an agreement "is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent."

   An exchange of writings can satisfy the Statute of Frauds if the writings contain the material terms of the agreement, and "at least one writing, the one establishing a contractual relationship between the parties, must bear the signature of the party to be charged, while the unsigned document must on its face refer to the same transaction as that set forth in the one that was signed." Crabtree v. Elizabeth Arden Sales Corp., 305 N.Y. 48, 55, 110 N.E.2d 551, 553 (1953).

   Direct refers to four documents in its argument that the contract satisfies the Statute of Frauds: Cerberus's December 26, 2002 email, the January Consulting Agreement sent by Cerberus to Direct, the February Consulting Agreement response by Direct, and the April 15, 2003 letter from Cerberus to IRU.

-16-

The parties have not provided the April 15, 2003 letter to the Court, but the complaint describes it in detail:

> 75.  The next day, Cerberus directed a letter of introduction to IRU.  Drafts of the letter were furnished to Mr. Koidl for comment and correction.  Mr. Koidl assisted in drafting the letter, exchanging comments with Mr. Teitelbaum.
>
> 76.  One important change in the first draft of the April 15, 2003 letter from Cerberus was Mr. Koidl's insistence that the letter confirm that Direct introduced Cerberus to IRU.  Messrs. Koidl, Bruno, and Teitelbaum specifically discussed the letter would serve as written confirmation and acknowledgement of the contract between the parties and that IRU and its portfolio of investments was introduced to Cerberus by Direct.  This change was important to Mr. Koidl, and Cerberus consented to these changes to the letter to reflect this confirmation.  Mr. Bruno signed the letter.
>
> 77.  The April 15, 2003 letter acknowledged Mr. Koidl's role in introducing Cerberus to IRU, referring to Mr. Koidl as Cerberus's advisor.  Cerberus admitted in the letter that it was looking to expand in Germany, which is why it engaged Direct.
>
> 78.  Messrs. Teitelbaum and Koidl agreed that the April 15th letter was the writing that confirmed Direct introduced Cerberus to the IRU portfolio of investments and recognized and confirmed and ratified the parties' contract.  Along with e-mail exchanges, this was an additional "signature" to the Consulting Agreement.

-17-

Accepting those allegations as true, the writings, taken together, contain the material terms of the agreement and satisfy the Statute of Frauds.

## II. Breach of the Implied Covenant of Good Faith and Fair Dealing

The claim for breach of the duty of good faith and fair dealing is inherent in a claim of breach of contract. Therefore, because Direct's contract claims survive, the Court will not dismiss it.

## III. Promissory and Equitable Estoppel

Under New York law, promissory estoppel has three elements: "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and injury sustained by the party asserting the estoppel by reason of his reliance." Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co., 804 F.2d 787, 793 (2d Cir. 1986), quoting Restatement (Second) of Contracts § 90 (1981).

Direct alleges that (1) Cerberus made a promise to pay Direct a finder's fee if it closed a deal with IRU; (2) Direct reasonably and forseeably relied on that promise by "spending considerable effort and resources attempting to

-18-

identify and source deals for Cerberus, presenting to Cerberus many different investment opportunities, including IRU, and consequently dAF, and affording Cerberus exclusivity with respect to such investment opportunities" (¶ 203); and (3) by reason of that reliance, Direct lost money.

The complaint states a claim under the alternative theory of promissory estoppel, and defendants' motion to dismiss it is denied.


IV.  Unjust Enrichment and Quantum Meruit

Defendants rely on Minichiello v. Royal Business Funds Corp., 223 N.E.2d 793, 18 N.Y.2d 521, 525 (1966), cert. denied, 389 U.S 820, 19 L. Ed. 2d 72, 88 S. Ct. 41 (1967), to argue that the Statute of Frauds bars recovery under the theories of unjust enrichment and quantum meruit. Minichiello discusses NY GOL § 5-701(a)(10):

> Its purpose is to make clear that the contracts required to be evidenced by writing include a contract or agreement for the compensation of a business broker for acting as a "finder", "originator" or "introducer," or for assisting in the negotiation or consummation of the transaction, and that the requirement cannot be avoided by an action for compensation in quantum meruit.

However, the Court of Appeals limited that holding in Morris Cohon & Co. v. Russell, 245 N.E.2d 712, 713-1423 N.Y.2d 569, (1969), stating that Minichiello "is limited to situations in which there is a complete absence of any memorandum." Here, there is no such "complete absence of any memorandum." The Morris Cohon court stated:

> The Statute of Frauds was designed to guard against the peril of perjury; to prevent the enforcement of unfounded fraudulent claims. But, as Professor Williston observed: "The Statute of Frauds was not enacted to afford persons a means of evading just obligations; nor was it intended to supply a cloak of immunity to hedging litigants lacking integrity; nor was it adopted to enable defendants to interpose the Statute as a bar to a contract fairly, and admittedly, made" (4 Williston, Contracts [3d ed.], § 567A, pp. 19-20).

Here, as discussed above, there are numerous writings evidencing an agreement between the parties.

The elements of a quantum meruit claim are: (1) plaintiff rendered services to defendant; (2) defendant accepted those services; (3) plaintiff expected compensation; and (4) the reasonable value of the services." GSGSB, Inc. v. New York Yankees, 862 F. Supp. 1160, 1170 (S.D.N.Y. 1994).

Direct alleges that (1) it rendered services to Cerberus by introducing it to IRU and facilitating the deal; (2) Cerberus encouraged and accepted those services;

(3) Direct expected compensation; and (4) Cerberus owed Direct $3.7 million for its services. Therefore, defendants' motion to dismiss the unjust enrichment and quantum meruit claims is denied.

### V. Fraud

Cerberus moves to dismiss Direct's claim for fraud. As stated in Glynwill Investments, N.V. v. Prudential Securities, Inc., 1995 WL 362500, *7 (S.D.N.Y. June 16, 1995) (internal citations omitted):

> It is well-established under New York law that a cause of action for fraud does not lie where the only fraud alleged consists of the breach of a contract between the parties. In order to state a claim for fraud separate from a breach of contract, plaintiff must allege the breach of a legal duty which exists independent of the contract. Where the fraudulent conduct alleged amounts only to the defendant's false representation that it was adhering to the terms of the contract, the claim for fraud must be dismissed as redundant of the breach of contract claim.

To state a fraud claim co-existent with a breach of contract claim, "a plaintiff must either: (1) demonstrate a legal duty separate from the duty to perform under the contract; (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages."

Bridgestone/Firestone Inc. v. Recovery Credit Servs. Inc., 98 F.3d 13, 20 (2d Cir.1996).

Direct has not demonstrated a legal duty separate from the duty to perform under the contract. The complaint states (¶ 187): "Cerberus had a legal duty to Direct separate from its duty to perform under the parties' contract, and violated this duty by taking steps to avoid having to pay Direct under the contract, including refusing to sign the written Consulting Agreement and other deeds and actions." That does not identify any duty other than the duty to pay under the contract.

Nor does Direct demonstrate fraudulent misrepresentations collateral or extraneous to the contract. The complaint states (¶ 184):

> Cerberus made material misrepresentations to Direct, including that Cerberus is too large and important not to already be known to Dresdner Bank, and, therefore, to IRU; Direct had nothing to do with IRU and dAF; and other misrepresentations about the extent to which Direct introduced IRU and its investment opportunities to Cerberus sufficiently to warrant earning the fees under the "key commercial terms" proposed by Cerberus and agreed to by Direct.

Those misrepresentations describe Cerberus's attempt to avoid payment under the contract.

Direct does not seek special damages caused by the misrepresentation and unrecoverable as contract damages.

The damages it seeks on the fraud claim are the same damages it seeks on the breach of contract claim.

Cerberus's motion to dismiss the fraud claim is granted.


CONCLUSION

The motion to dismiss claims one, two, and four through seven of the complaint is denied. The motion to dismiss claim three of the complaint is granted.

So ordered.

DATED:    New York, New York
          February 7, 2008

                                    _Louis L. Stanton_
                                    LOUIS L. STANTON
                                    U.S.D.J.

-23-